

**FILED**

APR 18 2019

**THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT**

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| [UNDER SEAL], | ) | Case No. |
| | ) | |
| Plaintiff-Relator, | ) | **FILED UNDER SEAL** |
| | ) | **PURSUANT TO** |
| v. | ) | **31 U.S.C. § 3730(b)(2)** |
| | ) | |
| [UNDER SEAL], | ) | JURY TRIAL DEMANDED |
| | ) | DO NOT PLACE IN PACER |
| Defendants. | ) | DO NOT PLACE IN PRESS BOX |

**COMPLAINT FOR DAMAGES AND OTHER RELIEF
UNDER THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730)**

**1:19-cv-02628
Judge Ruben Castillo
Magistrate Judge Judge Sheila M. Finnegan**

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DISTRICT**

**FILED**

APR 18 2019

**THOMAS G. BRUTON**
**CLERK, U.S. DISTRICT COURT**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, the **STATES OF ILLINOIS and INDIANA** *ex rel.* **MERCHANT ADAMS**, an Illinois resident, ) ) ) ) ) | |
| Plaintiff-Relator, ) | Case No. |
| ) | |
| v. ) | **FILED UNDER SEAL** |
| ) | **PURSUANT TO** |
| **ALVIN L. ALL**, an Illinois resident, ) | **31 U.S.C. § 3730(b)(2)** |
| **KIMBERLY R. WILSON**, an Illinois ) | |
| resident, **KAREFIRST MANAGEMENT,** ) | JURY TRIAL DEMANDED |
| **INC.**, an Illinois corporation, **KAREFIRST** ) | DO NOT PLACE IN PACER |
| **ILLINOIS, P.C.**, an Illinois professional ) | DO NOT PLACE IN PRESS BOX |
| corporation, **KAREFIRST INDIANA,** ) | |
| **P.C.**, an Indiana professional corporation, ) | |
| **KAREFIRST IOWA, P.C.**, an Iowa ) | |
| professional corporation, **KAREFIRST** ) | |
| **MINNESOTA, P.C.**, a Minnesota ) | |
| professional corporation, **KAREFIRST** ) | |
| **TEXAS, P.C.**, a Texas professional ) | |
| corporation, and **LOMATA VENTURES,** ) | |
| an Illinois general partnership, ) | |
| ) | |
| Defendants. ) | |

**COMPLAINT FOR DAMAGES AND OTHER RELIEF**
**UNDER THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3730)**

On behalf of the United States of America, and the States of Illinois and

Indiana, Plaintiff-Relator, Merchant Adams ("Adams" or "Relator"), brings this action to

recover damages and civil penalties pursuant to the federal False Claims Act, 31 U.S.C.

§ 3728, *et seq.* ("FCA"), the Illinois False Claims Act, 740 Ill. Comp. Stat. §§ 175/1-8

("Illinois FCA"), and the Indiana Medicaid False Claims and Whistleblower Protection

Act, Ind. Code 5-11-5.7-1, *et seq.*, from Defendants Alvin L. All, a resident of the State

of Illinois ("All"), Kimberly R. Wilson, a resident of the State of Illinois ("Wilson"),

KareFirst Management Corporation, an Illinois corporation with corporate headquarters in Skokie, Illinois ("KareFirst Management"), including its subsidiaries and affiliates, including, without limitation, KareFirst Illinois, P.C., an Illinois professional corporation with corporate headquarters in Skokie, Illinois ("KareFirst Illinois"), KareFirst Indiana, P.C., an Indiana professional corporation with corporate headquarters in Skokie, Illinois ("KareFirst Indiana"), KareFirst Iowa, P.C., an Iowa professional corporation with corporate headquarters in Skokie, Illinois ("KareFirst Iowa"), KareFirst Minnesota, P.C., a Minnesota professional corporation with corporate headquarters in Skokie, Illinois ("KareFirst Minnesota"), KareFirst Texas, P.C., a Texas professional corporation with corporate headquarters in Skokie, Illinois ("KareFirst Texas"), and Lomata Ventures, an Illinois general partnership with headquarters in Skokie, Illinois ("Lomata") (collectively, "KareFirst") ("All", "Wilson" and "KareFirst", collectively the "Defendants").

## I.    **EXECUTIVE SUMMARY**

1.    Defendants have orchestrated a scheme to routinely overbill federally-sponsored healthcare programs for nursing services by charging in excess of the services actually provided—commonly referred to as "upcoding"; charging for wholly unnecessary services; and charging for services that were not provided at all. Defendants' business model is to make available KareFirst nurse practitioners to nursing facilities to provide care to resident patients initially or subsequent to their admission. This care is largely provided on an *ad hoc* basis, uncoordinated and unaffiliated with the patient's primary care provider. Defendants bill payors, including federally-sponsored healthcare programs, for the services provided by KareFirst nurse practitioners.

2.    The heart of Defendants' scheme is KareFirst's proprietary software system, known as the KareFirst Electronic Charting System ("KareFirst

Charting System"), which automatically upcodes the services actually provided by KareFirst's nurse practitioners.

3.     The KareFirst Charting System causes this automatic upcoding by, among other ways, pre-populating patient history notes, and forcing nurse practitioners to respond to irrelevant inquiries, both of which suggest more care was rendered to the patient during the encounter in question than was actually provided.  The KareFirst Charting System then generates an inflated billing code based on that sham information.

4.     Nurse practitioners are powerless to manually reduce the billing code after they have entered their notes regarding their patient encounter, even when they can see that the billing code is not at all justified by the services actually performed for the patient.

5.     It is virtually impossible for KareFirst nurse practitioners to enter any patient encounter data that does not result in an inflated bill.  Not surprisingly, the KareFirst Charting System results in egregious upcoding.

6.     In addition to the use of the KareFirst Charting System, Defendants use the corporate culture they have created to force KareFirst nurse practitioners to troll for patients in nursing facilities, ultimately providing services that are not necessary or billing for services not provided to stay in the good graces of All and Wilson.  That culture, for example, causes Defendants to bill for reviewing records that were never reviewed, and, more egregiously, for providing end-of-life counseling that is never provided.

7.     The KareFirst culture begins with its hiring practices, employing primarily nurse practitioners with little to no experience.

8.      KareFirst then forces its nurse practitioner hires to sign onerous employment agreements that include financial penalties for those who leave KareFirst's employment.

9.      KareFirst then provides its newly hired nurse practitioners with training that encourages and normalizes the practice of trolling for patients and providing services not rendered.

10.      That practice is encouraged, if not required, by KareFirst's compensation system, which requires nurse practitioners to meet onerous "production" requirements that would be extremely difficult to meet without billing for more services than are actually provided.  The failure to meet those production requirements results in financial penalties, harassment by All and Wilson, and can lead to termination.

11.      KareFirst's "compliance" department further reinforces Defendants' scheme by flagging nurse practitioners for not providing sufficient documentation, instead of reducing the code level to reflect the actual services performed. The compliance department at KareFirst is otherwise non-existent—nurse practitioners have nowhere to go to report concerns other than All or Wilson.

12.      When nurse practitioners do raise concerns, as Relator did in this case, nurse practitioners receive furious responses, including threats of termination and more (even threats of physical harm), as Relator experienced first-hand.

13.      Defendants' scheme continues to this day, causing not only financial harm to the United States, but also substantial safety risks for patients by (i) falsely documenting that patients are receiving higher levels of care while not actually receiving such care, (ii) exposing extremely fragile patients, many in the final months of

their lives, to unnecessary exams and tests, and (iii) denying patients (or loved ones) the ability to make informed end-of-life decisions.

14.     Defendants have an obligation to operate KareFirst with integrity because KareFirst provides care to the most vulnerable patient population in the United States.

15.     From this position of trust, Defendants fail to turn square corners with patients and their families, the United States, state governments, and ultimately taxpayers.

16.     This action seeks to stop Defendants' illegal conduct.

## II.     BACKGROUND

### A.     Defendants' Business Model is a Fraudulent Scheme

17.     The FCA violations alleged in this Complaint arise from Defendants' submission of false claims for nursing facilities services reimbursed by federally-sponsored healthcare programs.

18.     Defendants exploit the fact that nursing facility operators welcome KareFirst into their locations for two reasons:  (i) nursing facilities are compensated, in part, based on patient outcomes[1], and (ii) federally-sponsored healthcare programs, not the facility operators, reimburse KareFirst for its services.

---

[1]  For example, the Protecting Access to Medicare Act of 2014 established a value-based purchasing component for skilled nursing facilities ("SNFs") (a type of nursing facility Defendants commonly provide services at), including incentives for high-performing facilities and a measure for all-cause, all-condition readmissions to any hospital from the SNF within 30 days following hospital discharge designed to recognize and reward, or punish, SNF facility performance on preventing unnecessary readmissions.  Public reporting of SNF quality data, including readmission rates, commenced in October 2017.  In 2018, SNFs, like acute care hospitals, are to be subject to a penalty of up to 2% of their Medicare reimbursement for posting higher-than-average rates of hospital readmission.

19.    To create outsized financial gains, Defendants developed the KareFirst Charting System to automatically upcode patient encounters and falsely document medically unnecessary services and services not rendered by KareFirst nurse practitioners.

20.    Defendants created a corporate culture and instituted clinical practices to assure a constant stream of patient encounters are entered into the KareFirst Charting System to be fraudulently billed.

21.    Defendants created a business model with KareFirst premised on violating the FCA for each patient encounter billed to federally-sponsored healthcare programs.

**B.    Defendants' Proprietary Software Enables Fraudulent Scheme**

22.    Defendants developed the KareFirst Charting System as a proprietary, in-house software system for KareFirst nurse practitioners to document patient encounters.

23.    The KareFirst Charting System contains a custom algorithm to generate a billing code for the patient encounter, based on information nurse practitioners electronically enter, for purposes of reimbursement by federally-sponsored healthcare programs.

24.    Defendants integrated this custom algorithm into the KareFirst Charting System's workflow.

25.    Defendants designed the coding functionality so that it lacks a button or other means for KareFirst nurse practitioners to challenge or to otherwise request further review of the algorithm's coding determination.

-7-

26. In doing so, Defendants perverted the KareFirst Charting System from what should be a helpful software system into software designed to fraudulently bill federally-sponsored healthcare programs.

27. Defendants designed the KareFirst Charting System to take coding decisions out of the hands of KareFirst nurse practitioners for their most commonly used code, subsequent nursing facility care, which is billed under CPT® Codes 99307, 99308, 99309, and 99310.

28. CPT® Code 99307 is utilized for reimbursement for subsequent nursing facility care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: a problem focused interval history, a problem focused examination, and straightforward medical decision-making. Usually, the patient is stable, recovering, or improving. Typically, 10 minutes are spent at the bedside and on the patient's facility floor or unit. *See* CPT® Professional Edition at 19.

29. CPT® Code 99308 is utilized for reimbursement for subsequent nursing facility care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: an expanded problem focused interval history, an expanded problem focused examination, and medical decision-making of low complexity. Usually, the patient is responding inadequately to therapy or has developed a minor complication. Typically, 15 minutes are spent at the bedside and on the patient's facility floor or unit. *See id.*

30. CPT® Code 99309 is utilized for reimbursement for subsequent nursing facility care, per day, for the evaluation and management of a patient, which requires at least 2 of these 3 key components: a detailed interval history, a detailed

examination, and medical decision-making of moderate complexity. Usually, the patient has developed a significant complication or a significant new problem. Typically, 25 minutes are spent at the bedside and on the patient's facility floor or unit. *See id.* at 20.

31. CPT® Code 99310 is utilized for reimbursement for subsequent nursing facility care, per day, for the valuation and management of a patient, which requires at least 2 of these 3 key components: a comprehensive interval history, a comprehensive examination, and medical decision-making of high complexity. The patient may be unstable or may have developed a significant new problem requiring immediate physician attention. Typically, 35 minutes are spent at the bedside and on the patient's facility floor or unit. *See id.* at 20.

32. Defendants defaulted the KareFirst Charting System algorithm to select the highest coding levels CPT® Codes 99309 and 99310 for every patient encounter regardless of the clinical data entered by the KareFirst nurse practitioner.

33. Defendants also designed the KareFirst Charting System to create the appearance of medical necessity for these highest coding levels—CPT® Codes 99309 and 99310—when not actually present. Defendants do so by forcing KareFirst nurse practitioners through charting workflows that create unnecessary and misleading documentation. This workflow falsely creates the appearance of unstable patients receiving extensive care requiring complex medical decision-making. Put more simply, Defendants designed the KareFirst Charting System to automatically document its way to medical necessity, even when clearly not present, for CPT® Codes 99309 and 99310.

34.     Finally, the KareFirst Charting System allows nurse practitioners to bill for advance planning care (CPT® Codes 99497 and 99498) and prolonged non-face-to-face care (CPT® Codes 99358 and 99356) simply by clicking a button without regard to whether the inputted data supports such reimbursement.

35.     CPT® Code 99497 is utilized for reimbursement for advance planning care that includes the explanation and discussion of advance directives such as standard forms (with completion of such forms, when performed) by a physician or other qualified healthcare professional for the first 30 minutes of face-to-face with the patient, family member(s), and/or surrogate. *See* CPT® Professional Edition at 41. CPT® Code 99498 is utilized for reimbursement for each additional 30 minutes of advance planning care. *See id.*

36.     In practice, KareFirst encourages billing of CPT® Code 99497 for any discussion of code status with a patient or merely confirming a patient's code status.

37.     By pressing this button, the KareFirst nurse practitioner receives .55 RVUs and is closer to meeting his or her RVU target and avoiding Defendants' productivity penalties.

38.     At KareFirst, advance care planning could be as cursory as a single sentence. For example, Wilson, KareFirst's President and Chief Nursing Officer, asked a patient in Relator's presence "when the angels come and get you, do you want me to let them take you to heaven?" With that, Wilson stated to Relator that CPT® Code 99497 was eligible for reimbursement.

39.     Defendants' advance care planning practice denies patients meaningful end-of-life discussions during that specific encounter and in subsequent encounters because providers believe advance care planning has been conducted.

40.     CPT® Code 99358 is utilized for reimbursement for the first hour of non-face-to-face services (such as record review) in relation to a patient where face-to-face patient care has occurred or will occur and relates to ongoing patient management. *See* CPT® Professional Edition at 24-5. CPT® Code 99358 is utilized for reimbursement for each additional half hour of non-face-to-face services. *See id.*

41.     In practice, Defendants' clinical practice encourages use of CPT® Code 99358 for reviewing records already reviewed during the initial admission or for pretending to review additional records, and entering a highly generalized note into the KareFirst Charting System to falsely document that the service was rendered.

42.     Wilson encouraged Relator to bill CPT® Code 99358 for non-face-to-face patient care because "we all know we have to read the chart [on admission] but we really do spend a lot of time doing this."

43.     By pressing this button, the KareFirst nurse practitioner received .75 RVUs and is closer to meeting his or her RVU target and avoiding Defendants' productivity penalties.

44.     The KareFirst Charting System enables Defendants' scheme and automates and facilitates fraud on federally-sponsored healthcare programs.

**C.      Defendants Force Nurse Practitioners to Troll for Patient Encounters**

45.     Defendants use the KareFirst RVU-EU Weekly Target to enforce nurse practitioner productivity to assure a continuous stream of patient encounters entered into the KareFirst Charting System.

46.     RVU productivity is a common compensation arrangement for healthcare providers and does not suffer from an inherent legal infirmity.

47.     Defendants pervert this common RVU compensation arrangement as a means to fraudulently bill and therefore violate the FCA.

48.     Defendants' employment arrangement guaranteed an annual base salary for eight pay periods (equivalent of 4 months). In the case of Relator, his annual base salary was $110,000. *See* Exhibit A at Exhibit A, Section 1.

49.     Defendants require employees to work 5 days a week.

50.     After 4 months, Defendants required KareFirst nurse practitioners to continually maintain a minimum rolling 200 RVU-EUs per month (50 weekly RVU-EUs or 10 RVU-EUs daily) or face a significant reduction in salary. If reduced, KareFirst nurse practitioners can revert back to their original base salary by meeting the minimum rolling 200 RVU-EUs per month requirement. *See id.*

51.     In the case of Relator, Adams specifically faced a $10,000 penalty for failing to meet the minimum rolling 200 RVU-EUs per month requirement. *See id.*

52.     Defendants' minimum RVU-EU requirement for a KareFirst nurse practitioner during a business day is 10 RVU-EUs. *See id.* at Total Compensation Example Table.

53.     The RVU-EUs value assigned by Defendants for KareFirst nurse practitioners per each specific service is set forth below:

| Visiting Type | CPT Code | Routine | Public Aid | Emergency Only | FACE TO FACE *** |
| | | Final RVU Value | Final RVU Value | Final RVU Value | Prolonged 99356 Threshold |
|---|---|---|---|---|---|
| Nursing fac care subseq | 99307 | 0.3 | 0.15 | 0 | 40 |
| Nursing fac care subseq | 99308 | 0.5 | 0.2 | 0 | 45 |
| Nursing fac care subseq | 99309 | 0.66 | 0.25 | 0 | 55 |
| Nursing fac care subseq | 99310 | 1 | 0.33 | 0 | 65 |
| Discharge < 30 | 99315 | 0.5 | 0.25 | 0 | |
| Discharge > 30 | 99316 | 0.8 | 0.33 | 0 | |
| Prolonged Service Code (MUST BE FACE TO FACE) | 99356 | .65 | 0 | 0 | |
| Prolonged Service Code - Non face-to-face | 99385 | .75 | 0 | 0 | |
| Prolonged Service Code - Non face-to-face (+1 Unit) | 99359 | .35 | 0 | 0 | |
| Advncd care plan 30 Min | 99497 | .55 | 0 | 0 | |
| Advncd care plan addl 30 Min | 99498 | .5 | 0 | 0 | |

See Exhibit B.

54. The vast majority of care provided by KareFirst nurse practitioners is subsequent care in nursing facilities reimbursed under CPT® Codes 99307, 99308, 99309, and 99310.

55. The reality for KareFirst nurse practitioners attempting to complete 10 daily RVU-EUs in the nursing facility setting providing subsequent patient care is very challenging, and this is the bare minimum to avoid Defendants' financial penalty.

-13-

56.    For example, a KareFirst nurse practitioner meeting the daily minimum 10 RVU-EU requirement using a single code in a single day would be required to identify, initiate, and complete 33.34 individual encounters at CPT® Code 99307, 20 individual encounters at CPT® Code 99308, 15.15 individual encounters at CPT® Code 99309, and 10 individual encounters at CPT® Code 99310.

57.    A KareFirst nurse practitioner, such as Relator, working within a normal distribution range of CPT® Code 99307 through CPT® Code 99310 would struggle to meet Defendants' minimum 10 daily RVU-EU requirement, if initiating and documenting such patient encounters in good faith.

58.    However, the KareFirst Charting System simply defaults to CPT® Codes 99309 and 99310 as part of Defendants' fraudulent scheme.

59.    Defendants do permit KareFirst nurse practitioners the opportunity to review the CPT® code calculated by the algorithm prior to finalizing the progress note.

60.    Defendants, however, do not include a button or option to initiate a review process or flag the code determination for additional review.

61.    Even if a KareFirst nurse practitioner attempted to challenge the algorithm, Defendants' corporate culture seeks to prevent and retaliates against any KareFirst nurse practitioner who questions the KareFirst Charting System's coding algorithm.

**D.    Defendants' Corporate Culture Reinforces Its Fraudulent Scheme**

62.    KareFirst established and maintains a corporate culture that reinforces its fraudulent scheme and permits violations of the FCA to go unreported.

63.    Defendants purposefully did not implement an effective compliance program.

64.     For example, Defendants do not operate a compliance hotline for KareFirst employees (anonymous or otherwise).

65.     No written code of conduct is provided to employees or materials that expressly discuss compliance with the FCA.

66.     KareFirst employs inexperienced nurse practitioners or those with minimal acute care experience.

67.     These inexperienced nurse practitioners have less experience with, training in, and exposure to healthcare compliance compared with those with significant acute hospital experience. Defendants exploit these inexperienced nurse practitioners' lack of familiarity with good compliance practices to execute their illegal scheme.

68.     Defendants use the RVU-EU Weekly Target to financially punish nurse practitioners whose productivity fails to meet KareFirst's minimum RVU-EU benchmarks used in KareFirst's standard employment arrangement.

69.     Defendants contractually institute a very significant $10,000 penalty should a KareFirst nurse practitioner terminate his or her employment within the first year, regardless of the reason. *See* Exhibit A at Section 4.

70.     Defendants' $10,000 penalty serves as a deterrent to KareFirst nurse practitioners from raising compliance concerns or simply ending their employment to stop participating in Defendants' illegal scheme. *See id.*

71.     As KareFirst's Chief Executive Officer, All's reputation for an explosive short fuse and use of offensive and demeaning language is well-known.

72.     All personally handles serious compliance concerns when reported, as in the case of Relator.  All swiftly retaliates against any employee who raises a legitimate concern, particularly involving the KareFirst Charting System.

73.     This results in KareFirst nurse practitioners being unlikely to report compliance concerns, particularly during their first year of employment.

74.     Defendants' corporate culture also shifts blame for the KareFirst Charting System on to KareFirst nurse practitioners.

75.     KareFirst nurse practitioner employees are required to sign an attestation regarding the KareFirst Charting System ("Charting Attestation") upon joining KareFirst.

76.     The KareFirst Charting Attestation falsely suggests that the KareFirst Charting System (a) "help[s] our nurse practitioners chart accurately" and (b) "intelligently choose the appropriate CPT Code based on the data in the progress note." *See* Exhibit C at ¶ 1.

77.     The Charting Attestation requires KareFirst nurse practitioners to attest they are "responsible for determining the medical necessity for a patient encounter and to clearly document the medical necessity in your progress/evaluation note." *See id.* at ¶ 2. It reminds KareFirst nurse practitioners that "medical necessity should guide the nurse practitioner's services provided and the volume of documentation in the evaluation note." *See id.*

78.     The KareFirst Charting Attestation notes that "After a nurse practitioner charts for a patient encounter in the KareFirst Electronic Charting System, a CPT® code is generated for the encounter based on Medicare's Evaluation and

Management Guidelines." *See id.* It explains that "KareFirst used these guidelines to create a compliance algorithm that analyzes the information in the note and suggests the appropriate CPT code for the nurse practitioner to review." *See id.*

79.     Defendants claim, "The nurse practitioner can either accept and approve the suggested CPT code or return to the evaluation note to modify the underlying clinical documentation. Any modifications are then processed by the system and a new CPT code is generated for review." *See* <u>Exhibit C</u> at ¶ 2.

80.     The reality is that the KareFirst Charting System, contrary to Defendants' attempt to shift responsibility, automatically upcodes patient encounters and falsely documents medically unnecessary services and services not rendered.

81.     Ultimately, Defendants' corporate culture reinforces Defendants' fraudulent scheme by assuring a constant stream of patient encounters to be fraudulently billed by the KareFirst Charting System.

**E.     Defendants Refuse to Stop KareFirst's Fraudulent Scheme**

82.     To stop Defendants, Relator reported the illegal conduct and disregard for patient safety to All in his role as Chief Executive Officer.

83.     Relator challenged the legality of the KareFirst Charting System and threatened to file a *qui tam* action if the scheme was not halted.

84.     In response, All threatened Relator in a tirade of profanity, including, "don't f*** with me", "I am f***ing sick of you", "I am going to get your f***ing license pulled", and "you will be f***ed", and finally escalating with threats of physical harm, including, "I will f*** you up" and "say the word and I will do it right f***ing now" and "you will not f***ing walk again".

85.     To date, Defendants have not stopped, nor have they reported, the illegal conduct reported by Relator to the appropriate federal and state regulatory agencies or to the affected CMS fiscal intermediaries.

86.     Defendants have a strong financial disincentive to address the conduct alleged in this Complaint, and Defendants have not done so to date.

87.     To properly address the issue, Defendants would have to disclose to the United States the unlawful conduct alleged in this Complaint and individually remit all KareFirst payments received from federally-sponsored healthcare programs.

88.     Defendants simply will not risk making such a disclosure because of the potential financial and reputational harm, both personally and professionally, and to KareFirst as a high growth company.

89.     Defendants would have also risked the potential of being excluded by the United States Department of Health and Human Services' ("HHS") Office of Inspector General ("HHS-OIG") from participation in any federally-sponsored healthcare programs, which would also have significant collateral consequences for each of the Defendants.

90.     Rather, All intimidated and harassed Relator using terribly profane and offensive language, ultimately threatening Relator with physical violence, and tasked KareFirst's counsel to threaten Relator with referral to the Illinois Department of Financial & Professional Regulation for licensure action without a good faith basis.

91.     To date, Defendants continue to engage in this fraudulent scheme through KareFirst in violation the FCA.

III.   **THE PARTIES**

A.   **Relator**

92.   Merchant Adams is a resident of the Village of Park Ridge in Cook County, Illinois.

93.   Relator is a licensed Registered Professional Nurse with approximately 6-1/2 years of experience and maintains an active license in the State of Illinois.

94.   Relator is also a licensed Advanced Practice Nurse with almost 3 years of experience and maintains an active license in the State of Illinois.

95.   Relator is board certified in adult geriatrics primary care by the American Nurses Credentialing Center.

96.   Relator attended the University of Illinois at Chicago ("UIC") for his graduate degree in nursing through the accelerated entry program and graduated in 2016.

97.   During Relator's graduate nursing training, Relator completed clinical training in the Chicago area at Lutheran General Hospital (acute care), Midwest Hospice (hospice care), Elmwood Estate (SNF care), O'Hare International Airport (urgent care), and at a private medical practice (internal medicine).

98.   After Relator completed his graduate nursing degree and training, Relator served as a nurse practitioner for a private practice physician from March 2016 until May 2018, providing office and nursing facility based geriatric care.

99.   Adams joined KareFirst on May 21, 2018 as a full-time nurse practitioner.

100. By way of background, Relator relocated to Chicago in 2008 because Relator's wife secured a tenure-tracked teaching position at Northeastern Illinois University. At the same time, Relator secured an art history research position at UIC.

101. Prior to Chicago, Relator was a visiting lecturer in art at the College of Santa Fe in Santa Fe, New Mexico from 2003 to 2007.

102. Relator attended Virginia Commonwealth University for his undergraduate degree in painting and printmaking, graduating in 1996.

103. Relator attended the School of the Art Institute of Chicago for his master of fine art degree, graduating in 2000.

104. Adams attended the University of Texas-Austin for his master degree in art history, graduating in 2009.

105. Adams is an original source of information in this Complaint within the meaning of the FCA. 31 U.S.C. § 3730(e)(4)(B).

**B.      Alvin L. All**

106. All graduated from the University of Chicago's Booth School of Business with a Masters of Business Administration in 1996.

107. All is a resident of the City of Lake Forest in Lake County, Illinois.

108. All is a successful software and Internet entrepreneur, co-founding a successful company in June 25, 1999 named iParenting, LLC d/b/a "iParenting Media".

109. iParenting Media was a company focused on child relevant content.

110. The Walt Disney Company ("Disney") purchased All's company in 2007 for a reported $19,000,000.

111. At the time of the transaction, All joined Disney as an employee and served as the former Director and General Manager of Disney's Internet Media Group based in North Hollywood, California.

112. Since departing Disney, All has focused on at least two new businesses: KareFirst and Lomata Ventures.

113. All formed KareFirst with Wilson on November 15, 2013.

114. Since 2013, All has continuously served as Chief Executive Officer of KareFirst.

115. All is uniquely empowered by his significant ownership stake in and leadership roles at KareFirst. This results in All's complete control over KareFirst's executive decision-making in coordination with Wilson.

## C. Kimberly R. Wilson

116. Wilson is President and Chief of Nursing at KareFirst since 2013.

117. Wilson is responsible for KareFirst's clinical operations and is deeply involved in day-to-day management activities in close coordination with All.

118. Wilson and All were previously married.

119. Wilson is a resident of the City of Chicago in Cook County, Illinois.

120. Wilson was initially licensed by the State of Illinois as a Licensed Practical Nurse in 1994.

121. Wilson was licensed by the State of Illinois as a Registered Professional Nurse in 2001.

122. Wilson was licensed by the State of Illinois as an Advanced Practice Nurse in 2011.

### D.    KareFirst Management, Inc.

123.    KareFirst Management, Inc. was incorporated in the State of Illinois on November 15, 2013 and currently maintains its corporate headquarters in the Village of Skokie in Cook County, Illinois.

124.    KareFirst Management is the parent corporation of the KareFirst Illinois professional corporation, as well as the KareFirst Indiana, Iowa, Missouri, Minnesota, Texas and Wisconsin professional corporations.

125.    KareFirst Management coordinates the delivery of nurse practitioner professional services to nursing facility patients.

126.    KareFirst Management establishes the policies and procedures for KareFirst Illinois and the other KareFirst professional corporations serving, or attempting to serve, Indiana, Iowa, Missouri, Minnesota, Texas and Wisconsin.

127.    KareFirst Management advertises that:

> KareFirst Management provides business and consulting services to KareFirst nurse practitioner groups. Our service helps nurse practitioners focus on their clinical responsibilities, while KareFirst Management handles the administrative and business side of the medical practice. KareFirst Management's service consist of organizational guidance, business structuring, marketing, business development, recruiting, insurance enrollment, credentialing, medical billing, employee compensation structures, benefit packages, liability and malpractice insurance attainment and more.

*See* http://www.karefirstmanagement.com (last accessed April 4, 2019).

128.    Since its formation in 2013, All has always served as the Chief Executive Officer of KareFirst Management.

129.    Wilson has served as the President and Chief of Nursing of KareFirst Management.

130.    Karefirst Management does not have an executive level compliance officer commonly referred to as a Chief Compliance Officer or Chief Ethics Officer.

131.    All acts as KareFirst Management's *de facto* chief compliance officer.

132.    KareFirst Management also does not maintain a formal Code of Conduct to Relator's knowledge.

133.    KareFirst Management does maintain an Audit Manual & Standards of Medical Documentation that runs 13 pages ("Audit Manual"), which is part of the new hire packet for KareFirst nurse practitioners. *See* Exhibit D.

134.    The Audit Manual never mentions the FCA by name anywhere in the document or where or who to report a KareFirst compliance concern. This is despite Defendants directly causing claims to be submitted to federally-sponsored healthcare programs.

135.    KareFirst Management also does not maintain a compliance hotline (anonymous or otherwise) for KareFirst employees.

136.    While KareFirst Management lacks a formal compliance structure, this has no bearing upon or otherwise relieves All (as Chief Executive Officer) and Wilson (as President and Chief of Nursing) from their inherent duty to oversee KareFirst's compliance with applicable laws and regulations, particularly the FCA.

137.    KareFirst's failure to maintain a meaningful corporate compliance oversight function knowingly or recklessly permitted a corporate culture in which FCA violations could occur (and did occur). KareFirst further prevented individuals, such as

Relator, from promptly reporting such violations to appropriate KareFirst executives who actually cared.

138.    It is impossible for All, in his role as KareFirst's Chief Executive Officer, and Wilson, in her role as KareFirst's President and Chief of Nursing, to discharge their compliance function on behalf of KareFirst because of the inherent conflict of interest created by their various roles and ownership stakes.

139.    KareFirst's current compliance program, as conceived and implemented, simply cannot fulfill its mission for KareFirst.

140.    KareFirst was destined to fail and did fail to the detriment of its patients and their families, the United States, numerous state governments, and ultimately American taxpayers.

E.    **KareFirst Illinois, P.C. and Various Other KareFirst Professional Corporations**

141.    KareFirst Illinois, P.C. is an Illinois professional corporation which was formed in February 8, 2013.

142.    KareFirst Illinois is the corporate entity that contracts to provide nurse practitioners to nursing facilities in the State of Illinois.

143.    KareFirst Illinois is controlled by All and is managed by KareFirst Management, which is also controlled by All.

144.    KareFirst Illinois had approximately 15 to 20 nurse practitioners employed at the end of 2018.

145.    KareFirst Illinois provides services to approximately 20 to 30 nursing facilities in Chicago and the greater Chicago metropolitan area.

146.    KareFirst Illinois also provides services in central Illinois.

147.    Additionally, KareFirst has formed professional corporations in the States of Indiana, Iowa, Missouri, Minnesota, Texas and Wisconsin to undertake substantially the same activities as KareFirst Illinois under the direction of KareFirst Management using the same illegal strategies as KareFirst Illinois in violation of the FCA and applicable state False Claims Acts.

**F.    Lomata Ventures**

148.    Lomata is an investment vehicle formed by All.  It is an Illinois general partnership.

149.    Lomata shares its headquarters with KareFirst Management and KareFirst Illinois in Skokie, Illinois, along with Defendants' other State professional corporations.

150.    Lomata's website advertises that Lomata "provides capital to startup companies, small and medium sized businesses, and spin off companies from larger enterprises that we believe will have long-term above average growth in emerging markets." *See* https://lomataventures.com (last accessed April 4, 2019).  It continues, "Lomota Ventures capital does not always have to be just a monetary form—we can provide technical and managerial expertise." *See id.*

151.    All is actively involved with Lomata's business.[2]

---

[2]  For example, All is listed as one of two speakers at the Women in Flavor and Fragrance Commerce, Inc. ("WFFC") conference entitled "Cannabis Today: Legality, Consumption and Use in Personal Care" that occurred at the Morton Arboretum on May 1, 2018.  At that WFFC conference, All's presentation advertised he would discuss the "current legal situation of cannabis, along with the consumption and use in personal care products.  We will learn the difference between medical marijuana, CBD, and THC" and "the forms of consumption of cannabis via topical application, sublingual, ingestible, and inhalation." *See* <u>Exhibit E</u>.

152.    Given All's control of Lomata and its shared headquarters with KareFirst Management, All used Lomata, in part, to invest in KareFirst and for making other direct personal investments in other companies.

153.    Also, given All's control of Lomata and its shared headquarters with KareFirst Management and KareFirst Illinois, along with Defendants' other State professional corporations, Lomata aids All, or is otherwise utilized by All, to violate the FCA in the KareFirst scheme.

## IV.    JURISDICTION AND VENUE

154.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions pursuant to 31 U.S.C. §§ 3729 and 3730. There has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint as those concepts are used in 31 U.S.C. § 3730(e).

155.    Relator qualifies as an "original source" of the information on which the allegations in this Complaint are based. Relator has direct and independent knowledge about Defendants' misconduct alleged herein, and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to Relator's claims. None of the allegations set forth in this Complaint are based on a public disclosure of information in a criminal, civil, or administrative hearing; in a Congressional, administrative, or General Accounting Office report, hearing, audit, or investigation; or from news media. Rather, these allegations are the independent declaration of Adams arising from his intimate working relationship with Defendants during his employment by KareFirst from May 21, 2018 until December 10, 2018.

156. Before filing this Complaint, Relator voluntarily disclosed to the United States Department of Justice ("DOJ") the information on which the allegations in this Complaint are based.

157. This Court has general and specific personal jurisdiction over each of the Defendants by virtue of KareFirst maintaining its corporate headquarters in Skokie, Illinois, and each of the Defendants reside in and/or regularly transact business in the State of Illinois, specifically Chicago and the greater Chicago metropolitan area, which serves as the basis for Relator's Complaint.

158. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because each of the Defendants are subject to personal jurisdiction in this Judicial District because each individually resides herein and/or is corporately headquartered, or otherwise transact business and otherwise employ individuals in this Judicial District.

## V.   GOVERNMENT HEALTHCARE PROGRAMS

159. Defendants fraudulently billed federally-sponsored healthcare programs, including Medicare and Medicaid, for automatically upcoded services, medically unnecessary services, and services not rendered.

### A.   Medicare

160. In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395, *et seq.*, known as the Medicare Program, as part of Title XVIII of the Social Security Act, to pay for the costs of certain healthcare services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. *See* 42 U.S.C. §§ 426, 426-1. Generally, persons over 65 years of age or suffering a permanent disability are eligible for Medicare.

161.    Reimbursement for Medicare claims is made by the United States through CMS, which is an agency of HHS, and is directly responsible for the administration of the Medicare Program.

162.    CMS contracts with private companies, referred to as "fiscal intermediaries", to directly administer and pay medical provider claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u).

163.    In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims", received from medical providers. Those claims are paid with federal funds.

164.    There are two primary components to the Medicare Program that are involved in Defendants' illegal scheme, Part A and Part B.

165.    Medicare Part A authorizes payment for institutional care, including nursing facilities. 42 U.S.C. §§ 1395c-1395i-5.

166.    Medicare Part B authorizes payment for physician services to treat medical conditions or prevent them (42 U.S.C. §§ 1395j-1395w-5) such as CPT® Codes 99307, 99308, 99309, and 99310 (subsequent nursing facility care) and CPT® Codes 99358 and 99356 (prolonged non-face-to-face care) and CPT® Code 99497 and 99498 (advance care planning), all of which are codes that Defendants bill federally-sponsored healthcare programs in their illegal scheme.

167.    Under Medicare Part B, medical providers, such as nurse practitioners, enter into an agreement with Medicare to provide healthcare services to

Medicare patients. The professional, also called a "provider", is authorized to bill Medicare for that treatment.

168. To apply to participate in Medicare, a medical practice that bills Medicare Part B completes CMS Form 855B, and individual medical providers complete CMS Form 855I.

169. Both Forms CMS-855B and CMS-855I expressly list federal laws that are violated by and the severe penalties for "deliberately falsifying information in this application to gain or maintain enrollment in the Medicare program" including, without, limitation:

> 18 U.S.C. § 1001 authorizes criminal penalties against an individual who, in any matter within the jurisdiction of any department or agency of the United States, knowingly and willfully falsifies, conceals or covers up by any trick, scheme or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry. Individual offenders are subject to fines of up to $250,000 and imprisonment for up to five years. Offenders that are organizations are subject to fines of up to $500,000 (18 U.S.C. § 3571). Section 3571(d) also authorizes fines of up to twice the gross gain derived by the offender if it is greater than the amount specifically authorized by the sentencing statute.

> Section 1128B(a)(1) of the Social Security Act authorizes criminal penalties against any individual who, "knowingly and willfully," makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program. The offender is subject to fines of up to $25,000 and/or imprisonment for up to five years.

> The Civil False Claims Act, 31 U.S.C. § 3729, imposes civil liability, in part, on any person who:

> a) knowingly presents, or causes to be presented, to an officer or any employee of the United States Government a false or fraudulent claim for payment or approval;

b) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; or

c) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid.

The Act imposes a civil penalty of $5,000 to $10,000 per violation, plus three times the amount of damages sustained by the Government.

Section 1128A(a)(1) of the Social Security Act imposes civil liability, in part, on any person (including an organization, agency or other entity) that knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof, or of any State agency...a claim...that the Secretary determines is for a medical or other item or service that the person knows or should know:

a) was not provided as claimed; and/or

b) the claim is false or fraudulent.

This provision authorizes a civil monetary penalty of up to $10,000 for each item or service, an assessment of up to three times the amount claimed, and exclusion from participation in the Medicare program and State health care programs.

18 U.S.C. 1035 authorizes criminal penalties against individuals in any matter involving a health care benefit program who knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact; or makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items or services. The individual shall be fined or imprisoned up to 5 years or both.

18 U.S.C. 1347 authorizes criminal penalties against individuals who knowing and willfully execute, or attempt, to executive a scheme or artifice to defraud any health care benefit program, or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by or under the control of any, health care benefit program in connection with the delivery of or payment for health care benefits, items, or services. Individuals shall be fined or imprisoned up to 10 years or both. If the violation results in serious bodily injury, an individual will be fined or imprisoned up to 20 years, or both. If the violation results in death, the individual shall be fined or imprisoned for any term of years or for life, or both.

The government may assert common law claims such as "common law fraud," "money paid by mistake," and "unjust enrichment." Remedies include compensatory and punitive damages, restitution, and recovery of the amount of the unjust profit.

170. Form CMS-855I requires, like Form CMS-855B, the provider to certify that:

I agree to abide by the Medicare laws, regulations and program instructions that apply to me or to the organization listed in Section 4A of this application. The Medicare laws, regulations, and program instructions are available through the fee-for-service contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare.

I agree that any existing or future overpayment made to me (or to the organization listed in Section 4A of this application) by the Medicare program may be recouped by Medicare through the withholding of future payments.

I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

171. In order receive payment from Medicare, providers, like KareFirst, must complete and submit a claim for payment on a Health Insurance Claim Form known as Form CMS-1500.

172. Form CMS-1500 contains patient-specific information, including the diagnosis and types of services that were provided to the Medicare patient.

173. The Medicare Program relies upon the accuracy and truthfulness of Form CMS-1500 to determine whether and what amounts the provider is owed.

174. To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the provider submitting a claim to Medicare:

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

175. That certification is then followed by the following "Notice" stating "Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws."

176. Defendants, even All, who was previously unfamiliar with the healthcare industry prior to KareFirst, were well warned and on notice about the illegality of submitting false claims to the Medicare Program or any other any federally-sponsored healthcare program.

**B.    Obligations to Refund Overpayment**

177. As a condition to participate in the Medicare Program, providers are affirmatively required to disclose to CMS fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement. 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C; *see also* 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. §§ 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to CMS fiscal intermediaries, and the failure to do so is a felony. Providers' contracts with CMS fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

178. Accordingly, if a CMS fiscal intermediary pays a claim for services that were not medically necessary, a refund is due, and a debt is created in favor of CMS. 42 U.S.C. § 1395u(1)(3). In such cases, the overpayment is subject to

-32-

recoupment. 42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 13951(j).

179.    Defendants were well warned about their affirmative duty to refund any overpayment to the Medicare program, or any other any federally-sponsored healthcare program, and the illegality of not doing so.

**C.    Medicaid**

180.    The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, *et seq.*, is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level with various State counterparts. As with the Medicare Program, providers may, through the submission of Health Insurance Claim Forms, be reimbursed for charges arising out of the provision of necessary care to Medicaid beneficiaries.

181.    The Illinois Department of Health Care and Family Services is the Illinois agency/administrator that handles reimbursement of Medicaid claims.

182.    The Indiana Health Coverage Programs is the Indiana agency/administrator that handles reimbursement of Medicaid claims.

183.    The Iowa Department of Human Services is the Iowa agency/administrator that handles reimbursement of Medicaid claims.

184.    The Minnesota Department of Human Services is the Minnesota agency/administrator that handles reimbursement of Medicaid claims.

185.    The Missouri Department of Social Services is the Missouri agency/administrator that handles reimbursement of Medicaid claims.

186.    The Texas Department of Health and Human Services is the Texas agency/administrator that handles reimbursement of Medicaid claims.

187.    The Wisconsin Department of Health Services is the Wisconsin agency/administrator that handles reimbursement of Medicaid claims.

**D.    Federally-Sponsored Healthcare Programs Do Not Pay for Upcoded Services, Medically Unnecessary Services, or Services Not Rendered**

188.    Submitting a claim for payment to federally-sponsored healthcare programs for upcoded services, medically unnecessary services, or services not rendered is the quintessential FCA violation.

189.    To participate in the Medicare Program, a provider must file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for receiving reimbursement from Medicare. One such important requirement is that claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. §§ 1395y(a)(1)(A), (B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.29.

190.    Various claim forms, including but not limited to the Health Insurance Claim Form, Form CMS-1500, require that the provider certify that the medical services rendered were medically "required", medically indicated and necessary, and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. §§ 1395n(a)(2) and 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records. *Id. See also* 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

191.    Similarly, Illinois Medicaid only covers "medically necessary" services. Il. Handbook for Providers Medical Services, Chapter 100, General Policy and Procedures, § 136. When participating in the Illinois Medicaid Program, "Providers are

expected to obey all laws, civil and criminal, state and federal regulations, and Department policies pertaining to delivery of and payment for health care." *See id.*

192.    Illinois Medicaid defines "fraud" as:

[A]n intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to them or some other person.  It includes any act that constitutes fraud under applicable federal or State law.

*See id.*

193.    Illinois Medicaid defines "abuse" as:

[P]rovider practices that are inconsistent with sound fiscal, business, or medical practices and that result in an unnecessary cost to the Medical Assistance Program or in reimbursement for services that are not medically necessary or that fail to meet professionally recognized standards for health care.  It also includes participant practices that result in unnecessary cost to the Medical Assistance Program.

*See id.*

194.    Claims for upcoded medical services are claims for payment that are artificially inflated.  Submitting upcoded claims for payment violates these statutory and regulatory requirements and is fraudulently misleading, causing the United States and federally-sponsored healthcare programs to pay for claims that they would not otherwise pay for.

195.    Submitting claims for unnecessary medical services that do not disclose that such services are unnecessary violates these statutory and regulatory requirements and is fraudulently misleading, causing the United States and federally-sponsored healthcare programs to pay for claims that they would not otherwise pay for.

196.    Submitting claims for medical services not rendered violates these statutory and regulatory requirements and is fraudulently misleading, causing the

United States and federally-sponsored healthcare programs to pay for claims that they would not otherwise pay for.

## VI.  **FEDERAL FCA**

197.   The FCA was enacted during the Civil War and substantially amended in 1986, 2009, and 2010.  The FCA creates incentives for individuals to come forward with information about fraud against the United States without fear of reprisals or government inaction, and enables the use of private legal resources to prosecute fraud claims on the United States' behalf.

198.   The FCA allows any person having knowledge of a false or fraudulent claim against the United States to bring an action individually and for the government, and to share in any recovery.  The party bringing the action is known as a relator, and the action that a relator brings is called a *qui tam* action.  The FCA requires that this Complaint be filed under seal for a minimum of 60 days without service on Defendants to allow the United States time to conduct its own investigation and to determine whether or not to join this action.

199.   The FCA provides that any person who, with actual knowledge, or in reckless disregard or deliberate ignorance of the truth, submits or causes to be submitted a false or fraudulent claim to the United States for payment or approval is liable for civil penalties for each claim, plus three times the amount of the damages sustained because of the false claim.

200.   The FCA, as amended specifically, imposes liability on any person who:

      (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

>   (B)   knowingly makes, uses, or causes to be made or used, a
>         false record or statement material to a false or fraudulent
>         claim ... ; or
>
>   (G)   knowingly makes, uses, or causes to be made or used, a
>         false record or statement material to an obligation to pay or
>         transmit money or property to the Government, or
>         knowingly conceals or knowingly and improperly avoids or
>         decreases an obligation to pay or transmit money or
>         property to the Government ... .

31 U.S.C. § 3729(a)(1).

201.   The terms "knowing" and "knowingly", for purposes of FCA liability, mean that a person must have acted with:

>   (1)   Actual knowledge of the information;
>
>   (2)   Deliberate ignorance of the truth or falsity of the
>         information; or
>
>   (3)   Reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b)(1)(A)[3].

202.   No proof of specific intent to defraud is required.   31 U.S.C. § 3729(b)(1)(B).

203.   Congress amended the FCA in 2009 to clarify that a "claim" includes:

>   Any request or demand, whether under contract or otherwise, for money
>   or property and whether or not the United States has title to the money or
>   property that (i) is presented to an officer, employee or agent of the
>   United States or (ii) is made to a contractor, grantee, or other recipient, if
>   the money or property is to be spent or used on the Government's behalf
>   or to advance a Government program or interest ... .

31 U.S.C. 3729(b)(2).

---

[3] The FCA was amended by the Fraud Enforcement and Recovery Act of 2009, Public Law 111-21.  31 U.S.C. §§ 3729(a)(1)(A), (B) (reflecting changes to the wording of the pre-2009 FCA provisions previously found at 31 U.S.C. §§ 3729(a)(1), (2) and (3)).

204.    A person violating the FCA is liable to the United States for civil monetary penalties, plus three times the amount of damages the United States sustains because of the false claims.  Under the 1986 Amendments to the FCA, the range of civil penalties for violations was set at a minimum of $5,000 to a maximum of $10,000 per false claim.

205.    Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990, the range of civil penalties for FCA violations was adjusted to a minimum of $5,500 to a maximum of $11,000 per false claim.

206.    The Federal Civil Penalties Inflation Improvements Act of 2015 ("Inflation Adjustment Act") now requires the DOJ to annually adjust for inflation civil monetary penalties under the FCA.

207.    For FCA violations made after October 23, 1996, but before August 1, 2016, the minimum penalty remains $5,500, and the maximum penalty remains $11,000 per false claim.

208.    Pursuant to the Inflation Adjustment Act's enactment, DOJ adjusted the range of civil monetary penalties for violations of the FCA assessed on or after January 29, 2018, at a minimum of $11,181 to a maximum of $22,363 per false claim.  83 Fed. Reg. 3944-45 (January 29, 2018).

## VII.    RELATOR WAS UNIQUELY POSITIONED TO DISCOVER DEFENDANTS' ILLEGAL SCHEME

209.    Relator was uniquely positioned to discover Defendants' illegal scheme involving KareFirst and its software that causes the submission of false claims to the United States in violation of the FCA.

210.    Relator had a firsthand, continuous working relationship with Defendants from May 2018 to December 2018, including with All and Wilson individually.

211.    Wilson interviewed Relator for a full-time nurse practitioner position with KareFirst on or about April 3, 2018.

212.    Relator interviewed with All for the position on or about April 11, 2018.

213.    Relator was offered a position with KareFirst as a nurse practitioner on or about April 12, 2018.

214.    Relator's first day of work as a full-time KareFirst nurse practitioner was May 21, 2018.

215.    On his first date of work, Relator received cursory training on the KareFirst Charting System at KareFirst's corporate office in Skokie, Illinois. Relator did not receive any further training on the software or any training on KareFirst's Audit Manual.

216.    Relator did not receive any formalized clinical training, but Relator was required to shadow Wilson for 3 days at a Chicago nursing facility serviced by KareFirst.

217.    During that shadow period, Wilson introduced Relator to that nursing facility's director of nursing and head administrator. At that time, Wilson stressed Relator should develop good relations with similar key management personnel at his future nursing facilities.

218.    During the shadowing period, Wilson offered 2 keys points of advice to Relator to meet his KareFirst RVU-EU productivity requirements and help "get your visits".

219.    Wilson advised Relator to stay close by the nursing stations within his assigned nursing facilities and to "keep your ears open" so that you can "get your visits".

220.    Wilson also advised daily review of the pharmacists' recommendations for each patient as they became available.  Wilson stated to Relator that the pharmacists' recommendations are an excellent way to "get your visits."

221.    In Relator's experience, pharmacists' recommendations are often helpful, but do not remotely justify a patient visit each time a recommendation is issued.

222.    Wilson recommended Relator simply work down the list of pharmacists' recommendations received each day and visit each patient and thereby "get your visits".

223.    Wilson implored Relator that "everytime I sign for something I bill".

224.    After Relator commenced working independently, Wilson followed up on the pharmacists' reports stating to Relator that "some find them tedious but to me they are a visit" and "you can get all your RVUs from pharmacy recs".

225.    During the shadowing period, Wilson also stressed the KareFirst bonus system for higher RVU-EU productivity.

226.    Wilson offered tips to achieve higher RVU-EU productivity and KareFirst bonuses.

227. Wilson stressed two billing opportunities Relator should seize upon to increase his RVU-EU productivity: non-face-to-face patient care reimbursed under CPT® Codes 99358 and 99359 and advance care planning reimbursed under CPT® Codes 99497 and 99498.

228. Wilson stressed that new patient admissions were opportunities to bill non-face-to-face patient care the day after the initial admission work was completed (what Relator would learn was essentially double billing for the same initial admission service).

229. Prior to KareFirst, Relator was unfamiliar with billing non-face-to-face services under CPT® Codes 99358 and 99359, given that these codes were only recently reimbursed by Medicare and certain private payors (but not Medicaid) starting in 2017.

230. After Relator commenced working independently, Wilson followed up with Relator regarding non-face-to-face patient care noting that "we all know we have to read the chart [on admission] but we really do spend a lot of time doing this". Wilson stressed to Relator to make sure you reference non-face-to-face patient care is "associated with a patient visit".

231. Relator was very concerned because Wilson was suggesting to double bill for the same chart reading: once on the initial visit, and again the day after the initial admission visit.

232. As to advance care planning, Wilson stressed that any time Relator talks, in any manner, about a patient's code status, that patient encounter is eligible for reimbursement under CPT® Codes 99497 or 99498.

233. During the shadowing period, Wilson demonstrated to Relator how to complete an advance care planning consultation consistent with this KareFirst clinical practice.

234. With Relator observing, Wilson stated to a nursing facility patient during an evaluation that "when the angels come and get you, do you want me to let them take you to heaven?" to which that patient mumbled "yeah".

235. With that being the sole extent of the advance care planning consultation, Wilson stated to Relator that CPT® Code 99497 was now eligible for reimbursement.

236. Relator was very concerned about Wilson's training regarding advance care planning because it was inconsistent with Relator's prior training and understanding of what constituted such a consultation.

237. Worse, the patient Wilson selected for the advance care planning demonstration, in Relator's opinion, was not decisional, and a family member or loved one was clearly required to participate with this specific patient for the consultation to be properly conducted.

238. At this early juncture, Relator had limited interaction with All.

239. All did make several points to Relator early on.

240. All stressed timely entry of progress notes in the KareFirst Charting System to Relator.

241. Although unprompted by Relator, All sought to reassure Relator regarding the propriety of the $10,000 early termination penalty and the non-compete

-42-

covenant contained with Relator's employment agreement. At the time, Relator had no reason to be concerned about these provisions.

242. However, Relator did have concerns about Wilson's clinical and billing recommendations during the shadowing period based on his prior experience and professional training.

243. At the completion of the shadowing period, Relator was assigned to 3 nursing facilities, two in the City of Chicago and one in a Chicago suburb. The nursing facilities were located relatively far apart from one another.

244. When Relator started to practice independently, Relator relied upon his prior training and experience providing care in nursing facilities and with geriatric patients. He discounted Wilson's billing and clinical advice.

245. Initially, Relator's experience working independently at nursing facilities on behalf of KareFirst went smoothly during the remaining days of May 2018.

246. On June 6, 2018, KareFirst held its regular monthly nurse practitioners meeting at KareFirst's corporate office in Skokie, Illinois. KareFirst nurse practitioners located outside of the greater Chicago area or Illinois joined by conference call.

247. At the meeting, Relator was introduced to the other KareFirst nurse practitioners.

248. At that regularly monthly meeting, All and Wilson often spoke individually with KareFirst nurse practitioners regarding specific matters.

249. All and Wilson individually spoke with Relator at the June 2018 meeting.

250. During that discussion, All and Wilson asked Relator if he could (a) help train a newly hired nurse practitioner, and (b) shadow a newer KareFirst nurse practitioner to determine if she had, in All's word, "endurance" for the job.

251. Upon later shadowing the newer KareFirst nurse practitioner, Relator determined that All was referring to the nurse practitioner's obesity and whether that interfered with this employee's performance. Relator thought this a strange and inappropriate request on All's part.

252. Relator noted in the individual meeting to All and Wilson that the KareFirst Charting System was difficult and time-consuming to use in the clinical environment.

253. Wilson agreed the KareFirst Charting System was time-consuming to use and not perfect.

254. All made clear he was very proud of the KareFirst Charting System and stressed that a great deal of money was invested into its development. This sentiment was regularly repeated by All at KareFirst monthly nurse practitioner meetings.

255. All and Wilson ended the individual meeting by stressing that Relator needed to keep up his RVU-EU productivity.

256. In June 2018, Relator started to struggle with traveling back and forth between his 3 assigned nursing facilities (2 in Chicago and 1 in a Chicago suburb), given Chicagoland's notoriously grid-locked traffic.

257. Relator was spending hours commuting between his 3 assigned facilities each day. This was reducing his time for clinical care and completing progress notes.

258. Relator was struggling to provide good care and meet KareFirst's RVU-EU productivity requirements because of the significant travel times between the 3 facilities.

259. Relator was starting to have a hard time completing his progress notes the same day he provided care.

260. Relator was also struggling emotionally because of his increasing recognition that the consistently high coding recommendations being produced by the KareFirst Charting System were simply inappropriate.

261. Specifically, Relator was struggling with the option of signing off on obvious upcoding, or alternatively, somehow deleting or altering data in his progress notes to lower the inappropriately high CPT® code assigned automatically by the KareFirst Charting System.

262. Relator was deeply troubled by the fact that he was forced to allow an upcoded claim to be submitted, or alternatively, reducing the upcoding by altering patient data reducing the complexity of a patient's actual condition, and risking that patient's safety.

263. Also, on a Sunday afternoon in June 2018, Wilson oddly contacted Relator over the phone and requested that Relator prescribe an antibiotic to a minor child who was a relative of Wilson. Relator reported to Wilson he felt uncomfortable doing so because he lacked pediatric experience. Wilson was clearly offended.

264. At the monthly July 2018 meeting for KareFirst nurse practitioners, All and Wilson did not meet with Relator individually and made no comments regarding Relator's performance.

-45-

265.    After the July 2018 monthly meeting, All started directly contacting Relator regarding Relator's productivity.  All regularly contacting Relator was a new development.

266.    All was starting to question the amount of time Relator was spending at Relator's assigned nursing facilities.

267.    On July 17, 2018, All confronted Relator regarding how quickly Relator was completing his progress notes.

268.    Relator responded to All that he was having a hard time providing good care, meeting KareFirst's RVU-EU productivity requirements, and completing his progress notes on a daily basis, given the commuting time between his 3 assigned facilities.  Relator explained the travel times were simply consuming too much of his daily work schedule.

269.    After July 17, 2018, All started to focus on Relator's productivity.

270.    Relator attempted to assure All and Wilson that he was diligently working to complete his progress notes while meeting KareFirst RVU-EU productivity requirements.  Relator remained personally committed to providing good patient care.

271.    Throughout July 2018, Relator worked to meet KareFirst expectations while putting patient care first.

272.    However, Relator was starting to have real compliance concerns regarding the consistently high complexity the KareFirst Charting System algorithm was assigning to Relator's evaluation and management encounters.

273.    Relator was becoming even more deeply troubled by the consistently high coding recommendations for simple tasks and the inability to change

the coding determination without falsifying his progress notes and threatening patient safety.

274.    In August 2018, Relator attended the monthly KareFirst meeting for nurse practitioners.

275.    At that time, All and Wilson changed one of Relator's nursing facility assignments to reduce Relator's travel time between assigned facilities. While not stated, this was tacit acknowledgment by All and Wilson that Relator's facility assignments were geographically challenged.

276.    In August 2018, Relator continued to focus on providing quality care to patients while meeting KareFirst's RVU-EU productivity requirements.

277.    However, All and Wilson continued to micromanage Relator's RVU-EU productivity.

278.    In August 2018, Wilson also directed Relator to review each and every patient's lab results every evening at 1 of his assigned nursing facilities (regardless if Relator ordered the labs in question) and to initiate a patient encounter on each patient on the list regardless if medically necessary.

279.    During August 2018, even with the facility change, Relator was still struggling to keep up with his progress notes without taking away time from RVU-EU productivity or sacrificing patient care.

280.    By August 2018, Relator's concern about the consistently high coding recommendations being produced by the KareFirst Charting System continued, and was deepening.

281.    Relator felt the recommendation simply did not make sense—clearly low complexity patient encounters were always being coded at the highest complexity.

282.    By mid-October 2018, Relator was deeply suspicious that the KareFirst Charting System was designed to automatically upcode every patient encounter and falsify the medical necessity of encounters.

283.    On October 30, 2018, Wilson called Relator and yelled at Relator that a nursing facility administrator complained no KareFirst nurse practitioner was present that day at a facility assigned to Relator.

284.    Relator responded that, for the day in question, the nursing facility medical director was present and that Relator was providing care at his other assigned facility.

285.    During this call with Wilson on October 30, 2018, Relator decided to resign from KareFirst and informed Wilson of his decision.

286.    This was difficult for Relator because of the $10,000 early termination penalty Defendants would assess Relator, which Relator was not readily able to pay.

287.    However, Relator had suffered enough from the constant pressure of All and Wilson, and he was deeply troubled by KareFirst's business practices, particularly the KareFirst Charting System.  Relator did not want to be a party to a fraudulent scheme.

288.    Later that day, All contacted Relator and requested Relator to remain with KareFirst.

-48-

289. Relator expressed his concerns about the impossible clinical demands and compliance concerns regarding the KareFirst Charting System.

290. After the call with All, Relator was very distraught and was very concerned about paying the $10,000 early termination penalty. Relator did not have the financial ability to do so.

291. Relator decided to continue working for KareFirst for the meanwhile.

292. However, Relator was suffering from the stress of working with All and Wilson and the fear that he was aiding in a fraudulent scheme that threatened patient safety.

293. Relator's work conditions did not improve and KareFirst's illegal practices continued unabated, even after Relator reported his compliance concerns to All, particularly regarding the KareFirst Charting System.

294. On November 13, 2018, All contacted Relator regarding Relator's late progress notes.

295. On this day, Relator attempted to resign from KareFirst again, regardless of the $10,000 early termination penalty.

296. All's response to Relator's attempt to resign was explosive and extremely combative.

297. All threated that he would report Relator to Medicare and "go after your license" in the State of Illinois.

298. Relator responded that, if you do that, "I will file a *qui tam*" to stop Defendants' illegal business practices.

-49-

299. After Relator warned of a *qui tam* action, All lost all control and engaged in a tirade of profanity, including, "don't f*** with me", "I am f***ing sick of you", "I am going to get your f***ing license pulled", and "you will be f***ed".

300. All's threats escalated into All threatening, in no uncertain terms, to physically harm Relator. All said to Relator, "I will f*** you up" and "say the word and I will do it right f***ing now" and "you will not f***ing walk again".

301. Relator requested All stop threatening him, and All shouted "I am the employer and you work for me mother f***er".

302. Relator terminated the conversation.

303. Given All's ferocity, Relator was genuinely concerned that All would physically harm him.

304. After All's brutal exchange, Relator avoided speaking with All again.

305. The following day, All texted Relator demanding any outstanding progress notes be completed. Relator stated that he would complete any outstanding progress notes.

306. All followed through with his expletive-laced threats.

307. On or after November 13, 2018, All tasked KareFirst's counsel to threaten Relator with referral to the Illinois Department of Financial & Professional Regulation, the agency responsible for nurse practitioner licensure. On November 16, 2018, KareFirst's counsel formally wrote to Relator threatening the same.

308. Relator engaged counsel to speak with KareFirst's counsel regarding the licensure issue.

309.    After that, Defendants stopped threatening Relator with referral to the Illinois Department of Financial & Professional Regulation.

310.    Surprisingly, All also demanded Relator continue working for KareFirst providing care to patients until December 14, 2018 while Relator was completing any outstanding progress notes.

311.    Relator would complete all outstanding progress notes on or about December 14, 2018.

312.    All also demanded that Relator review 157 audited charts and audit comments for patients seen by Relator during October, November and December 2018.

313.    KareFirst personnel generated this audit on an in-house basis.

314.    This represented a large majority of Relator's patient encounters during the period in question and was clearly designed to (a) retaliate against Relator by creating a vast amount of work for Relator, and (b) create KareFirst documentation that suggested Relator had inappropriately coded patient encounters.

315.    On or before December 14, 2018, All demanded Relator again extend his employment until December 28, 2018.

316.    However, Relator stopped providing patient care on December 14, 2018.

317.    At that point, Relator began to review the 157 audited charts and associated audit comments as specifically demanded by Defendants.

318.    The KareFirst audit comments received solely focused on the coding level determination.

319. At this point, Relator could not change the coding determination within the KareFirst Charting System because Relator had already accepted and submitted the progress notes.

320. This was a meaningless exercise meant to punish Relator and cover Defendants' tracks.

321. The KareFirst audited charts and audit comments, however, only confirmed the KareFirst Charting System automatically upcoded patient encounters, falsified the medical necessity of unnecessary services, and fraudulently documented services not rendered.

322. Defendants' attempt to create documentation that suggested Relator had somehow inappropriately coded patient encounters completely backfired.

323. For example, the KareFirst audit comments stated that for a November 2, 2018 patient encounter that "CC of rash would not prompt a comprehensive exam and 99310 CPT code." *See* Exhibit F at 6.

324. In another example, the KareFirst audit comments stated for a November 8, 2018 patient encounter "CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient." *See id.* at 7.

325. In another example, the KareFirst audit comments stated that for a November 28, 2018 patient encounter, "CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient. Patient was just seen on 11/2 without any changes in condition or management and 99310 was also billed on 11/2." *See id.* at 9.

326. However, the KareFirst Charting System algorithm makes the coding determination, and KareFirst nurse practitioners, such as Relator, are powerless to change the coding determination. Yet, the KareFirst personnel conducting the audit review suggested that Relator should somehow change the coding determination. Their comments were completely disconnected to the operational reality of the KareFirst Charting System.

327. Unwittingly, the KareFirst audit comments prove the KareFirst Charting System automatically upcoded patient encounters, falsified the medical necessity of unnecessary services, and fraudulently documented services not rendered.

328. Relator completed the chart audit review on December 21, 2018.

329. To date, Karefirst has failed to pay Relator approximately $4,300 in wages earned before Relator was terminated.

330. To this day, Defendants continue to operate the KareFirst fraudulent scheme resulting in the continuing submission of false claims for nurse practitioner services rendered in nursing facilities in violation of the FCA.

## VIII. SPECIFIC EXAMPLES

331. Relator provides the following 14 specific examples of services payable by federally-sponsored healthcare programs that were automatically upcoded, medically unnecessary, or services not rendered directly caused by the KareFirst Charting System.

332. Relator was the KareFirst nurse practitioner for the specific patient examples below. Relator treated these patients between October and December 2018.

333.    The examples below are specifically taken from the sample of charts audited by KareFirst that Defendants specifically demanded Relator review along with KareFirst's audit comments.

**A.    Patient 1—Automatic Upcoding Example**

334.    On October 31, 2018, Patient 1 was seen for a cough by Relator in one of his assigned facilities. *See* Exhibit G.

335.    Relator initiated this patient encounter based on the request of nursing staff.

336.    Patient 1 has a history of Down syndrome and seizures and was on parenteral nutrition.

337.    Relator was familiar with Patient 1 based on prior evaluations.

338.    Relator conducted a brief physical exam listening to Patient 1's lungs and GI tube.

339.    Relator quickly determined that Patient 1's cough was simply the result of Patient 1's body position.

340.    Relator elevated Patient 1's body position to correct the coughing concern.

341.    Good, safe clinical practice dictated that Relator briefly check Patient 1's anti-seizure medication and general laboratory results.

342.    Patient 1 is not verbal and suffers from substantial neurological deficit. No patient consultation occurred.

343.    Relator made no medical adjustments to Patient 1's care plan.

344.    The total time of the exam was no more than 5 minutes, particularly given Relator's familiarity with Patient 1.

-54-

345.     This was a routine visit with straightforward or low complexity medical decision-making.

346.     Relator documented in good faith the Patient 1 encounter in the KareFirst Charting System.

347.     The KareFirst Charting System illegally coded the Patient 1 encounter as CPT® Code 99310, which was the highest level of complexity.

**B.     Patient 2—Automatic Upcoding Example**

348.     On December 5, 2018, Patient 2 was seen for review of hypertension by Relator at one of his assigned facilities. *See* Exhibit H.

349.     Relator initiated this patient encounter after Patient 2 completed physical therapy to review blood pressure only.

350.     Relator was familiar with Patient 2 based on prior evaluations.

351.     Relator conducted a brief physical exam and reviewed blood pressure and current medications.

352.     Relator noted that Patient 2 recently had surgery to remove orthopedic hardware from his/her leg and noted the surgical site was unremarkable.

353.     Relator made no medical adjustments to Patient 2's care plan.

354.     This was a routine visit with straightforward or low complexity medical decision-making.

355.     The total time of the exam lasted less than 10 minutes, particularly given Relator's familiarity with Patient 2.

356.     Relator documented in good faith the Patient 2 encounter in the KareFirst Charting System.

357.    The KareFirst Charting System illegally coded the Patient 2 encounter as CPT® Code 99310, which was the highest level of complexity.

### C.    Patient 3—Automatic Upcoding Example

358.    On November 27, 2018, Patient 3 was seen for right shoulder pain by Relator at one of his assigned facilities. *See* Exhibit I.

359.    Relator initiated the encounter with Patient 3 based on the facility's physical therapist expressing concern that Patient 3 reported pain.

360.    Patient 3 had previously suffered a stroke and suffered from hemiplegia.

361.    Relator was familiar with Patient 3 based on prior evaluations.

362.    Relator conducted a brief exam of Patient 3's shoulder and ordered a basic x-ray.

363.    As a precaution, Relator ordered Patient 3 to avoid weight-bearing activities until the x-ray report ruled out injury.

364.    Relator made no other medical adjustments to Patient 3's care plan.

365.    This was a routine visit with straightforward or low complexity medical decision-making.

366.    The total time of the exam was less than 10 minutes, particularly given Relator's familiarity with Patient 3.

367.    Relator documented in good faith the Patient 3 encounter in the KareFirst Charting System.

368.    The KareFirst Charting System illegally coded the Patient 3 encounter as CPT® Code 99310, which was the highest level of complexity.

D.     **Patient 4—Automatic Upcoding Example**

369.    On November 27, 2018, Patient 4 was seen for back pain by Relator at one of his assigned facilities. *See* Exhibit J.

370.    Relator initiated this patient encounter based on a request of facility nursing staff.

371.    Patient 4 suffered from chronic back pain and chronic obstructive pulmonary disease.

372.    Relator was familiar with Patient 4 based on prior evaluations.

373.    Relator conducted a limited physical exam. Relator refilled Patient 4's morphine and oxygen prescription and reviewed and approved Patient 4's physical therapy plan.

374.    Practically speaking, the facility nurse's request for Relator to see Patient 4 was a request for Relator to refill Patient 4's prescriptions and approve the therapy plan.

375.    Relator made no medical adjustments to Patient 4's care plan.

376.    This was a routine visit with straightforward or low complexity medical decision-making.

377.    The total time of the exam was less than 10 minutes, particularly given Relator's familiarity with Patient 4.

378.    Relator documented in good faith the Patient 4 encounter in the KareFirst Charting System.

379.    The KareFirst Charting System illegally coded the Patient 4 encounter as CPT® Code 99310, which was the highest level of complexity.

### E.    Patient 5—Automatic Upcoding Example

380.    On November 2, 2018, Patient 5 was seen for a rash on the chest by Relator at one of his assigned facilities. *See* Exhibit K.

381.    Relator initiated this patient encounter based on a request from facility nursing staff.

382.    Relator was familiar with Patient 5 based on prior evaluations.

383.    Relator examined the rash and reviewed patient's medication.

384.    Relator made no medical adjustments to Patient 5's care plan.

385.    The total time of this patient encounter was less than 5 minutes, particularly given Relator's familiarity with Patient 5.

386.    This was a routine visit with straightforward or low complexity medical decision-making.

387.    Relator documented in good faith the Patient 5 encounter in the KareFirst Charting System.

388.    The KareFirst Charting System illegally coded the Patient 5 encounter as CPT® Code 99310, which was the highest level of complexity.

### F.    Patient 6—Automatic Upcoding Example

389.    On November 16, 2018, Patient 6 was seen for an initial visit upon admission by Relator at one of his assigned facilities. *See* Exhibit L.

390.    Relator initiated this patient encounter based on a request from facility nursing staff.

391.    Relator examined Patient 6 for repeated falls at home and conducted a history and physical exam, review of medications, and ordered standard labs.

392.    Relator briefly discussed the Illinois advanced directive form to confirm Patient 6's full code status.

393.    The total time of this patient encounter was less than 15 minutes.

394.    This was a routine visit with straightforward or low complexity medical decision-making.

395.    Relator documented in good faith the Patient 6 encounter in the KareFirst Charting System.

396.    The KareFirst Charting System illegally coded the Patient 6 encounter as CPT® Code 99310, which was the highest level of complexity.

397.    Additionally, the KareFirst Charting System illegally coded the Patient 6 encounter to bill for CPT® Code 99497 merely because Relator confirmed Patient 6's code status.

**G.    Patient 7—Automatic Upcoding Example**

398.    On November 9, 2018, Patient 7 was seen for shortness of breath on a non-emergent (chronic) basis by Relator at one of his assigned facilities. *See* Exhibit M.

399.    Relator initiated this patient encounter based on a request of facility nursing staff.

400.    Relator was familiar with Patient 7 based on prior evaluations.

401.    Relator conducted a history, physical exam and reviewed medications.

402.    Relator made no medical adjustments to Patient 7's care plan.

403.    The total time of this patient encounter was less than 5 minutes, particularly given Relator's familiarity with Patient 7.

404.     This was a routine visit with straightforward or low complexity medical decision-making.

405.     Relator documented in good faith the Patient 7 encounter in the KareFirst Charting System.

406.     The KareFirst Charting System illegally coded the Patient 7 encounter as CPT® Code 99310, which was the highest level of complexity.

### H.     Patient 8—Automatic Upcoding Example

407.     On November 2, 2018, Patient 8 was seen for hypertension by Relator at one of his assigned facilities. *See* Exhibit N.

408.     Relator initiated this patient encounter based on a request of facility nursing staff.

409.     Relator was familiar with Patient 8 based on prior evaluations.

410.     Relator conducted a physical exam and reviewed medication and labs.

411.     Relator made no medical adjustments to Patient 8's care plan.

412.     The total time of this patient encounter was less than 5 minutes, particularly given Relator's familiarity with Patient 8.

413.     This was a routine visit with straightforward or low complexity medical decision-making.

414.     Relator documented in good faith the Patient 8 encounter in the KareFirst Charting System.

415.     The KareFirst Charting System illegally coded the Patient 8 encounter as CPT® Code 99310, which was the highest level of complexity.

### I.     Patient 9—Automatic Upcoding Example

416.     On November 1, 2018, Patient 9 was seen for hypertension by Relator at one of his assigned facilities. *See* Exhibit O.

417.     Relator initiated the encounter with Patient 9 to review Patient 9's hypertension only.

418.     Relator was familiar with Patient 9 based on prior evaluations.

419.     Relator conducted a brief physical exam, reviewed blood pressure and current medications.

420.     Relator made no medical adjustments to Patient 9's care plan.

421.     The total time of this patient encounter less than 5 minutes, particularly given Relator's familiarity with Patient 9.

422.     This was a routine visit with straightforward or low complexity medical decision-making.

423.     Relator documented in good faith the Patient 9 encounter in the KareFirst Charting System.

424.     The KareFirst Charting System illegally coded the Patient 9 encounter as CPT® Code 99310, which was the highest level of complexity.

### J.     Patient 10—Automatic Upcoding Example

425.     On December 4, 2018, Patient 10 was seen for generalized weakening and functional decline by Relator at one of his assigned facilities. *See* Exhibit P.

426.     Relator initiated this patient encounter based on a request of facility physical therapist staff.

427.     Relator was familiar with Patient 10 based on prior evaluations.

-61-

428.     Relator conducted a brief physical exam, reviewed blood pressure, current medications and labs, and reviewed anti-seizure medication levels, and approved continued physical therapy.

429.     Relator made no medical adjustments to Patient 10's care plan.

430.     The total time of this patient encounter was between 5 to 10 minutes, particularly given Relator's familiarity with Patient 10.

431.     This was a routine visit with straightforward or low complexity medical decision-making.

432.     Relator documented in good faith the patient encounter in the KareFirst Charting System.

433.     The KareFirst Charting System illegally coded the Patient 10 encounter as CPT® Code 99310, which was the highest level of complexity.

**K.     Patient 11—Non-Face-to-Face Services Not Rendered**

434.     On December 10, 2018, Relator provided non-face-to-face services in connection with Patient 11's admission to one of Relator's assigned facilities. *See* Exhibit Q.

435.     Relator initiated non-face-to-face services related to Patient 11 pursuant to KareFirst's clinical policies and procedures.

436.     Relator reviewed Patient 11's medical records. This required only 5 to 10 minutes.

437.     However, Relator had already completed substantially the same task the previous day when Relator evaluated Patient 11 during Patient 11's initial admission.

438.    Relator documented this non-face-to-face patient service consistent with KareFirst policies and procedures in the KareFirst Charting System, which illegally coded this service under CPT® Code 99358.

**L.    Patient 12—Non-Face-to-Face Services Not Rendered**

439.    On December 10, 2018, Relator provided non-face-to-face services in connection with Patient 12's admission to one of Relator's assigned facilities.  *See* Exhibit R.

440.    Relator initiated non-face-to-face services related to Patient 12 pursuant to KareFirst's clinical policies and procedures.

441.    Relator reviewed Patient 12's medical records.  This required only 5 to 10 minutes.

442.    However, Relator had already completed substantially the same task the previous day when Relator evaluated Patient 12 during Patient 12's initial admission.

443.    Relator documented this non-face-to-face patient service consistent with KareFirst policies and procedures in the KareFirst Charting System, which illegally coded this service under CPT® Code 99358.

**M.    Patient 13—Non-Face-to-Face Services Not Rendered**

444.    On December 10, 2018, Relator provided non-face-to-face services in connection with Patient 13's admission to one of Relator's assigned facilities.  *See* Exhibit S.

445.    Relator initiated non-face-to-face services related to Patient 13 pursuant to KareFirst's clinical policies and procedures.

446.    Relator reviewed Patient 13's medical records. This required only 5 to 10 minutes.

447.    However, Relator had already completed substantially the same task the previous day when Relator evaluated Patient 13 during Patient 13's initial admission.

448.    Relator documented this non-face-to-face patient service consistent with KareFirst policies and procedures in the KareFirst Charting System, which illegally coded this service under CPT® Code 99358.

**N.    Patient 14—Non-Face-to-Face Services Not Rendered**

449.    On December 10, 2018, Relator provided non-face-to-face services in connection with Patient 14's admission to one of Relator's assigned facilities. *See* Exhibit T.

450.    Relator initiated non-face-to-face services related to Patient 14 pursuant to KareFirst's clinical policies and procedures.

451.    Relator reviewed Patient 14's medical records. This required only 5 to 10 minutes.

452.    However, Relator had already completed substantially the same task the previous day when Relator evaluated Patient 14 during Patient 14's initial admission.

453.    Relator documented this non-face-to-face patient service consistent with KareFirst policies and procedures in the KareFirst Charting System, which illegally coded this service under CPT® Code 99358.

## IX.    CLAIMS FOR RELIEF

454.    Defendants specifically violated the FCA by:

(a)    Developing and utilizing the proprietary KareFirst Charting System software to automatically upcode patient encounters, document medically unnecessary services as necessary, and document services not rendered, thereby tainting each claim made to federally-sponsored healthcare programs with FCA violations;

(b)    Causing the submission of false claims to the United States seeking to be paid for claims for KareFirst services in nursing facilities.

(c)    Unlawfully retaining payments from federally-sponsored healthcare plans for KareFirst claims for services in nursing facilities, even though Defendants were required to remit such payments to the United States and failed to do so even after Relator complained to Defendants.

455.    Defendants with actual knowledge, or in reckless disregard or deliberate ignorance of, the truth submitted or caused to be submitted false and fraudulent claims for KareFirst services in nursing facilities that have been paid by federally-sponsored healthcare programs.  This has resulted directly from Defendants' submitting false and fraudulent claims for KareFirst services in nursing facilities.

456.    Defendants acted with actual knowledge of, or in reckless disregard or deliberate ignorance of, the truth when they made false and fraudulent claims for KareFirst services in nursing facilities.

457.    Despite this knowledge (or reckless disregard or ignorance), Defendants fraudulently concealed from the United States false and fraudulent claims for KareFirst services in nursing facilities.

458. Defendants have a strong financial disincentive to address the conduct alleged in this Complaint, and Defendants have not done so to date.

459. To properly address the issue, Defendants would have to disclose to the United States the unlawful conduct alleged in this Complaint and individually remit all KareFirst payments received from federally-sponsored healthcare programs.

460. Defendants simply would not risk making such a disclosure because of the potential financial and reputational harm.

461. Defendants would also risk the potential of being excluded by the HHS-OIG from participation in any federally-sponsored healthcare programs, which would also have significant collateral consequences for each of the Defendants.

462. To date, Defendants, particularly All and Wilson, have not self-reported the unlawful conduct alleged in this Complaint to the United States and affected state governments. Defendants, particularly All and Wilson, did the opposite when faced with an affirmative duty to do so.

### FIRST CAUSE OF ACTION
**Presentation or Causing the Presentation of False Claims
Pursuant to 31 U.S.C. § 3729(a)(1)(A)**

463. Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

464. Each time Defendants caused a claim for KareFirst services to be presented to a federally-sponsored healthcare program, Defendants caused the submission of a false claim to the United States.

465. The claim was false because payment was directly caused by Defendants' proprietary KareFirst Charting System that automatically upcoded patient

encounters, falsely documented medically unnecessary services, and services not rendered.

466. Defendants knew the claims for KareFirst services in nursing facilities were false when submitted because Defendants directed the illegal scheme that was premised on false and fraudulent claims.

467. Defendants are separately and individually liable to the United States for the cost of KareFirst claims submitted to federally-sponsored healthcare programs from 2013 until the date of this Complaint based on the illegal conduct alleged therein.

## SECOND CAUSE OF ACTION
### Making or Using False Record or Statement to Cause Claim to be Paid
### Pursuant to 31 U.S.C. § 3729(a)(1)(B)

468. Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

469. In order to submit the false and fraudulent claims for KareFirst services in nursing facilities, Defendants utilized the proprietary KareFirst Charting System to systematically upcode patient encounters, falsely document medically unnecessary services, and services not rendered.

## THIRD CAUSE OF ACTION
### Making or Using False Record or Statement to Avoid an Obligation to Refund
### Pursuant to 31 U.S.C. § 3729(a)(1)(G)

470. Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

471. As particularly set forth in the foregoing paragraphs, by the acts alleged, Defendants have knowingly made, used, or caused to be made or used, false records or statements to knowingly conceal or knowingly and improperly avoid or

decrease an obligation to pay or transmit money to the United States arising from false and fraudulent claims for KareFirst services in nursing facilities and the refusal to report the same to the United States.

## FOURTH CAUSE OF ACTION
### Fraudulent Inducement
### Pursuant to 31 U.S.C. § 3729(A)(1)(G)

472.    Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

473.    To convince federally-sponsored healthcare programs to pay for KareFirst services, Defendants fraudulently promised to provide medically necessary care in a safe manner in compliance with applicable laws. Defendants knew at the time no such claims could be made by KareFirst given its illegal business model.

474.    If the United States knew Defendants made these false representations, the United States would not have paid for KareFirst claims through federally-sponsored healthcare programs based on the illegal conduct alleged therein from 2013 until the date of this Complaint.

## FIFTH CAUSE OF ACTION
### Retaliatory Discharge
### Pursuant to 31 U.S.C. § 3730(h)

475.    Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

476.    Relator's act of reporting Defendants' unlawful conduct, as more particularly described in Paragraphs 82 through 91 and Paragraphs 209 through 330, was lawful conduct "in furtherance of" an FCA action.

477.    Relator personally told All on November 13, 2018 that he would file a *qui tam* action against Defendants if All did not stop the illegal KareFirst conduct.

-68-

478.    Relator's protected conduct put Defendants, particularly All, on notice of the distinct possibility of a *qui tam* action.

479.    Defendants, individually and separately, each discriminated against Relator by intimidating, harassing, and ultimately terminating Relator for reporting their unlawful conduct.

## SIXTH CAUSE OF ACTION
### Illinois False Claims Act
### 740 Ill. Comp. Stat. §§ 175/1-8

480.    Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

481.    This is a claim for treble damages and penalties under the Illinois FCA.

482.    Defendants knowingly presented or caused to be presented, false or fraudulent claims for services to the State of Illinois for payment or approval.

483.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Illinois to approve and pay such false and fraudulent claims.

484.    The State of Illinois, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

485.    The State of Illinois has been damaged, and continues to be damaged, in an amount to be determined at trial.

486.    The State of Illinois is entitled to the maximum penalty for each and every violation alleged herein.

### SEVENTH CAUSE OF ACTION
**Retaliatory Discharge**
**Pursuant to 740 Ill. Comp. Stat. § 175/4(G)**

487. Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

488. Relator's act of reporting Defendants' unlawful conduct, as more particularly described in Paragraphs 82 through 91 and Paragraphs 209 through 330, was lawful conduct "in furtherance of" an Illinois false claims action.

489. Relator personally told All on November 13, 2018 that he would file a *qui tam* action against Defendants if All did not stop the illegal Karefirst conduct.

490. Relator's protected conduct put Defendants, particularly All, on notice of the distinct possibility of a *qui tam* action.

491. Defendants, individually and separately, each discriminated against Relator by intimidating, harassing, and ultimately terminating Relator for reporting their unlawful conduct.

### EIGHTH CAUSE OF ACTION
**Indiana Medicaid False Claims and Whistleblower Protection Act**
**Ind. Code 5-11-5.7-1, *et seq*.**

492. Relator repeats and incorporates by reference the allegations in Paragraphs 1 through 453 as if fully set forth herein.

493. This is a claim for treble damages and penalties under the Indiana Medicaid False Claims and Whistleblower Protection Act.

494. Defendants knowingly presented or caused to be presented, false or fraudulent claims for services to the State of Indiana for payment or approval.

495.    Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the State of Indiana to approve and pay such false and fraudulent claims.

496.    The State of Indiana, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for Defendants' unlawful conduct.

497.    The State of Indiana has been damaged, and continues to be damaged, in an amount to be determined at trial.

498.    The State of Indiana is entitled to the maximum penalty for each and every violation alleged herein.

## X.    **DEMAND FOR RELIEF**

**WHEREFORE**, Relator Merchant Adams, on behalf of the United States of America and the States of Illinois and Indiana, demands judgment against each of the Defendants as to the violations alleged herein, ordering that:

(A)    Under 31 U.S.C. § 3729(a), Defendants separately and independently pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $22,363 for each violation, to be paid separately and independently by each of the Defendants, or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq.*;

(B)    Relator be awarded the maximum amount allowed under 31 U.S.C. § 3729(d) of the FCA and/or any other applicable provision of law;

(C)     Relator be awarded all costs and expenses, including attorneys' fees, as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law;

(D)     Relator be awarded the maximum amount as provided by 31 U.S.C. § 3730(h) to make him whole, including two times back pay, interest on such back pay, and compensation for special damages sustained because of the retaliatory discharge, including litigation costs and reasonable attorneys' fees;

(E)     Relator be awarded the maximum amount as provided by 740 Ill. Comp. Stat. § 175/4(g) to make him whole, including two times back pay, interest on such back pay, and compensation for special damages sustained because of the retaliatory discharge, including litigation costs and reasonable attorneys' fees;

(F)     Relator be awarded such other and further relief as the Court may deem to be just and proper, including a permanent injunction against Defendants from continuing to engage in the same or similar conduct with KareFirst and any other healthcare company that All invests in personally, including through Lomata, or any other entity, with or without the assistance of Defendants.

(G)     The State Governments of Illinois and Indiana be awarded the maximum penalty for each and every violation alleged herein under their respective state FCA statutes.

## TRIAL BY JURY

Relator hereby demands a trial by jury as to all issues.


Dated:  April 18, 2019

<div style="margin-left: 3em">

Respectfully submitted,

BREWSTER LAW FIRM LLC

_____

Philip S. Brewster
Brewster Law Firm LLC
560 Green Bay Road
Suite 402
Winnetka, Illinois  60093
Tel:  (847) 386-6514
Email:  philip.brewster@brewsteradvisory.com

*Co-Counsel for Plaintiff-Relator*


_____

Matthew K. Organ
Goldberg Kohn Ltd.
55 East Monroe Street
Suite 3300
Chicago, Illinois  60603
Tel:  (312) 201-3982
Email:  matthew.organ@goldbergkohn.com

*Co-Counsel for Plaintiff-Relator*

</div>

A

## Exhibit A

Relator Employment Agreement
Dated May 1, 2018

(See Attached)

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made and entered on April 12, 2018 (the "Effective Date"), by and between KAREFIRST ILLINOIS P.C., an Illinois corporation ("KareFirst") and Merchant Adams ("Employee"). Your "Start Date" will be May 1, 2018.

In consideration of the premises and the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Establishment of Employment.** Employee shall be employed as a nurse practitioner(NP) to provide services for KareFirst's patients as directed by KareFirst. All such services shall be provided in accordance with KareFirst's policies, rules and regulations, as well as KareFirst's Employee Handbook (sometimes collectively referred to as the "Rules"), all of which are hereby incorporated by reference. KareFirst may add, amend or delete provisions from its Rules from time to time and will use best efforts to provide timely notice to Employee of any such changes. Employee agrees that Employee shall devote all of Employee's professional time, knowledge and skill to Employee's employment. Employee may engage in activities outside of Employee's employment if: (a) they do not interfere in the duties of Employee hereunder; (b) do not violate the provisions of Section 16; (c) do not present any conflict of interest to Karefirst or adversely impact KareFirst's reputation as determined by KareFirst; and (d) are covered by Employees separate malpractice insurance that KareFirst does not pay for and covers Employee for clinical activities outside of KareFirst if applicable.

Employee shall be a full-time employee of KareFirst and will be expected to provide primary care services to patients at their assigned facility. Employee will work a minimum of 5 days a week with a commitment of at least 40 hours a week. Employee shall work and be on-call as scheduled by KareFirst, at such facilities as assigned by KareFirst from time to time (the "Facilities").

2. **Qualifications of Employee.** Employee hereby represents to KareFirst that Employee shall meet and maintain all statutory and regulatory requirements of the State of Illinois relating to the licensure and regulation of NPs. Further, Employee represents that Employee:

(a) Is currently licensed to practice professional nursing and as an Advance Practice Nurse in the State of Illinois and has never had his or her licenses suspended or revoked in Illinois or any other state;

(b) Holds a current national certification from the American Nurses Credentialing Center or another certification approved by KareFirst;

(c) Has not been convicted of any crime in the past ten (10) years and is not currently involved in any criminal proceedings;

(d) Has never been excluded by Medicare or Medicaid and is not currently under investigation with any payor; and

(e) Has experience and does not require training to be able to perform the following duties: conduct the health assessment of a patient, diagnose patients; take patient histories; perform physical examinations; order appropriate diagnostic tests; develop and implement plans of care and treatment for patients and evaluate patient status; manage primary care conditions (common acute, chronic stable or health maintenance conditions) and secondary care conditions (unfamiliar,

Page 1 of 15

uncommon, unstable or complex conditions), and evaluate tertiary care conditions (acute, life-threatening conditions such as respiratory and cardiac arrest). Employee represents that Employee is able to perform the services described herein and assist in the admission, transfer or discharge of patients from Facilities.

3. **Treatment of Patients.** Employee acknowledges that Employee's treatment of patients may or may not be under the supervision of a physician (the "Collaborating Physician"). HB 313, Senate Amendment 1: Full Practice Authority for APRNs, grants an Illinois licensed Advanced Practice Registered Nurse, who is a certified as a nurse practitioner, the ability to practice without a written collaborative agreement if the NP qualifies based on specific conditions.

If the NP qualifies for a Scope of practice with Full Practice Authority in Illinois then the NP and a Collaborating Physician will sign a notarized attestation that the NP has 1) 4,000 hours of clinical experience and 2) 250 hours of continuing education or training after first attaining national certification and 3) such documentation shall be provided to IDFPR. Clinical experience must be in NPs area of certification, in collaboration with a physician/s and must be attested to by Collaborating Physician and NP.

If the NP does not qualify for a Scope of practice with Full Practice Authority then the NP and a Collaborating Physician will sign a Collaborating Agreement prior to rendering services as an Employee of KareFirst.

Employee further agrees to the following:

(a) Join the ancillary medical staff and retain staff privileges at the Facilities, and will render all services required by the Operating Standards or other policies established by the Facilities.

(b) Render all services under this Agreement and provide all procedures and consultations in a competent and efficient manner. Employee shall be expected to treat all patients consistently and in compliance with the standards established in the medical community in which KareFirst and Facilities are a part, as well as with all applicable state and federal laws related to the care of patients.

(c) Prepare and complete all of the usual and customary patient records and forms involved in attending to patients at the Facilities, including a progress note and face sheet for each patient, and shall participate in the preparation of forms and other billing data as may be requested by KareFirst. Employee further agrees that all such records and forms shall be promptly and accurately completed as directed by KareFirst.

(d) Participate in all medical, educational and audit activities performed within KareFirst or within the Facilities or as may be required by federal and state regulatory agencies including, but not limited to, analysis of protocol outliers and outcomes, as well as KareFirst quality assurance and quality improvement programs.

(e) Be responsible for all clinical responsibilities within her scope of practice including those described in Section 2(e) which Employee specifically represents Employee has the experience and training to perform as of the Effective Date

Employee also understands that Employee may be relieved from treating any patient or patients if Employee fails to adhere to KareFirst's Rules as well as the rules and regulations of the Facilities.

Page 2 of 15

Employee further agrees that KareFirst may relieve Employee from treating any patient whom KareFirst feels would be better treated by another employee. Employee agrees that in dealing with patients or prospective patients of KareFirst, Employee will give no assurance in any form to such persons that Employee or any particular employee of KareFirst will treat such patient, it being expressly understood that KareFirst, or its delegates shall have the sole authority to determine which Employee shall perform professional services for any particular patient of KareFirst.

**4. Term of Employment.** The term of Employee's employment hereunder shall begin on the Start Date for a period of twelve (12) months. The first 12 months are considered the "First Employment Year". Employee may terminate the agreement by either 1) completing the First Employment Year and giving a sixty (60) day written notice whereby their last day can be as soon as the last day of the First Employment Year or 2) providing ninety (90) days' notice or 3) paying the amount of $10,000 ("Early Termination Damages") to KareFirst to compensate KareFirst for Employee's failure to complete a full year of employment and the damages KareFirst will suffer since its investment in Employee will not be recouped prior to completion of a full employment year by Employee. Such costs include, but are not limited to, the cost of training, credentialing, licensure and recruitment of Employee. The parties agree that this amount is a fair representation of the actual damages KareFirst will incur if Employee fails to complete an entire year of employment with KareFirst, and is not intended as a penalty. Early Termination Damages will be payable within 30 days of termination and KareFirst may apply any amounts owed to Employee upon termination against the Early Termination Damages owed by Employee. Employee shall also pay any costs and legal fees incurred by KareFirst in collecting and/or enforcing this provision.

KareFirst may terminate this Agreement on fourteen (14) days' notice at any time. In addition, and not by way of limitation hereof, this Agreement may, in KareFirst's sole discretion, be immediately terminated for any one or more of the following reasons:

(a) Revocation or suspension of: (i) Employee's license to practice as a nurse or Nurse Practitioner in the State of Illinois or any other state; or (ii) Employee's DEA license or registration in the State of Illinois or any other state; or (iii) other major disciplinary action of any constituted authority taken with respect to Employee or Employee's license(s);

(b) Inability of KareFirst to secure malpractice coverage for Employee in accordance with the provisions of Section 6 of this Agreement;

(c) Failure by Employee to maintain Employee's certification in accordance with the provisions of Section 2 herein including, failure to obtain required Continuing Education Units(CEU) credits to maintain licensure and failure to continuously meet any other representations of Section 2;

(d) Substandard performance of Employee's duties or obligations hereunder as reasonably determined by KareFirst including, without limitation: poor clinical performance; incompatibility with KareFirst's employees, patients or Facility personnel; or a demonstrated unwillingness or inability to follow the professional instructions of the Collaborating Physician;

(e) Indictment or conviction of Employee of a felony or a crime involving dishonesty or moral turpitude in any jurisdiction;

(f) The use of drugs, alcohol or any other intoxicant by Employee to the extent such use impairs Employee's ability to provide high quality medical services or adversely affects KareFirst's reputation;

Page 3 of 15

(g) Employee's bankruptcy, assignment for the benefit of creditors or any other action taken by the Employee or third parties with respect to the Employee for debt relief;

(h) Employee's disability or illness for a period of at least: (i) 90 consecutive days; or (ii) 120 days in any 12 consecutive month period;

(i) Employee's failure to maintain unrestricted privileges at any Facility, if applicable;

(j) The suspension or termination of Employee's status as a Medicare or Medicaid provider or as a participating provider with any managed care organizations designated by KareFirst;

(k) Failure by Employee to fully cooperate in any review of Employee's credentials, qualifications or compliance with this Agreement or the failure or refusal by Employee to diligently perform Employee's duties under this Agreement or to comply with the Rules, or the appropriate authorities or regulations of any Facilities at which Employee provides services hereunder;

(l) Unprofessional, unethical, immoral or fraudulent conduct by Employee, as determined in the reasonable judgment of KareFirst;

(m) Gross professional negligence by Employee;

(n) Employee's misrepresentation or omission of information provided pursuant to the application process for retention by KareFirst or privileges at any of the Facilities, including the history of Employee's past malpractice claims as required pursuant to Section 6;

(o) The request by any Facility to remove or replace Employee with another provider or the loss of any Facility agreement by KareFirst;

(p) Employee's representation to any third party that Employee has a right to speak for, enter into an agreement or otherwise bind KareFirst or its employees and contractors in any way, or the entering into any agreement in the name of KareFirst, whether orally or in writing;

(q) Employee's failure to disclose to KareFirst in writing prior to execution of this Agreement: (i) any professional disciplinary proceeding in any state by federal or state authorities; or (ii) any disciplinary action by any hospital or any other health care facility; and

(r) Employee's material breach of this Agreement, subject to KareFirst's provision of written notice specifying the actions, conduct or omissions constituting the allegation(s) of material breach and Employee's cure of the breach within five (5) days after receipt of the notice. There shall be only one (1) opportunity to cure a particular breach.

**5. Compensation.** For all services rendered by Employee hereunder, KareFirst shall compensate Employee as designated in Exhibit A, attached hereto and made a part of this Agreement by this reference.

**6. Malpractice Insurance.** You will be covered for clinical services you perform for KareFirst with malpractice insurance under the KareFirst group policy. Employee shall, in writing, notify KareFirst immediately if Employee is named as a part of a lawsuit concerning their services provided as an employee for KareFirst or any lawsuit arising from Employee's action's. Employee shall provide a

complete statement of any and all malpractice lawsuits or charges against Employee related to Employee's licensure and practice of nursing or advance practice nursing in any state.

It shall be a condition of employment with KareFirst that if Employee had malpractice insurance previously to provide evidence of malpractice coverage covering Employee during all periods of time prior to the Effective Date covering periods of time when Employee was rendering professional services. Employee shall provide a complete statement from the carrier(s) of any and all malpractice lawsuits or charges against Employee related to Employee's licensure and practice of nursing or advance practice nursing in any state.

7. **Termination of Employment.** If Employee shall permanently leave the employment of KareFirst for any reason whatsoever, it is agreed that Employee shall receive any Base Salary which Employee is owed by KareFirst through the date of termination, payable within thirty (30) days following the effective date of termination, less any prepaid large benefits from which Employee will continue to benefit following termination including, but not limited to, prepaid malpractice insurance premiums prorated based on the duration of the policy period.

8. **Endorsement of Checks.** Upon the execution of this Agreement, the Employee agrees to execute a Power of Attorney in the form attached hereto, made a part hereof and designated as Exhibit B authorizing KareFirst or a designated agent of KareFirst to take certain actions, including the endorsement of checks payable to the Employee for the services rendered by the Employee for KareFirst during the term of this Agreement.

9. **Severability.** If any section or portion of any section of this Agreement shall be for any reason determined to be excessive, invalid or unenforceable, such excessive, invalid or unenforceable section or portion of such section shall be redetermined to make such section or portion of such section valid, enforceable and carried into effect unless to do so would clearly violate the present legal and valid intentions of the parties hereto.

10. **Prohibition Against Assignment.** Employee agrees that this Agreement and the rights, interests and benefits hereunder shall not be subject to execution, attachment, or similar process. Any attempt to assign, transfer, pledge, hypothecate or otherwise dispose of this Agreement or of such rights, interests and benefits contrary to the foregoing provisions, or the levy of any attachment or similar process thereupon shall be null and void and without effect and shall relieve KareFirst of any and all liability hereunder.

11. **Notice.** Business and legal notices, designations, consents, offers, acceptances and other communications pertaining to this agreement shall be in writing and shall be deemed duly given by both 1) sending an email and 2) if delivered in person, by courier, or overnight delivery by FedEx or USPS, to the following:

If to Company:

Alvin All
Chief Executive Officer
KareFirst Management Corporation
4711 Golf Rd., Suite 1250
Skokie, IL 60076
Fax: (847) 235-6135
alvinall@karefirst.com

If to Employee:

REDACTED

Street Address:

City State Zip Code:

Email Address:

Phone:

Fax:

**12. Governing Law.** This Agreement shall be subject to and governed by the laws of the State of Illinois, irrespective of the fact that Employee may become a resident of a different state. Any cases brought by either party related to this Agreement shall be brought in Cook County, Illinois.

**13. Binding Effect.** This Agreement shall be binding upon and inure to the benefit of KareFirst and Employee and their respective heirs, legal representatives, executors, administrators, successors, and assigns.

**14. Employers Property.**

(c)    All notes, reports, sketches, plans, published memoranda, electronic data files, computer files, technology equipment including but not limited to a laptop, mouse or hotspot, or other documents created, developed, generated or held by Employee during employment, concerning or related to KareFirst business, and whether containing or related to Confidential Information or not, are the property of KareFirst and will be promptly delivered (with all copies thereof) to KareFirst upon termination of Employee's employment for any reason whatsoever; provided, that in the case of electronic data and computer files concerning KareFirst's business which may be maintained on a computer or electronic instrument owned by Employee, all such files shall be returned to KareFirst, and such files shall be permanently deleted from the Employee's computer and/or from any and all electronic instruments, as applicable. During the course of employment, Employee shall not remove any of the above property containing Confidential Information, or reproductions or copies thereof, or any apparatus from KareFirst's premises without authorization.

**15. Non-Disclosure of Confidential Information.**

(a)    Employee hereby acknowledges that during the course of Employee's employment, Employee will learn or develop Confidential Information (as hereinafter defined) in trust and confidence. Employee acknowledges that unauthorized disclosure or use of Confidential Information, other than in discharge of Employee's duties, will cause KareFirst irreparable harm. Employee shall maintain Confidential Information in strict confidence at all times and shall not divulge Confidential Information to any unauthorized person or corporation or other entity, or use in any manner, or knowingly allow another to use Confidential Information, without KareFirst's written consent, either during the term of employment or thereafter, for as long as said information remains confidential. Employee further acknowledges that KareFirst will be harmed by unauthorized disclosure or use of Confidential Information regardless of where such disclosure or use occurs, and that therefore the provisions of this Section 14 are not limited to any single state or other jurisdiction.

(b)    During Employee's business relationship with KareFirst, and thereafter, Employee agrees that Employee shall refrain from giving or participating in any interviews regarding or related to KareFirst,

Page 6 of 15

its managers or employees, Employee's business relationship with KareFirst and/or any matter which concerns, relates to or involves any Confidential Information, unless given express written consent by the Company.

(c)     All notes, reports, sketches, plans, published memoranda, electronic data files, computer files or other documents created, developed, generated or held by Employee during employment, concerning or related to KareFirst business, and whether containing or related to Confidential Information or not, are the property of KareFirst and will be promptly delivered (with all copies thereof) to KareFirst upon termination of Employee's employment for any reason whatsoever; provided, that in the case of electronic data and computer files concerning KareFirst's business which may be maintained on a computer or electronic instrument owned by Employee, all such files shall be returned to KareFirst, and such files shall be permanently deleted from the Employee's computer and/or from any and all electronic instruments, as applicable. During the course of employment, Employee shall not remove any of the above property containing Confidential Information, or reproductions or copies thereof, or any apparatus from KareFirst's premises without authorization.

(d)     For purposes of this Agreement, the term "Confidential Information" shall mean all proprietary information of KareFirst, and for purposes hereof, shall include any information which is not generally known to the public, information which relates to KareFirst's trade secrets or business affairs, business policies, computer programs, marketing and business plans, financial information, all agreements (including this Agreement), KareFirst employment practices or policies applicable to its employees and/or contractors, KareFirst's officers, directors, managers and employees' private lives, employees' and contractors' responsibilities, competence, abilities and compensation, current and prospective collaborating facilities/entities, patient lists, KareFirst's medical billers' data processing, information protected under HIPAA and information that has been identified to Employee as confidential by KareFirst, either orally or in writing. Confidential Information does not include: (i) written information legally acquired by Employee on a non-confidential basis prior to negotiations leading to this Agreement; (ii) information which is a matter of public knowledge; (iii) information which is or becomes available to Employee from third parties, who in making such disclosure breached no confidentiality obligation to KareFirst; and (iv) Employee's general skills and experience as defined under the governing law of this Agreement.

## 16. Covenant of Employment.

(a)     It is expressly recognized and acknowledged by Employee that Employee desires employment with KareFirst, and that as a result of such employment by KareFirst, Employee will become familiar and possessed of the manner and method by which KareFirst renders its services and other valuable and proprietary information. Employee will further become personally acquainted with the patients and individuals doing business with KareFirst. Employee acknowledges that KareFirst has a near-permanent relationship with its patients, clients and the Facilities. Accordingly, KareFirst will suffer significant loss and damage if Employee should compete with KareFirst in any fashion as hereinafter provided. Employee further recognizes and acknowledges that it would be difficult, if not impossible, to compute the amount of such loss or damage to KareFirst, and that an action at law to compensate KareFirst for such loss or damage would be speculative and, therefore, inadequate for the reasonable protection of KareFirst. Accordingly, KareFirst is without an adequate remedy in the event Employee violates any of the covenants contained herein. Employee acknowledges that the covenants and conditions of this Agreement are reasonable and necessary for the protection of KareFirst's business.

(b)     Subject to the limitations provided in this Section 16, Employee expressly covenants and agrees that during the term of Employee's employment with KareFirst and for a period of two (2) years

immediately following the expiration or termination of Employee's employment with KareFirst for any reason or for no reason (the "Covenant Period"), Employee shall not directly or indirectly, on behalf of Employee or any other person or entity:

(i) perform services which are the same or competitive with those offered by KareFirst for any Facility serviced by Karefirst at the time of Employee's termination or in the twelve (12) month period prior to termination (a "Contracted Facility");

(ii) solicit, entice, convince or encourage any Contracted Facility to terminate their contract or relationship with KareFirst, or to enter into a contract or relationship with any other person/entity or any organization that provides medical services or the same or similar services to those offered by KareFirst;

(iii) solicit any employees, contractors or Collaborating Physicians of KareFirst to become employees, contractors or agents of any other person, firm or entity; or

(iv) solicit any patients or their family members to seek services from any person or entity other than KareFirst.

(c)     Employee understands that these are restrictive covenants and fully agrees to the reasonability thereof. If, for any reason, the covenants provided for above shall be deemed too extensive and therefore unreasonable, such covenants shall be reinterpreted to requalify the limitations provided therein so as to make said covenants enforceable, as long as the modifications to be made will not substantially defeat the original purposes of the parties hereto. If Employee violates these covenants and KareFirst brings legal action for injunctive or other relief, the covenants shall be deemed to have the duration specified herein, computed from the date the relief is granted.

(d)     In addition to the injunctive relief which any court of competent jurisdiction will allow KareFirst, the parties have carefully reviewed this matter, and agree that in the event of a breach of this Section 16 of this Agreement by Employee, Employee shall become liable to KareFirst for liquidated damages ("Liquidated Damages") in the amount of Ten Thousand Dollars ($10,000) per month that any violation of this Section 16 by Employee shall continue, prorated for periods of less than one (1) month. Both parties hereby expressly agree that the Liquidated Damages are a fair estimate of the damages that would be sustained by KareFirst in the event of Employee's breach of this Section 16 and such amount is not a penalty or a forfeiture; rather, by virtue of the difficulty of assessing the actual monetary losses KareFirst would suffer as a result of Employee's breach of this provision, the parties have determined that said sum is reasonable and fair as Liquidated Damages.

(e)     In the event that this Agreement expires and Employee continues employment with KareFirst without the benefit of a new written agreement which states that the new agreement supersedes all prior agreements between the parties, then the provisions of this Section shall nonetheless remain in effect and the Covenant Period will be measured from the date Employee's KareFirst employment actually terminates.

(f) In consideration of Employee's agreement to the terms of this Section 16, Employee shall be compensated as set forth in Exhibit A.

17. __Non-Disparagement.__  Employee agrees that during the term of Employee's employment by KareFirst, and at all times subsequent thereto, Employee shall maintain a professional relationship and shall conduct himself/herself with office staff, Facility personnel and other third parties with whom

he/she comes into contact, (whether in a direct or indirect professional capacity), in a professional manner and specifically agrees not to disparage KareFirst, its employees or officers or otherwise discuss practice-related internal matters of KareFirst of any kind with any third party. Employee hereby agrees that this covenant shall be in force during the term of this Agreement and forever subsequent thereto.

18. **KareFirst's Right to Inventions and Discoveries.** Any Intellectual Property based upon Confidential Information and developed at any time either during or after the term of Employee's employment shall be the property of KareFirst. Employee shall assign to KareFirst, or its designees, Employee's entire right, title and interest in said Intellectual Property. Consistent with Illinois law and laws of other states, KareFirst acknowledges that no provision in this Agreement is intended to require assignment of any of Employee's rights in an invention if no equipment, supplies, facilities or trade secret information of KareFirst was used, and the invention was developed entirely on Employee's own time, unless the invention relates to the business of KareFirst or to KareFirst's actual or demonstrably anticipated research and development, or the invention results from any work performed by Employee for KareFirst.

For purposes of this provision, the term "Intellectual Property" shall mean all discoveries, inventions, improvements, formulas, ideas, devices, writings or other similar things, including, but not limited to, notes, records, reports, sketches, plans, memoranda and other tangible information related to such Intellectual Property, whether or not subject to protection under patent or copyright laws, which Employee shall conceive solely or jointly with others in the course of or within the scope of Employee's employment by KareFirst, or which relates directly to the business of KareFirst or KareFirst's actual or anticipated research and development, or which was conceived or created using KareFirst's material or facilities, whether during or after working hours.

19. **Indemnification.** Employee agrees to defend, indemnify and hold harmless KareFirst, its shareholders, employees, contractors, agents and representatives (the "Indemnified Parties") from and against any loss, injury liability, claim, damage or expense (including, without limitation, reasonable attorneys' fees, interest and costs, including attorneys' fees to enforce this provision) arising from, related to or connected with: (i) the negligent actions or omissions of Employee in the performance of Employee's duties under this Agreement; (ii) Employee's knowing and willful failure or refusal to observe or perform any obligation, representation, warranty or covenant in this Agreement; and (iii) violation by Employee of HIPAA, the billing rules and regulations of any payor or any other state and federal law to which Employee or KareFirst is subject. The obligation to defend the Indemnified Parties shall arise at the time notice of the Claim, demand or lawsuit is delivered to Employee and shall exist regardless of whether the Claim, demand or lawsuit has merit and regardless of the outcome. The provisions of this Section 18 shall survive termination of this Agreement, but shall not apply to any claim to the extent it is otherwise covered by insurance. Once the Indemnified Parties have provided notice to Employee, the Employee shall have the right to choose counsel reasonably acceptable to the Indemnified Parties. Failure to give prompt notice pursuant to this Section shall not relieve Employee's obligations of defense and indemnification except to the extent that Employee is actually prejudiced by such failure to give timely notice. No settlements or adjustments shall be made without KareFirst's prior written consent, which consent shall not be unreasonably withheld, unless settled without an admission of liability.

20. **Entire Agreement.** This Agreement and the Rules, as well as the attached Exhibits, constitute the entire agreement between the parties and contains all of the agreements between the parties with respect to the subject matter hereof. This Agreement supersedes any and all other agreements, either oral or in writing, between the parties hereto with respect to the subject matter hereof. No change or

Page 9 of 15

modification of this Agreement shall be valid unless in writing and signed by the person or party to be charged except that KareFirst shall have the right to modify the Rules and Exhibit A at any time upon notice to Employee. The parties agree that Sections 5 through 21, shall survive termination of this Agreement as well as any provision which is intended to survive by its terms.

**21. Headings.** The headings of this Agreement are inserted for convenience only, and are not to be considered in construction of the provision hereof.

**22. Compliance.** Employee agrees to comply with all federal and state statutes, as well as all applicable third-party payor rules, and regulation applicable to billing and reimbursement activities, including, but not limited to, the following activities: appropriate documentation of services in the medical record and coding, participation in all training and education activities offered by KareFirst as well as active participation in auditing and compliance activities. Additionally, Employee agrees to take such steps as may be necessary to assist KareFirst in implementing and complying with the provisions of KareFirst's Compliance Plan and Policies (the "CPP"). It shall be Employee's responsibility to monitor and audit Employee's own documentation and activities in order to assure compliance with the CPP and applicable laws, regulations and guidelines. Employee agrees that KareFirst shall be entitled to conduct periodic audits of Employee's documentation and coding practices in order to insure that codes and modifiers selected by Employee are appropriately supported by medical record documentation. Employee further agrees that in the event KareFirst finds evidence that Employee's coding activities do not comply with the CPP and/or any applicable law or third-party payor requirement, KareFirst will notify Employee in writing within 30 days of such a determination of deficiencies, including all claim-specific information and the rationale for the determination. If Employee fails to remediate such deficiencies promptly or if KareFirst discovers credible evidence of Employee's continued misconduct or flagrant, fraudulent or abusive conduct relating to claims, KareFirst shall, in addition to not submitting any false or inappropriate claims, have the right to terminate this Agreement and/or report the misconduct to appropriate authorities. The parties agree that "misconduct" shall not be considered to include inadvertent errors or mistakes. Such errors will be remediated through normal channels with the applicable carrier, intermediary, or CMS-designated payor.

In addition, Employee agrees to comply with all rules and regulations, as well as all training activities, established by KareFirst in order to satisfy the requirements of the Health Insurance Portability and Accountability Act ("HIPAA"). It shall be a condition of Employee's continued employment hereunder that Employee use Employee's best efforts to meet all applicable standards established by KareFirst to comply with HIPAA.

IN WITNESS WHEREOF, KareFirst has caused this Agreement to be signed by its duly authorized officers and Employee has executed this Agreement all on the day and year first above written.

**EMPLOYMENT AGREEMENT**
**SIGNATORY PAGE**

KareFirst Illinois P.C.

Signature: _____

Name: Kimberly R Wilson

Title: ANP

Date: 4-16-18

Employee

Signature _____

Name: Merchant Adams

Title: APN

Date: 4/16/18

EXHIBIT A

ATTACHED TO AND MADE A PART OF THE EMPLOYMENT AGREEMENT ENTERED INTO BY AND BETWEEN KAREFIRST ILLINOIS, P.C. ("KAREFIRST") AND Merchant Adams ("EMPLOYEE")

1.     For all services rendered by the Employee hereunder in each "Employment Year "(12 consecutive months worked), KareFirst shall pay to Employee an annual base salary ("Annual Base Salary") in the amount of One Hundred Ten Thousand Dollars ($110,000). Payment of the Annual Base Salary is conditioned upon Employee completing and submitting timely and accurate progress notes related to the primary care service performed by Employee. Employee will be paid a portion of the Annual Base Salary spread over 24 pay periods as defined as the 1st of the month to the 15th (First Monthly Pay Period) and the 16th to the end of the month (Second Monthly Pay Period) and both pay periods can be referred to as a "Pay Period".

Compensation in the Pay Period is calculated by dividing the Annual Base Salary by 24 Pay Periods which amount is defined as the "Pay Period Base Salary". If employee does not work all of the workdays in a Pay Period, and paid time off has not been earned and approved, a portion of the Pay Period Base Salary will be paid based on the day's work divided by the workdays in the Pay Period multiplied by the Pay Period Base Salary. A regular work day is considered not worked, if the employee 1) does not work at a facility, or 2) the employee works at a facility but has not completed their progress notes for patients attended to during the First Monthly Pay Period by the 15th day of the month or Second Monthly Pay Period by the last day of the month. A regular work day can be worked outside of a facility for a number of reasons such as a marketing event, but this must be approved by either the Chief of Nursing and/or Chief Executive Officer.

Employee has a Relative Value Units Equivalents Weekly Target ("RVU-EU Weekly Target") of fifty (50) RVU-EUs per week for a minimum of five days of work. This equates to 10 RVU-EUs per work day (RVU-EU Daily Target). Employee will be paid Twenty-Five Dollars ($25) per RVU-EU that exceeds the summation of achieved RVU-EUs in a Pay Period minus the summation of the RVU-EU Daily Target for the same Pay Period.

Employee will have a guaranteed $110,000 Annual Base Salary for 8 Pay Periods(equivalent of 4 months). After the 8 Pay Periods, if employee cannot achieve a rolling four-week summation of RVU-EUs that exceeds 200 RVU-EUs which is the equivalent of a target of 50 weekly RVU-EUs four weeks in a row, then employee's Annual Base Salary will change to $100,000 a year with a RVU-EU Weekly Target of fifty (50) RVU-EUs per week for five days of work.

If Employee's Annual Base Salary is decreased to $100,000 but Employee can achieve a rolling four week summation of RVU-EUs that meets or exceeds 200 RVU-EUs which is the equivalent of a target of 50 weekly RVU-EUs four weeks in a row, then employee's Annual Base Salary will revert back to the original compensation of $110,000 a year with a "RVU-EU Weekly Target" of fifty (50) RVU-EUs per week for a minimum of five days of work.

When Employee uses Paid Time Off days, the rolling four week target will be reduced by the RVU-EU Daily Target multiplied by the number of PTO days used. In essence you are not penalized for taking PTO days.

2.     In addition to Base Salary, Employee shall also be entitled to receive the following fringe benefits:

(i)      Twenty-three (23) days of paid time off ("PTO") per Employment Year and earned at 0.9583 PTO days per Pay Period.

(ii)     Malpractice insurance in accordance with Section 6 of the Agreement;

(iii)    Fifty percent (50%) of premiums towards Employee's medical and/or dental insurance and twenty five percent (25%) of the premiums towards the medical and/or dental insurance of Employee's dependents, all in accordance with the terms of such plans.

(iv)     If you do not use the dental insurance you will be reimbursed for vision and dental expenses not to exceed Five Hundred Dollars ($500) per Employment Year. If you use the dental insurance, you will be reimbursed for vision expenses not to exceed Two Hundred Fifty Dollars ($250) per Employment Year;

(v)      Reimbursement of approved continuing medical education ("CME") expenses not to exceed Five Hundred Dollars ($500) per Employment Year;

(vi)     Participation in KareFirst 401(k) program in accordance with the terms of such program(s) as they may exist from time to time.

3.       As consideration for the agreement of Employee to be bound by the provisions of Section 16, Employee will be paid $1,200 Dollars spread over 24 Pay Periods in the first 12 months.

KareFirst shall have the right to modify this Exhibit A at any time and shall provide notice of any such modifications to Employee.

KareFirst Illinois P.C.

Signature: _____

Name: Kimberly C Wilson

Title: AVP

Date: 4/16/18

Employee

Signature _____

Name: Merchat Adams

Title: APN

Date: 4/16/18

## EXHIBIT A
### TOTAL COMPENSATION EXAMPLE TABLE

| Estimated Daily RVU-EUs | Estimated Weekly RVU-EUs | Target Weekly RVU-EUs | RVU-EUs Over Target | Total RVUs | Payout for Extra RVUs | Base | Extra RVUs | Total Comp |
|---|---|---|---|---|---|---|---|---|
| 20 | 100 | 50 | 50 | 100 | $25 | $110,000 | $65,000 | $175,000 |
| 19 | 95 | 50 | 45 | 95 | $25 | $110,000 | $58,500 | $168,500 |
| 18 | 90 | 50 | 40 | 90 | $25 | $110,000 | $52,000 | $162,000 |
| 17 | 85 | 50 | 35 | 85 | $25 | $110,000 | $45,500 | $155,500 |
| 16 | 80 | 50 | 30 | 80 | $25 | $110,000 | $39,000 | $149,000 |
| 15 | 75 | 50 | 25 | 75 | $25 | $110,000 | $32,500 | $142,500 |
| 14 | 70 | 50 | 20 | 70 | $25 | $110,000 | $26,000 | $136,000 |
| 13 | 65 | 50 | 15 | 65 | $25 | $110,000 | $19,500 | $129,500 |
| 12 | 60 | 50 | 10 | 60 | $25 | $110,000 | $13,000 | $123,000 |
| 11 | 55 | 50 | 5 | 55 | $25 | $110,000 | $6,500 | $116,500 |
| 10 | 50 | 50 | 0 | 50 | $25 | $110,000 | $0 | $110,000 |

As an example, if Employee was able to generate 15 daily RVUs for 260 work days in the year, the bonus compensation would be $32,500 and this would be added to the Annual Base Salary of $110,000 leading to a total annual compensation of $142,500.

EXHIBIT B

POWER OF ATTORNEY

I hereby authorize KAREFIRST ILLINOIS P.C. ("KareFirst") to open any mail received by KareFirst so as to determine whether or not such envelopes contain payments for professional services provided by me during my term of employment with KareFirst. I agree that all checks which are received for services rendered for KareFirst are the property of KareFirst and may be endorsed by any agent or designee of KareFirst for deposit in KareFirst's bank accounts. In addition, I agree that any checks received after I terminate services with KareFirst, which are received for past services, may also be signed by any agent or designee of KareFirst and deposited in KareFirst's bank account.

If any checks are mailed to me at any other address for services rendered while working for KareFirst, I agree to mail all such checks to the then current office of KareFirst, properly endorsed for deposit in KareFirst's bank account.

I also authorize KareFirst to deposit in its bank account all cash receipts pertaining to services provided by me at the offices of KareFirst.

Finally, I agree that I shall sign all necessary billing forms in order to allow Medicaid and other insurance billing forms to be promptly submitted to these companies.

I understand that this is an irrevocable power of attorney executed by me in consideration of my employment by KareFirst.

Employee

Signature: _M_____

Name: _Merchant Adams_

Title: _APN_

Date: _4/16/16_

B

## Exhibit B

KareFirst Skilled Nursing Facility CPT Codes and RVU

(See Attached)

## Skilled Nursing Facility CPT Codes and RVU's

| Visit Type | CPT Code | Routine<br>Final RVU Value | Public Aid<br>Final RVU Value | Emergency Only<br>Final RVU Value | FACE TO FACE ***<br>Prolonged 99356 Threshold |
|---|---|---|---|---|---|
| Nursing fac care subseq | 99307 | 0.3 | 0.15 | 0 | 40 |
| Nursing fac care subseq | 99308 | 0.5 | 0.2 | 0 | 45 |
| Nursing fac care subseq | 99309 | 0.66 | 0.25 | 0 | 55 |
| Nursing fac care subseq | 99310 | 1 | 0.33 | 0 | 65 |
| Discharge <30 min | 99315 | 0.5 | 0.25 | 0 | |
| Discharge >30 min | 99316 | 0.8 | 0.33 | 0 | |
| Prolonged Service Code (MUST BE FACE TO FACE) | 99356 | 0.65 | 0 | 0 | |
| Prolonged Service - Non face-to-face | 99358 | 0.75 | 0 | 0 | |
| Prolonged Service - Non face-to-face (+1 Unit) | 99359 | 0.35 | 0 | 0 | |
| Advncd care plan 30 min | 99497 | 0.55 | 0 | 0 | |
| Advncd care plan addl 30 min | 99498 | 0.5 | 0 | 0 | |

***Prolonged Service Code (MUST BE FACE TO FACE)

Prolonged Service Code 99356 - may only be billed when your evaluation time exceeds the threshold specified above. Reminder, evaluation time, is ONLY face to face with the patient, taking a history/performing physical exam and/or counseling the patient.

C

## **Exhibit C**

KareFirst Memorandum to KareFirst Nurse Practitioners
Re: Medical Necessity, CPT Codes and RVU-EU
Dated October 12, 2016

(See Attached)

 **KareFirst Management**

October 12, 2016

To:     KareFirst Nurse Practitioners

Re:     Medical Necessity, CPT Codes and RVU-EU

The KareFirst Electronic Charting System was developed to: 1) help our nurse practitioners chart accurately, 2) intelligently choose the appropriate CPT Code based on the data in the progress note and 3) help nurse practitioners better track your daily and weekly clinical encounters coupled with the RVU-Equivalent Units system(RVU-EU).

The nurse practitioner is responsible for determining the medical necessity for a patient encounter and to clearly document the medical necessity in your progress/evaluation note. Medical necessity should guide the nurse practitioner's services provided and the volume of documentation in the evaluation note. Medical necessity is captured primarily in the Chief Complaint section of the progress/evaluation note which concisely states the symptom, problem, or reason for the patient visit, and is usually expressed in the patient's own words

Example:     Patient states: "I feel terrible, I'm coughing and have chills"

Staff reports: patient coughing with malaise and 99.1 oral temperature

Observed patient up in chair coughing, pale, and diaphoretic

After a nurse practitioner charts for a patient encounter in the KareFirst Electronic Charting System, a CPT code is generated for the encounter based on Medicare's Evaluation and Management Guidelines. KareFirst used these guidelines to create a compliance algorithm that analyzes the information in the note and suggests the appropriate CPT code for the nurse practitioner to review. The nurse practitioner can

either accept and approve the suggested CPT code or return to the evaluation note to modify the underlying clinical documentation. Any modifications are then processed by the system and a new CPT code is generated for review.

The KareFirst Electronic Charting System also generates an RVU-EU value for each patient encounter. While there are RVU-EU targets, they are not a condition of employment and do not affect our nurse practitioner's base salary. If a nurse practitioner surpasses their RVU-EU target, then they will receive a bonus compensation based on RVU-EUs over their target.

Please sign below acknowledging receipt of this KareFirst memorandum and scan/email or fax back to Tanya Gannon at 847-235-6135.

Merchant Adams

05/11/2018

D

**<u>Exhibit D</u>**

KareFirst Audit Manual

(See Attached)



# Audit Manual & Standards of Medical Documentation

## AUDIT PROCESS

KareFirst recognizes the need to review medical records for compliance with applicable coding, billing and documentation requirements. Therefore, KareFirst's Compliance Officer will direct a regular program of internal audits to determine whether (1) bills are accurately coded and accurately reflect the services provided, (2) documentation is being completed correctly, 3) services or items provided are reasonable and necessary, (4) services were appropriately supervised, and (5) if any incentives for unnecessary services exist.

Audits will be obtained via the KareFirst Charting System audit function and monitored by the Compliance Officer. Each provider will be assigned a frequency class, of which will determine the level of internal auditing necessary.

Audits are broken up into 7 sections. Each section can be scored with 0-2 points. 0 points = unacceptable, 1 point = needs improvement, and 2 points = meets expectations. The max score for an audit is 14.

Frequency classification of audits:
1) New Hire - 30% of submitted evaluations after initial training for the first 30 days of employment for the purposes of continuous education training which may be extended to 90 days at the Compliance Officer's discretion.
2) Escalated - 10 % of submitted evaluations. If a score of 8 or less is noted on any one note then provider will be placed on escalated status.
3) Standard - 1% of submitted evaluations. Initial status for all current providers. If a score of 8 or less is noted on any one note then provider will be placed on escalated status.

Once the evaluation is audited, the provider will receive a notification on his/her KF Charting system dashboard with a notification numeral on the audit tab. Providers are required to review the audit within 1 week, and implement suggestions immediately. Upon review of the audit, the expectation is that the provider's audit score will increase or maintain at the current acceptable level. Audit scores may be used as part of the provider's performance review.

In collaboration with the Chief of Nursing (CON), and Chief Executive Officer (CEO), frequency classification for each provider may be augmented at the Compliance Officer's discretion.

## EVALUATION AND MANAGEMENT SERVICES

KareFirst strictly follows the 1997 Centers for Medicare and Medicaid Services (CMS) Evaluation and Management (E&M) Services Guidelines[1]. KareFirst auditing is strictly based on said CMS guidelines. Accordingly, KareFirst standards and expectations are described in the following paragraphs. As CMS releases updates and more information, this manual may be modified accordingly.

## Visit Type:

There are several visit type options to select. Please ensure you select the appropriate one. Below is a description of the various visit types.

| Visit Type | Description |
|---|---|
| Initial Visit | First encounter with patient. |
| Subsequent Visit - Acute | Urgent situations or problems that must be dealt with today. Follow up on acute problems such as PNA, CHF, UTI, etc. |
| Subsequent Visit - Chronic Disease Management: | The day to day management of the patient/labs/chronic problems; readmissions. |
| Subsequent Visit - Emergency | An emergent visit, a seizure, respiratory crisis, syncope, angina, cardiac arrest. |
| Discharge less than 30 minutes | When patient is discharging from the facility, and you spend less than 30 minutes on the case. |
| Discharge greater than 30 minutes | When patient is discharging from the facility, and you spend more than 30 minutes on the case. |
| Hospice - Related: | Evaluated problem IS related to the patient's terminal illness. |
| Hospice - Non-Related | Evaluated problem IS NOT related to the patient's terminal illness. |
| Non Face to Face Prolonged Service Visit | Select when additional services are performed relating to a future or past face to face visit. Time spent must be **at least 30 minutes.** |

---

[1]
https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/eval-mgmt-serv-guide-ICN006764.pdf

| Non Face to Face Prolonged Service Visit | <u>Can NOT use this visit type for anticoagulation therapy.</u> *Must* relate to ongoing patient management. (eg: phone calls with family members, extensive review of records, care coordination with consultants). Refer to ⊕ button. |
|---|---|

## Chief Complaint:

A chief complaint (CC) is a medically necessary reason for the patient to be meeting with the provider. "A readily identifiable chief complaint is the first step in establishing medical necessity. Without a chief complaint, the service is preventive." [2] Therefore, avoid describing constitutional statements in your chief complaint such as "in NAD".

Medical Necessity defined- "those visits necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member". [3]

A CC is a concise statement that describes the symptom, problem, condition, diagnosis, or reason for the patient encounter. The CC is usually stated in the patient's own words. For example, patient complains of upset stomach, aching joints, and fatigue. The medical record should clearly reflect the CC. [4]

A chief complaint can not simply be "follow up", but can be "HTN follow up".
Other examples include:
- "Patient seen for follow-up evaluation of pneumonia"
- "Consult requested by nurse for abdominal pain"
- Patient seen for Diabetic recheck
- Patient complains of dizziness and headache
- "My left eye is red and irritated."
- Patient seen for fall last night per NOD

---

[2] https://www.aapc.com/blog/26777-5-key-points-about-the-em-history-component/
[3]
(https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNMattersArticles/downloads/mm4246.pdf)
[4]
https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/eval-mgmt-serv-guide-ICN006764.pdf

## History of Present Illness (HPI)

HISTORY OF PRESENT ILLNESS (**HPI**) The **HPI** is a chronological description of the development of the patient's present illness from the first sign and/or symptom or from the previous encounter to the present. The HPI elements must describe the the chief complaint.

➔ **Do not repeat the chief complaint here in any of the elements.**
➔ **Do not repeat a description in more than one element.**

There are 8 elements to the HPI:

1) **Location:**
   Specific area of the body that is problematic and concerning for the patient. Not every history will always state a location. That is ok. "Systemic" may be used for illnesses that affect the whole body like Diabetes.
   Examples: abdominal pain, sore throat, knee swelling, right medial calf, right conjunctivae, left side of neck, left flank.

2) **Quality:** Distinctive character or attribute of the symptom or condition. How does the problem look, feel, behave? Examples: You can describe pain as dull, stabbing, sharp, radiating, throbbing. Describe a laceration as jagged or straight, crusty, or describe a sore throat as scratchy.

3) **Severity:** Degree of the condition. How severe? Ask the patient to rate how severe they feel the symptoms are on a scale of 1-10. Examples: For pain, pain scale is used.

4) **Duration:** When did this problem start? Examples: "Onset three days ago", "Since last Monday," since (date), "for about two months", "yesterday", "in the last two weeks", "approximately one year ago."

5) **Timing:** Is the problem constant or intermittent? Examples: "recurrent" or "the pain comes and goes","continuous", or "the pain never really seems to go away." You can use other statements such as "seldom" or "frequently" to describe the regularity of the recurrence may be counted toward timing.

6) **Context:** Surrounding events or where the patient was, and/or what the patient does when the symptom or problem began. What are/were precipitating factors, risk factors, previous treatment, how the patient's present symptoms fit in with prior related problems. Examples: "Injuries incurred in a motor vehicle accident", "running down the steps", sitting in a chair", "playing sports", etc. *Put your review of the most recent hospitalization in the context. If addressing a readmission to the facility from the hospital.*

7) **Modifying Factors:** What makes it better or worse? Specifically, what was done to try to improve the symptom or problem? Examples: "I applied an ice pack and it did not help," "took Tylenol and it did not touch the pain," "headache goes away when I lie down." Not "denies". Rather denies relief from Tylenol, denies relief from ice packs. Or "patient has not tried anything to help alleviate symptoms. "

8) **Associated Symptoms:** Signs or symptoms associated with chief complaint. Examples: Patients who describe the scratchy throat with nasal congestion and low grade fevers, are describing not only the chief complaint, but also the

33

associated signs and symptoms.

Some of the examples could be counted in more than one area. Keep in mind, however, that you should **only count a statement once, regardless upon which descriptor you decide it relates to.**

**Brief vs Detailed HPI:**
You have the option to select write the HPI as a brief or detailed HPI.
- Use brief for minor/low risk problems, in a narrative format, but address at least ONE of the HPI elements.
- Use detailed when you have multiple elements that are pertinent and important to the case.

## Past, Family and/or Social History (PFSH)
The PFSH consists of a review of three areas:
- **Past history:** the patient's past experiences with illnesses, operations, injuries and treatments.
- **Family history:** a review of medical events in the patient's family, including diseases which may be hereditary or place the patient at risk.
- **Social History:** an age appropriate review of past and current activities including ETOH, tobacco, and illicit drug use history, marital status, previous employment.

Due to the nature of KF's Charting System, it is imperative that fields are completed with meaning. Therefore it is unacceptable to complete a field with text if you did not actually perform or inquire about the history item. Rather, the field should be left blank instead.

Unacceptable notations in PFSH:
- None
- N/A
- Non contributory
- Unknown

## Advanced Care Planning
This section in your progress note allows you to document any discussion you have with a patient regarding advanced directives. Advanced directives include the discussion about the care the patient would want to receive if he/she become unable to speak for themselves as well completion of standard forms such as POLST, with the patient, family, and/or surrogate.

Advance directives may include:
- resuscitation procedures
- mechanical respiration
- Chemotherapy
- radiation therapy
- Dialysis
- simple diagnostic tests
- pain control
- blood products
- transfusions
- intentional deep sedation
- Written instructions regarding the initiation, continuation, withholding, or withdrawal of particular forms of life- sustaining medical treatment. (POLST form)
- Durable power of attorney for healthcare or health care proxy: A written document that enables a capable person to appoint someone else to make future medical treatment choices for him or her in the event of decisional incapacity.

Also in this section, you must select a MACRA measurement for **every** encounter.
1) Advanced directives discussed with patient (either by you or another provider) and documented in chart; **Patient/Surrogate decided on an advanced care plan**
2) Advanced directives discussed with patient (either by you or another provider) and documented in chart; **Patient/Surrogate unable to decide on an advanced care plan**
3) Advanced directives not discussed or documented in chart (either by you or another provider)

## ROS/EXAM

A Review of Systems (ROS) is an inventory of body systems **obtained through a series of questions** seeking to identify signs and/or symptoms which the patient may be experiencing or has experienced. If the physician is unable to obtain a history from the patient or other source, the record should describe the patient's condition or other circumstance which precludes obtaining a history.

Due to the nature of KF's Charting System, it is imperative that fields are completed with meaning. Therefore, it is unacceptable to complete a field with text if you did not actually perform a ROS or exam of that system field.

Unacceptable notations:
- WNL
- within normal limits

- Non contributory
- Deferred
- Refused (if a patient refuses examination and you want to document your attempt then place it in the narrative notes at the bottom of the note).

**A diligent provider will inquire if there is any chest pain, dyspnea, or abdominal pain in every patient. Likewise, these systems would be examined in every patient.**

## Labs, Xrays, and Other Tests

When you check any of these boxes, there must be further explanation written in the notes/findings box.

| Decided to obtain or view old records | Notes / Findings ⓘ |
|---|---|
| Reviewed or ordered clinical lab test | Enter Notes and Findings |
| Reviewed or ordered radiology test | |
| Reviewed or ordered other tests (PFTs, EKGs, etc.) | |
| Discussed test with performing physician | |

**Decided to obtain or view old records:** A decision to obtain old records or decision to obtain additional history from the family, caretaker or other source to supplement that obtained from the patient should be documented. Relevant findings from the review of old records, and/or the receipt of additional history from the family, caretaker or other source to supplement that obtained from the patient should be documented. If there is no relevant information beyond that already obtained, that fact should be documented. Notation of "Old records reviewed" or "additional history obtained from family" without elaboration is **insufficient.**[5]

**Reviewed or ordered clinical lab, radiology or other tests (PFT's, EKG's, etc):**
The review of lab, radiology and/or other diagnostic tests should be documented in the lab matrix. If the test reviewed does not have a template, write it in the notes/findings box. Use actual lab values, but avoid WNL. Rather, state "unremarkable".

If a diagnostic service is ordered, planned, scheduled, or performed at the time of the E/M encounter, describe that type of service in your plan.

**Discussed test with performing physician:**
If the results of laboratory, radiology or other diagnostic tests is discussed with the physician who performed or interpreted the study, document who this physician was.

---

[5]
https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/eval-mgmt-serv-guide-ICN006764.pdf (page 82)

## Assessment and Plan

**Problem** - mention the problem you are addressing, and/or your working differential diagnoses.

**Problem Type** - please select the appropriate type of problem based on the following criteria.

**Minor:** Problem will run a definite and limited course; i.e., would go away without treatment (eg: cold, insect bite, tinea corporis).

**Acute - Low Risk:** Uncomplicated illness or injury (eg: cystitis, allergic rhinitis, simple sprain).

**Acute - Medium Risk:** Problem has sudden onset and system symptoms. Problem requires medical intervention and will become much worse if not treated (eg: pyelonephritis, pneumonitis, colitis).

**Acute - High Risk Abrupt Neurological Change:** eg: seizure, TIA, weakness, sensory loss.

**Acute - High Risk Threat to Life or Bodily Function:** eg: multiple trauma, acute MI, pulmonary embolus, severe respiratory distress, progressive severe rheumatoid arthritis, psychiatric illness with potential threat to self or others, peritonitis, acute renal failure.

**Chronic Condition:** Illness that is prolonged in duration, does not often resolve spontaneously, and is rarely cured completely.

## Status -

**Stable:** Current concern is stable or the entire problem is resolved.

**Improved:** The treatment plan improved the condition or the problem has improved.

**Worsening - mild:** Situation has declined and is manageable.

**Worsening - severe:** Situation has drastically declined and needs in depth management and treatment.

**If you select worsening,** you must prove this in your documentation either in your HPI, ROS/Exam findings, and/or plan. Use numerical values when possible through comparison.

EXAMPLES:

- **For Any/and ALL Infectious process:** pt and/or staff reports increase in pain, fever or chills, lethargy, poor appetite or increasing WBC's.
- **For pneumonia:** pt and/or staff reports cough is not getting better, or is more frequent, O2 sats are not improving or are lower than baseline (USE NUMERICAL VALUES).

- **For cellulitis:** Observed worsening in erythema, and swelling or lack of improvement with current treatment
- **HEART FAILURE:** Exam findings of crackles in lungs, swelling in legs or anasarca. Pt or staff reports of increased DOE, weight gain.
- **HTN:** Pt reports of blurry vision, headaches or other side effects. BP numbers elevated, and compare to previous numbers . Such as previous BP's were 130's systolic, and currently systolic is running >150's. (USE NUMERICAL VALUES)
- GENERALLY, compare values. If hyponatremia is worsening, explain that 1 week ago, it was 128, and today it is 125. If Hgb was 9, and today is 8, state this. Use values to support your case.

## Problem is -

**New** - select if you are diagnosing the problem.

**Established** - select if the problem has been diagnosed previously by you or another provider.

**Uncertain Prognosis** - select if you are unsure of prognosis, ie a mass that could be cancerous, etc.

## Plan -

The initiation of, or changes in, treatment. Treatment may include patient instructions, nursing instructions, therapies, and medications. If referrals are made, consultations requested or advice sought, the record should indicate to whom or where the referral or consultation is made or from whom the advice is requested.

Each Problem and/or corresponding ICD10 code should be separated out, unless it relates directly to one another. For example, when seeing someone for a viral illness, you may lump together, nasal congestion, URI, cough, in one plan, but would separate out the COPD problem. See example

below:



## Plan Includes:

These boxes should only be selected if they are indeed included in the plan. Most are self explanatory.

**Plan Includes:** (check all that apply)

- ☑ Additional work-up
- ☑ IV Fluid without additives
- ☑ Prescription drug management
- ☑ PT/OT
- ☑ IV Fluid with additives
- ☑ Over the counter drugs
- ☑ Decision for DNR or to de-escalate care
- ☑ Drugs requiring intensive monitoring for toxicity (Coumadin, Dilantin, Digoxin, Amikacin, Vancomycin, Gentamycin, etc)

**Additional work up** should be selected only if you order additional diagnostic testing or consultations that are needed to make a definitive diagnosis.

**Prescription drug management**: according to NGS, Prescription drug management includes:

- Management and/or renewal of current prescription medications, including review of tolerance, side effects, dosage changes and medication termination
- New prescriptions issued as a result of the current encounter

- Discontinuation of current medication(s)

## Visit Duration

There are 3 main types of time that comprise any evaluation and management visit:

**Evaluating Patient:** Total time spent obtaining a history and examining the patient

**Counseling Patient:** Any direct communication with patient. Can include discussing: Diagnostic results and impressions; Emotional support; Translation services; Smoking cessation/safety; Instructions for disease management; Importance of treatment compliance; Treatment options or follow-up

**Non face-to-face time:** Any care coordination activities for the patient. Can include the following: Reviewing records and tests; Arranging for further services; Care plan meetings; Communicating with other professionals and the patient through written reports or telephone contact; Discussing the patient with the family without the patient present

If the majority of your visit time is spent counseling the patient and coordinating care (non face-to-face time), the system will prompt you to further describe your activities:



**Description of counseling/coordination of care activities:** A detailed description of the coordination of care or counseling provided.

## Counseling may include:
- Diagnostic Results & Impressions
- Recommended studies
- Prognosis
- Risks & Benefits of management
- Treatment options or follow-up
- Instructions for management
- Importance of compliance
- Risk education
- Patient & Family education

## Coordination of Care may include:
- Extensive chart review
- Discussing the case with other healthcare providers

- Referrals to other healthcare providers
- Arranging tests or other health or community care resources for the patient
- The documentation needs to provide sufficient information on what was coordinated and what was discussed or advice provided during counseling.

Not acceptable examples: "chart reviewed"; "RN consulted"; "reviewed Rx"

Acceptable examples: "chart reviewed for previous urine culture results and prior antibiotic use"; "Discussed with RN patient's eating, drinking, and BM patterns"; "Hospital record reviewed for treatment during hospital stay, lab trends, and imaging results"

## Submitted ICD 10 Diagnosis Codes

➔ Please avoid "unspecified" codes as much as possible.
➔ Submit all relevant ICD10 codes associated with today's problem. For example, if you are seeing a patient for a cough, and they have a history of CHF and COPD, you will likely be addressing these chronic illnesses in your plan. Therefore, add it in your ICD10 codes.
➔ All ICD10 codes in your plan, must be submitted.

E

**Exhibit E**

WFFC Event with All
Dated May 1, 2018

(See Attached)



# wffc

## CHICAGO

*presents*



Please join us for a joint meeting of the Chicago chapter of the WFFC
and the Society of Cosmetic Chemists at the Morton Arboretum
on May 1 for a buffet dinner and presentation on the
current legalities and use of cannabis and cannabinoids.

We will have two speakers for this event:
Alvin All of Lomata Ventures will discuss the current legal situation of
cannabis, along with the consumption and use in personal care
products. We will learn the difference between medical marijuana,
CBD, and THC, which is the psychoactive chemical in marijuana.
Also to be explored are the forms of consumption of cannabis via
topical application, sublingual, ingestible, and inhalation.

Our second speaker, Dr. Gene Frank, a registered pharmacist with Solo
Labs, will address some of the pharmaceuticals benefits and
concerns of cannabis and cannabinoids.

### TUESDAY MAY 1, 2018

**WFFC MEMBERS & SUBSCRIBERS: $65**
**NON-MEMBERS & GUESTS: $85**

**TIME**
5:00 – 6:30pm: Networking
6:30 – 7:30pm: Buffet Dinner
7:30 – 8:30pm: Speaker

**LOCATION**
GINGKO ROOM
THE MORTON ARBORETUM
4100 IL HIGHWAY 53,
LISLE IL 60532

Register Here ▶

THANK YOU TO OUR SPONSORS

  Innova Flavors

Global Essence

 flavorchem

Not a member or subscriber, click here to join the WFFC!

F

## Exhibit F

KareFirst Audit Comments

(See Attached)

**10/1/18**

1. REDACTED     -billed 99310 without any indication of change in medical management or indication of increased patient complexity. MDM should reflect patient complexity and high level decision making

2. REDACTED     -primary diagnosis is pain, unspecified and needs to be low back pain

3.    REDACTED     - 99310 without any indication of change in patient condition or change in medical management.  MDM needs additional information

4. REDACTED     - primary diagnosis should be low back pain not unspecified pain

5.    REDACTED     -non face to face should be more specific to the patient along with reason for the non face to face visit.

6. REDACTED     : non face to face should be more specific to the patient along with reason for the non face to face visit.

**10/3/18**

1. REDACTED     :- non face to face should be more specific to the patient along with reason for the non face to face visit.

2. REDACTED     - billed 99310 but patient stable without any acute issues and no change in medical management.  MDM should reflect higher decision making and complexity

3. REDACTED     -visit note is 99310 but the documented MDM needs to support higher level decision making

**10/4/18**

1.    REDACTED     -Advanced care discussion-no documentation of discussion that was had the summary just says "full"  Need to have documented discussion

2.     REDACTED -was seen for SOB and wheezing but ROS does not indicate these issues.  Plan for wheezing just says "ongoing"

3. REDACTED     -specify diastolic or systolic HF as primary diagnosis not heart failure, unspecified.

4. REDACTED     :- non face to face should be more specific to the patient along with reason for the non face to face visit.

**10/7**

1. REDACTED     billed 99310 and should be based on issues but primary diagnosis is conjunctivitis which is not highly acute.  Should be acute COPD exacerbation as primary and secondary conjunctivitis since patient's COPD was unstable and management of COPD was changed

2.    REDACTED     -seen for SOB but respiratory ROS did not indicate any breathing difficulty.

3. REDACTED     - specify type of HF as primary diagnosis (diastolic/systolic)

4. REDACTED     -specify type of HF as primary diagnosis (systolic vs diastolic)

**10/8**

1. REDACTED     - more specific with primary diagnosis code, unspecified osteoarthritis, unspecified site.  Be more specific with site and type of arthritis.

2. REDACTED - be more specific with primary diagnosis. Effusion unspecified should be effusion right knee

3. REDACTED -visit is low complexity without any changes in medical management. MDM should be changed to reflect the high complexity of this patient

3. REDACTED · non face to face should be more specific to the patient along with reason for the non face to face visit.

4. REDACTED · non face to face should be more specific to the patient along with reason for the non face to face visit.

5. REDACTED · non face to face should be more specific to the patient along with reason for the non face to face visit.

6. REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.

7. REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.

8. REDACTED· non face to face should be more specific to the patient along with reason for the non face to face visit.

9. REDACTED- CC SOB but not indicating any issues in respiratory ROS

10. · REDACTED· specify area of pain as right foot pain as primary diagnosis not pain, unspecified.

10/9

1. REDACTED - specify diastolic vs systolic CHF for primary DX.

2. REDACTED· -note should reflect higher level medical decision making based on 99310 CPT coding

10/10

1. REDACTED -vital signs missing, billed 99310 but was seen for chronic disease management weakness/falls without any change in condition or change in medical management. MDM should reflect higher level medical decision making

10/11-notes ok

10/15

1. REDACTED· -heart failure diagnosis should be more specific to diastolic or systolic

2. ˊREDACTED:-99310 was billed. MDM documentation needs to reflect higher level acuity and higher level medical decision making

3. REDACTED -primary diagnosis needs to be changed from pain, unspecified-needs to be more spesific

4. REDACTED·primary diagnosis needs to specify area of pain. Not pain, unspecified.

5. REDACTED ·-was just seen on 10/9 with same issue with minimal change in management. Billed 99310 on 10/9 as well as 99310 this visit. Visit needs to show reason for follow up as well as change in medical management.

10/16
1.   REDACTED   - primary diagnosis is pain unspecified-should specify area of pain. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
2.   REDACTED   -CC is cough but in ROS states that patient denies cough.
3. REDACTED         -non face to face should be more specific to the patient along with reason for the non face to face visit.
4.   REDACTED   :-HPI indicates limited ROM 2/2 fall and shoulder pain but exam does not indicate.
5. ·   REDACTED:- primary diagnosis should be cellulitis of right upper limb not cellulitis unspecified.
6. REDACTED         -indicated swelling and redness in HPI but not written in physical exam portion.
7.      REDACTED-primary diagnosis needs to be more specific to either diastolic of systolic CHF
8. REDACTED     :- CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

10/17
1. ·  REDACTED· plan for A.fib states to repeat INR on 8/20 but visit is past that date
2. REDACTED-cc was for follow up of pain and cellulitis but there is no plan associated with the diagnosis in A/P
5. REDACTED          HPI and CC are for toe swelling/cellulitis but physical exam does not indicate any issues.

10/19
1. REDACTED      - non face to face should be more specific to the patient along with reason for the non face to face visit.
2. REDACTED      - non face to face should be more specific to the patient along with reason for the non face to face visit.
3. REDACTED     -specify primary diagnosis as either systolic of diastolic CHF if possible
4. REDACTED| ·    :-was seen for SOB with associated symptoms of wheezing and cough but not reflected in ROS for respiratory system
5.   REDACTED   -CC SOB and wheezing but ROS in respiratory states denies wheezing
6. · ·  REDACTED CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
7. REDACTED       :-seen for cough and SOB but respiratory ROS does not reflect CC
8. REDACTED-specify area of pain as primary diagnosis
9. REDACTED       - CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

10/21
1. REDACTED         -specify type of heart failure as primary diagnosis
2. REDACTED       -secondary diagnosis of pain, unspecified-would be more specific if possible

3. REDACTED -would specify type of heart failure as primary diagnosis not heart failure, unspecified.

4. REDACTED would specify secondary diagnosis as systolic or diastolic CHF

**10/22**

1. REDACTED - non face to face update

2. 5. REDACTED -CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

3. REDACTED :- non face to face should be more specific to the patient along with reason for the non face to face visit.

4. REDACTED non face to face update

5. REDACTED -non face to face update

6. Alice Cobb-non face to face update

**10/24**

1. REDACTED -secondary diagnosis should be more specific to systolic or diastolic heart failure

2. REDACTED -primary diagnosis should be more specific. Heart failure systolic vs diastolic?

3. REDACTED -was seen for right great toe redness/excoriation but was not documented in ROS or physical exam

**10/25**

1. REDACTED; -pain is listed in assessment but no indication that this is an issue during visit.

2. REDACTED -Heart failure primary diagnosis should be more specific. Heart failure more specific to diastolic vs systolic CHF

**10/26**

1. REDACTED :-non face to face updated to be more specific to the patient

2. REDACTED -non face to face more specific to patient

3. REDACTED-primary diagnosis heart failure, unspecified needs to be more specific.

**10/28**

1. REDACTED :-non face to face more specific to patient

2. REDACTED -seen 10/21 with 99310 without any acute changes in condition or new complaints. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

3. REDACTED r-primary diagnosis-any more specific area of spinal stenosis?

4. REDACTED -diagnosis of dysuria but in ROS patient denies dysuria

5. REDACTED ;-was just seen 10/22 99310 visit not showing any significant change or reason for another 99310 visit. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

10/30

1. REDACTED    -previous visit on 10/3 also 99310 with no significant change in condition or management. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

2.    REDACTED    -specify type of heart failure. Visit on 10/10 also 99310 without change in condition. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

10/31

1. REDACTED,        -was patient discharged and returned? Note is a discharge but there is a follow up note on 11/28 indicating chronic disease management not new admission.

2.  REDACTED  -visit from 10/22 and 10/3 both 99310 with minimal change in management and condition. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

11/1-
1. REDACTED      -would specify type of heart failure as primary diagnosis
2.    REDACTED      :-was just seen on 10/26 and billed 99310.  Visit 6 days later with no change in condition would consider changing to 99309 or improve documentation to reflect higher level medical decision making or complexity of patient.
3. REDACTED         -specify location of pain and type of heart failure in diagnosis codes.
4. REDACTED      -primary diagnosis of unspecified osteoarthritis, unspecified site should be more specific.

11/2
1. REDACTED      -non face to face should be more specific to the patient along with reason for the non face to face visit.
2. REDACTED         - non face to face should be more specific to the patient along with reason for the non face to face visit.
3. REDACTED      -non face to face should be more specific to the patient along with reason for the non face to face visit.
4.    REDACTED     -note very similar to visit on 10/1 without any changes in condition or medical management.  CPT code this visit 99310.  CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
5. REDACTED i-cc needs to be expanded on. CPT code 99310 and patient just seen on 10/19 with CPT code 99310 with no significant change in exam or medical condition.
6.   REDACTED  i-CC of rash would not prompt a comprehensive exam and 99310 CPT code.
7. REDACTED      :-CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

11/5-notes ok

11/7
1. REDACTED        -primary diagnosis needs to be more specific.  Diastolic or systolic HF vs HR unspecified
2. REDACTED       -primary diagnosis and cc of dyspnea but no indication of dyspnea in ROS
3.    REDACTED-would make CC and primary diagnosis reflect higher level acuity of patient condition by changing to acute kidney failure based on reading MDM and note
4. REDACTED         -99310 was billed would need more documentation in MDM as to why the patient encounter is this level. Specify area of pain in ICD 10 coding.
5.    REDACTED   -spesify chronic vs acute diastolic CHF as primary diagnosis.
6. REDACTED-CC and primary diagnosis is dysuria but only indication of dark urine not dysuria in note.
7. REDACTED      -CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

11/8-

1. REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.
2. REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.
3. REDACTED BP is written as 17/61
4. REDACTED -vital signs missing. Billed at a 99310 and patient was seen for chronic disease management without any changes in medical management. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
5. REDACTED -vital signs missing, Primary diagnosis is unspecified heart failure (should specify acute or chronic and diastolic or systolic)
6. REDACTED -heart failure under assessment/plan is listed as acute on chronic CHF-There is no indication patient is having an acute exacerbation or no change in plan based on an acute exacerbation.

11/9
1. REDACTED primary diagnosis was dysuria but in ROS patient denies burning and cc was hematuria.
2. REDACTED -CC was UTI but was listed as the 4th diagnosis for billing
3. REDACTED - Had a note with DOS of 10/30 for the same issue with no change in management.
4. REDACTED :- CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
5. REDACTED - CC is cough/dyspnea without change in medical management or intervention and CPT code 99310. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

11/12
1. REDACTED -primary diagnosis should be pain in right hip or specify site of the current primary diagnosis
2. REDACTED -primary diagnosis should specify type of heart failure

11/16
1. REDACTED -CC is for fall/weakness but in ROS it states "denies fall"
2. REDACTED -would add additional info to Advanced care plan. A discussion is not documented just says "per chart and staff patient is a DNR"

11/19
1. REDACTED -primary diagnosis Is pain, unspecified-would choose more specific code. Secondary diagnosis is heart failure, unspecified. Would specify chronic systolic or diastolic.

11/20-note ok

11/21

1. REDACTED-specify type of heart failure. Current primary diagnosis is heart failure, unspecified

11/22

1. REDACTED  - non face to face should be more specific to the patient along with reason for the non face to face visit.

2.  , REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.

3. REDACTED|        -non face to face should be more specific to the patient along with reason for the non face to face visit.

11/23-note ok

11/24

1. REDACTED        ⊢non face to face should be more specific to the patient along with reason for the non face to face visit.

11/26

1. REDACTED  -primary diagnosis is heart failure, unspecified, should specify type of HF

2. REDACTED       -priary diagnosis is HF, unspecified, should specify type of HF if known

3. REDACTED       -was seen for asthma with associated symptoms in HPI of dyspnea, respiratory ROS does not indicate any dyspnea. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.

4.  , REDACTED -cc for back pain with radiculopathy, primary diagnosis should be changed to reflect reason for visit.

5. REDACTED  -if known specify type of heart failure as primary diagnosis.

11/27

1. REDACTED|       -specify area of pain as primary diagnosis not pain, unspecified

2. REDACTED       -right shoulder pain would not necessarily warrant a 99310 visit or a comprehensive exam. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient. CC of cough and viral URI without any significant interventions would not warrant a 99310 visit.

3. REDACTED       -non face to face should be more specific to the patient along with reason for the non face to face visit.

4. REDACTED :-non face to face should be more specific to the patient along with reason for the non face to face visit.

5. REDACTED ⊢ CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient. CC of cough and viral URI without any significant interventions would not warrant a 99310 visit.

6. REDACTED       -secondary diagnosis is Heart failure, unspecified. Would specify type if possible.

7. REDACTED|        specify area of pain as primary diagnosis, would not use pain, unspecified.

8. REDACTED ; -last 3 visits for this patient 99310 without significant change in condition. Checked off decision for DNR or to de-escalate care without any documentation other than patient switching from PT to restorative therapy.

**11/28**
1.   REDACTED - CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
2.   REDACTED · CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.  Patient was just seen on 11/2 without any changes in condition or management and 99310 was also billed on 11/2.

**11/29**
1. REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.

**11/30**
1.   REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.
2. REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.
3.   REDACTED -CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
4. REDACTED -primary diagnosis is heart failure, unspecified, would specify systolic vs diastolic if possible.

12/1
1.        REDACTED - non face to face should be more specific to the patient along with reason for the non face to face visit.

12/3
1. REDACTED        -Heart failure should be more specific is possible (acute vs chronic and systolic vs diastolic)
2. REDACTED        -was just seen 11/28 99310 coding without significant changes in management or condition. CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient or coding should be 99309
3. REDACTED        -primary diagnosis of heart failure, unspecified should be more specific if possible.
4.        'REDACTED:-HPI reports dysuria but in ROS GU system no denies burning.

12/4
1. REDACTED        -non face to face more specific to patient
2. REDACTED -specify type of heart failure for secondary diagnosis
3. REDACTED -CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient. Was just seen on 11/26 with 99310 without significant change in condition

12/5
1. REDACTED        - CPT code 99310 without sufficient documentation of higher level medical decision making or complexity of patient.
2. REDACTED   · non face to face should be more specific to the patient along with reason for the non face to face visit.
3.    REDACTED   ⊢ non face to face should be more specific to the patient along with reason for the non face to face visit.

12/6-notes ok

12/7
1. REDACTED        - non face to face should be more specific to the patient along with reason for the non face to face visit.

12/10
1.    REDACTED    :
2.  REDACTED
3. REDACTED
4. REDACTED
        All these non face to faces should be more sepsific to the patient along with reason for non face to face visit.

G

## Exhibit G

Patient 1

(See Attached)

12/20/2018        KareFirst

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB:  REDACTED
  Date of Service: 10/31/2018
  Visit Type: Subsequent Visit - Chronic Disease Management
  Evaluated by: Merchant Adams AGPCNP-BC
  Chief Complaint: cough
-----------------------------------------
HISTORY OF PRESENT ILLNESS
  Location: respiratory
  Context: adl dependent, dysphagic npo
  Modifying Factors: on parenteral feeds/ maintain upright
  Duration: ongoing
  Associated Symptoms: aspiration risk
  Severity/Score: 4
  Timing: on/off
-----------------------------------------
CHRONIC CONDITIONS
  REDACTED
```

## REDACTED

```
  Z93.1       Gastrostomy status
  K27.9       Peptic ulcer, site unspecified, unspecified as acute or chronic, without hemorrhage
or perforation
  E11.9       Type 2 diabetes mellitus without complications
  G82.50      Quadriplegia, unspecified
  E78.4       Other hyperlipidemia
  E55.9       Vitamin D deficiency, unspecified
  R05         Cough
  R11.12      Projectile vomiting
  N39.0       Urinary tract infection, site not specified
  S00.81XD    Abrasion of other part of head, subsequent encounter
  J06.9       Acute upper respiratory infection, unspecified
  E03.9       Hypothyroidism, unspecified
  R14.0       Abdominal distension (gaseous)
  A49.9       Bacterial infection, unspecified
  R22.9       Localized swelling, mass and lump, unspecified
  L03.818     Cellulitis of other sites
  J18.8       Other pneumonia, unspecified organism
  K75.89      Other specified inflammatory liver diseases
  Z79.4       Long term (current) use of insulin
  R13.10      Dysphagia, unspecified
-----------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
  Prior Illness: See above
  Prior Hospitalizations: 05/20/17  REDACTED    for REDACTED
11/12/17  REDACTED
                  12/25/17
  Dietary Status: G-Tube feeding, NPO
-----------------------------------------
  Family Involvement: Family involved, sister is    REDACTED
  Significant Family Medical History: family denies
-----------------------------------------
  Marital Status: REDACTED
  Code Status: Full code
  Level of Education: Unknown
VITALS
  T: 98.3    P: 78    R: 18    B/P: 110/70    POX: 97
  T: 98.3    P: 78    R: 18    B/P: 110/70    POX: 97
-----------------------------------------
NEUROLOGICAL
  ROS: per NOD
  Exam:
    Cranial Nerves: Blinks
    Sensation: Equal bilaterally
-----------------------------------------
PSYCHIATRIC
```

## REDACTED

12/20/2018                                              KareFirst

# REDACTED

------------------------------------------
EARS, NOSE, MOUTH, THROAT
  ROS: Dysphagia
  Exam:
    External Ears & Nose: External nose intact, no rhinorrhea, Pinna intact, No deformity, No drainage, deformities or lesions noted bilaterally
    lips, teeth & gums: Moist Mucous Membranes
    Oropharynx: Unable to visualize
------------------------------------------
CARDIOVASCULAR
  ROS: Quadriplegia
  Exam:
    Palpation of Heart: PMI nondisplaced
    Auscultation of Heart: 2/6 Murmur, +S1S2, split s2, no s3 or 4
    Pedal Pulse: 1+, Bilateral
    Extremities for Edema/Varicosities: No edema present
------------------------------------------
RESPIRATORY
  ROS: Denies cough per NOD
  Exam:
    Respiratory Effort: Bilateral equal lung expansion, No accessory muscle use, Unlabored breathing
    Auscultation of Lungs: Diminished, No wheezing, coarse throughout
------------------------------------------
GASTROINTESTINAL
  ROS: Denies constipation per NOD
  Exam:
    Abdomen: Soft, Obese, Gastrostomy tube in place, Bowel sounds active, G-tube dressing in place.
    Last BM: Incontinent of bowel
------------------------------------------
GENITOURINARY
  ROS: Denies foul odor by NOD
  Exam:
    External Genitalia & Vagina: no abnormal vaginal discharge
    Bladder: Incontinent of urine
------------------------------------------
MUSCULOSKELETAL
  ROS: Quadriplegia
  Exam:
    Gait & Posture: Bed bound,
    digits/nails: Cap refill < 2 seconds
    3) Right Upper Extremity: Twitching during assessment
    4) Left Upper Extremity: Twitching during assessment
    5) Right Lower Extremity: No edema,
    6) Left Lower Extremity: no edema
------------------------------------------
HEMATOLOGIC/LYMPHATIC
  ROS: Denies fever by NOD
  Exam:
    Neck: Trachea midline, No lymphadenopathy
    Other: Afebrile
    Neck: Supple, Trachea midline
------------------------------------------
INTEGUMENTARY
  Exam:
    Finding: Visible skin warm, dry, intact, Good skin turgor
------------------------------------------
ENDOCRINE
  ROS: DM2
  Exam:
    Finding: Accuchecks stable but elevated
------------------------------------------
------------------------------------------

LABS
    Notes / Findings: Records reviewed for clinical progress notes, diagnostic tests/results,
medications, and treatments., See Coordination of Care description for lab details
-------------------------------------------
PLANS
    DX: G82.50  Quadriplegia, unspecified
    Problem: quadriplegia
    Plan: wound risk/ frequernt repositioning . difficult with air loss mattress
-------------------------------------------
    DX: R05  Cough
    Problem: cough
    Plan: maintain hob high when on tube feeding
-------------------------------------------
    DX: R13.10  Dysphagia, unspecified
    Problem: dysphagia
    Plan: aspiration risk/ monitor for inabilityn to clear phlegm
-------------------------------------------
    DX: Z93.1 Gastrostomy status
    Problem: PEG
    Plan: replace as needed/ flush well/
-------------------------------------------
NARRATIVE NOTES
REDACTED    seen and examined for ongoing medical issues.  On and off cough which at times is
rlated possibly to poor body mech and position ewhile on g-tube feed.  Frequent position changes
are necessary.  Otherwise lungs clear/ gtube patent, and all med sin good supply.
-------------------------------------------

Electronically Signed By: Merchant, Adams AGPCNP-BC                                    :

H

**Exhibit H**

Patient 2

(See Attached)

12/20/2018                                                         KareFirst

```
EVALUATION INFO
   Patient Name:  REDACTED
   Patient DOB: REDACTED
   Date of Service: 12/05/2018
   Visit Type: Subsequent Visit - Chronic Disease Management
   Evaluated by: Merchant Adams AGPCNP-BC
   Allergies: PORK
   Chief Complaint:      REDW  woman seen and examined for chronic disease management evaluated for htn
and chronic disease mangement
-----------------------------------------
HISTORY OF PRESENT ILLNESS
   Location: cv
   Context: adl decline
   Modifying Factors: on meds
   Duration: ongoing
   Associated Symptoms: weakness at times
   Severity/Score: 4
   Timing: constant
-----------------------------------------
CHRONIC CONDITIONS
   I10        Essential (primary) hypertension
                    REDACTED
   R26.89     Other abnormalities of gait and mobility
   R26.81     Unsteadiness on feet
   M62.81     Muscle weakness (generalized)
   M79.604    Pain in right leg
                    REDACTED
   I51.4      Myocarditis, unspecified
                    REDACTED
   E78.5      Hyperlipidemia, unspecified
   K21.9      Gastro-esophageal reflux disease without esophagitis
   E87.6      Hypokalemia
                         REDACTED
                    REDACTED
                    REDACTED
   L08.9      Local infection of the skin and subcutaneous tissue, unspecified
   L03.115    Cellulitis of right lower limb
   S82.91XD   Unspecified fracture of right lower leg, subsequent encounter for closed fracture
with routine healing
   D64.9      Anemia, unspecified
   K59.09     Other constipation
-----------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
   Prior Illness: Listed Above
   Prior Hospitalizations:  REDACTED   04/2018
   REDACTED    04/2018
   Dietary Status: Regular diet
-----------------------------------------
   Family Involvement: Son     REDACTED
   Significant Family Medical History: HTN, DM2, CVA
-----------------------------------------
   Marital Status: REDACTED
   Code Status: Full code
NEUROLOGICAL
   ROS: Denies headache, Denies numbness, Denies tingling
   Exam:
      Cranial Nerves: Blinks, CN II-XII intact, Facial features even, Opens eyes spontaneously,
Opens mouth when asked
      Sensation: Equal bilaterally
-----------------------------------------
PSYCHIATRIC
```

# REDACTED

```
-----------------------------------------
```

EYES
  ROS: Denies eye pain
  Exam:
    Conjunctivae & Lids: No discharge, No tearing
    Pupils & Irises: Anicteric
------------------------------------------
EARS, NOSE, MOUTH, THROAT
  ROS: Denies ear pain, Denies rhinitis, Denies pharyngitis
  Exam:
    External Ears & Nose: External nose intact, no rhinorrhea, No rhinitis, Pinna intact, No
tenderness, No deformity
    Hearing: Hearing intact to conversation
------------------------------------------
CARDIOVASCULAR
  ROS: Denies chest pain, Denies palpitations, Denies dizziness
  Exam:
    Palpation of Heart: PMI nondisplaced
    Auscultation of Heart: Regular rhythm, +S1S2, No murmur
    Extremities for Edema/Varicosities: Trace edema bilat
------------------------------------------
RESPIRATORY
  ROS: Denies cough, Denies Dyspnea
  Exam:
    Respiratory Effort: Bilateral equal lung expansion, Unlabored breathing
    Auscultation of Lungs: Clear Breath Sounds, No wheezing
------------------------------------------
GASTROINTESTINAL
  ROS: Denies ABD pain, Denies nausea, Denies vomiting,
  Exam:
    Abdomen: Soft, Obese, Bowel sounds active, Nontender, Nondistended
    Liver & Spleen: No gross organomegaly
    Last BM: Continent of bowel,
------------------------------------------
GENITOURINARY
  ROS: Denies frequency, Denies urgency
  Exam:
    Bladder: Continent of urine, Nondistended
------------------------------------------
MUSCULOSKELETAL
  ROS: Myalgia, Weakness, Denies muscle spasms
  Exam:
    Gait & Posture: Ambulates with walker
    digits/nails: Cap refill < 2 seconds
    3) Right Upper Extremity: Mobile, Tremor
    4) Left Upper Extremity: Mobile, Tremor
    5) Right Lower Extremity: Mobile,
    6) Left Lower Extremity: Mobile
------------------------------------------
HEMATOLOGIC/LYMPHATIC
  ROS: Denies chills, Denies fever
  Exam:
    Neck: No lymphadenopathy
    Other: No bruising noted
------------------------------------------
INTEGUMENTARY
  ROS: Denies rash, Denies pruritus
  Exam:
    Finding: Visible skin warm, dry, Poor skin turgor
------------------------------------------
------------------------------------------
PLANS
  DX: F03.91  Unspecified dementia with behavioral disturbance
  Problem: dementia
  Plan: redirect / on psychotropics
------------------------------------------
  DX: I10  Essential (primary) hypertension
  Problem: htn
  Plan: amlodopine

```
----------------------------------------
DX: R26.89  Other abnormalities of gait and mobility
Problem: gait abnormality
Plan: largely resolved.  walks very well post surg.  discharged from therapy.  ortho follows,
----------------------------------------
DX:                    REDACTED
Problem: REDACTED
Plan:                  REDACTED
----------------------------------------
```
NARRATIVE NOTES

REDACTED       with chronic disease seen and examined for review of HTN and medical condition. Recently had hardware removed from leg and is now discharged from therapy with very good results. Continues all medications.  Labs were reviewed today and were unremarkable  ammonia is 62/ valproic acid is therapeutic at 52.4.
```
----------------------------------------
```
Electronically Signed By: Merchant Adams AGPCNP-BC

**Exhibit I**

Patient 3

(See Attached)

12/20/2018                                    KareFirst

```
EVALUATION INFO
   Patient Name:     REDACTED
   Patient DOB:      REDACTED]
   Date of Service: 11/27/2018
   Visit Type: Subsequent Visit - Chronic Disease Management
   Evaluated by: Merchant Adams AGPCNP-BC
   Chief Complaint: rt shoulder pain
-------------------------------------------
HISTORY OF PRESENT ILLNESS
   Location: rt shoulder
   Context: hx of hemiplegia on rt dom. side.
   Modifying Factors: meds make better
   Quality: achy/ radiating
   Duration: ongoing
   Associated Symptoms: spasms, weakness
   Severity/Score: 4
   Timing: constant
-------------------------------------------
CHRONIC CONDITIONS
   R33.8      Other retention of urine
   G60.8      Other hereditary and idiopathic neuropathies
   I63.50     Cerebral infarction due to unspecified occlusion or stenosis of unspecified cerebral
artery
   M62.838    Other muscle spasm
   G89.29     Other chronic pain
   N39.0      Urinary tract infection, site not specified
   R60.0      Localized edema
   G81.01     Flaccid hemiplegia affecting right dominant side                         :
   R30.0      Dysuria
   R41.0      Disorientation, unspecified
   R33.9      Retention of urine, unspecified
   N40.1      Benign prostatic hyperplasia with lower urinary tract symptoms
   R39.14     Feeling of incomplete bladder emptying
   R35.0      Frequency of micturition
   I73.9      Peripheral vascular disease, unspecified
   I10        Essential (primary) hypertension
   M25.511    Pain in right shoulder
-------------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
   Prior Illness: listed above
   Prior Hospitalizations: no recent hospitalizations
   Dietary Status: Regular diet
-------------------------------------------
   Family Involvement: Own POA
   Significant Family Medical History: Patient denies
-------------------------------------------
   Marital Status: REDACTED
   Code Status: Full code
VITALS
     T: 97.5    P: 81    R: 18    B/P: 132/86    POX: 97
     T: 97.5    P: 81    R: 18    B/P: 132/86    POX: 97
-------------------------------------------
NEUROLOGICAL
   ROS: Denies headache, Denies being dizzy
   Exam:
     Cranial Nerves: Opens eyes spontaneously, Opens mouth when asked, Blinks
     Sensation: weakness on right side from previous CVA
-------------------------------------------
PSYCHIATRIC
```

# REDACTED

```
-------------------------------------------
EYES
   ROS: + Glasses, Denies blurred vision, Denies eye pain
   Exam:
```

```
        Conjunctivae & Lids: No discharge, No tearing
        Pupils & Irises: Anicteric
----------------------------------------
EARS, NOSE, MOUTH, THROAT
   ROS: Denies rhinitis, Denies pharyngitis
   Exam:
        External Ears & Nose: External nose intact, no rhinorrhea, No rhinitis, Pinna intact, No
tenderness, No deformity
        Hearing: Hearing intact to conversation
        lips, teeth & gums: Moist Mucous Membranes, Good dentition
----------------------------------------
CARDIOVASCULAR
   ROS: Denies palpitations, Denies dizziness, Denies chest pain
   Exam:
        Palpation of Heart: PMI nondisplaced
        Auscultation of Heart: Regular rhythm, +S1S2
        Pedal Pulse: cannot feel the pulse on the right foot,  ABI of right leg 0.60, Thready on the
left foot
        Extremities for Edema/Varicosities: 2+ edema to right leg, 1+ Edema Left leg
----------------------------------------
RESPIRATORY
   ROS: Denies cough but coughing is only due to smoking Denies Dyspnea
   Exam:
        Respiratory Effort: Equal expansion bilaterally, No accessory muscle use
        Auscultation of Lungs: No wheezing, Bilateral, Clear Breath Sounds, Diminished, Declines
smoking cessation
----------------------------------------
GASTROINTESTINAL
   ROS: Denies ABD pain, Denies nausea, Denies vomiting
   Exam:
        Abdomen: Soft, nontender, Obese, Bowel sounds active
        Last BM: Continent of bowel
----------------------------------------
GENITOURINARY
   ROS: Denies frequency, Denies urgency
   Exam:
        Bladder: Foley in place, draining yellow urine, sedimentary urine
----------------------------------------
MUSCULOSKELETAL
   ROS: Pain in right shoulder / right side of the body
   Exam:
        Gait & Posture: Motorized Wheelchair mobility
        digits/nails: Cap refill < 2 seconds
        1) Head & Neck: Mobile, NC, AT
        3) Right Upper Extremity: Hemiplegia/ rt shoulder/ with laxity/ neg crank test,
        4) Left Upper Extremity: Mobile
        5) Right Lower Extremity: Hemiplegia, flaccid
        6) Left Lower Extremity: Mobile, edema 1+
----------------------------------------
HEMATOLOGIC/LYMPHATIC
   ROS: Denies fever, Denies chills
   Exam:
        Neck: Trachea midline, No lymphadenopathy
        Axillae: No lymphadenopathy
        Other: afebrile
        Neck: Supple, Trachea midline
----------------------------------------
INTEGUMENTARY
   ROS: Denies abrasions, Denies rash
   Exam:
        Finding: Visible skin warm, dry, intact, Good skin turgor
----------------------------------------
----------------------------------------
LABS
   Notes / Findings: Records reviewed for clinical progress notes, diagnostic tests/results,
medications, and treatments., See Coordination of Care description for lab details, Therapy Notes
reviewed
----------------------------------------
```

```
PLANS
   DX: G81.01  Flaccid hemiplegia affecting right dominant side
   Problem: hemiplegia
   Plan: in pt/ot/ continue to monotor
-----------------------------------------
   DX: M62.838  Other muscle spasm
   Problem: spasms
   Plan: monitor
-----------------------------------------
   DX: I10  Essential (primary) hypertension
   Problem: htn
   Plan: lisinopril, metoprolol, trimteremne/hctz
-----------------------------------------
   DX: M25.511  Pain in right shoulder
   Problem: rt shoulder pain
   Plan: oxycodone
-----------------------------------------
NARRATIVE NOTES
REDACTED      seen and examined after concern from therapist from rt shoulder laxity.  Post cva
   with substabntial atrophy. tested and without prominence ofhumerol head, though laxity of joint
   most likelydue to flaccid hemiplegia and atrophy.  2 -3 cm gapping of gh joint, but does not
   appear dislocated.  Recent injection last week form pcp.  Continue to monitr, pt /ot to cntinue.
   Will check shoulder in week or so to determine if their is worsening.   Patient to avoid weight
   bearoing on rt side per therapy.  Agree
-----------------------------------------
   Electronically Signed By: Merchant Adams AGPCNP-BC
```

J

**Exhibit J**

Patient 4

(See Attached)

12/20/2018          KareFirst

```
EVALUATION INFO
   Patient Name:     REDACTED
   Patient DOB: REDACTED
   Date of Service: 11/27/2018
   Visit Type: Subsequent Visit - Chronic Disease Management
   Evaluated by: Merchant Adams AGPCNP-BC
   Allergies: Bee Venoms
   Chief Complaint: Pain,
-----------------------------------------
HISTORY OF PRESENT ILLNESS
   Location: lower  back/ general
   Context: long term morphine use.
   Modifying Factors: morphine helps
   Quality: achy
   Duration: ongoing
   Associated Symptoms: weakness, fatigue
   Severity/Score: 10
   Timing: constant
-----------------------------------------
CHRONIC CONDITIONS
                 REDACTED
   J44.9      Chronic obstructive pulmonary disease, unspecified
   I10        Essential (primary) hypertension
   E78.5      Hyperlipidemia, unspecified
   Q61.9      Cystic kidney disease, unspecified
   D30.00     Benign neoplasm of unspecified kidney
   N40.1      Benign prostatic hyperplasia with lower urinary tract symptoms
   G11.1      Early-onset cerebellar ataxia
                 REDACTED
                      REDACTED
   Z87.891    Personal history of nicotine dependence
                      REDACTED
   R05        Cough
   D72.829    Elevated white blood cell count, unspecified
   R39.15     Urgency of urination
   R52        Pain, unspecified
   J18.9      Pneumonia, unspecified organism
   L21.9      Seborrheic dermatitis, unspecified
   R13.10     Dysphagia, unspecified
   M62.81     Muscle weakness (generalized)
-----------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
   Prior Illness: BPH
   Prior Hospitalizations: no recent hospitalizations
-----------------------------------------
   Significant Family Medical History: denies family history
-----------------------------------------
   Code Status: Full code
   Living Arrangements: lives in nursing home
   Alcohol/Tobacco/Illicit Drug Use: REDACTED
REDACTED
   NEUROLOGICAL
   ROS: A+O x4
   Exam:
      Cranial Nerves: Blinks, Opens eyes spontaneously, Opens mouth when asked
      Sensation: Equal bilaterally
-----------------------------------------
   PSYCHIATRIC
```

# REDACTED

```
   -----------------------------------------
   EYES
   ROS: Denies visual changes
   Exam:
```

```
      Conjunctivae & Lids: Moist conjunctiva, No discharge, No tearing
      Pupils & Irises: Anicteric
------------------------------------------
EARS, NOSE, MOUTH, THROAT
   ROS: denies nasal congestion, denies runny nose
   Exam:
      External Ears & Nose: NOSE:, External nose intact, EARS:Pinna intact
      Hearing: Hearing intact to conversation
      lips, teeth & gums: Moist Mucous Membranes
------------------------------------------
CARDIOVASCULAR
   ROS: Denies chest pain
   Exam:
      Palpation of Heart: PMI nondisplaced
      Auscultation of Heart: Regular rhythm, +S1S2
      Pedal Pulse: 1+
      Extremities for Edema/Varicosities: No edema present
------------------------------------------
CHEST
   ROS: Denies lump in breast
   Exam:
      Breasts: symmetrical breasts
      Palpation of Breasts & Axillae: Not tender to palpation
------------------------------------------
RESPIRATORY
   ROS: +cough, Denies wheezing, Denies Dyspnea, Denies pain with breathing
   Exam:
      Respiratory Effort: Unlabored breathing, productive cough.
      Auscultation of Lungs: Clear Breath Sounds, diminished
------------------------------------------
GASTROINTESTINAL
   ROS: Denies ABD pain, Denies nausea, Denies vomiting
   Exam:
      Abdomen: Soft, Nondistended, Nontender
      Last BM: Continent of bowel
------------------------------------------
GENITOURINARY
   ROS: Denies burning
   Exam:
      Bladder: Nondistended
------------------------------------------
MUSCULOSKELETAL
   ROS: c/o knees and fingers pain, chest pain
   Exam:
      Gait & Posture: Power w/c
      digits/nails: Cap refill < 2 seconds
      1) Head & Neck: Mobile
      2) Spine, Ribs & Pelvis: Mobile
------------------------------------------
HEMATOLOGIC/LYMPHATIC
   ROS: Denies abnormal bruising, Denies chills, Denies fever
   Exam:
      Neck: No lymphadenopathy
      Axillae: No lymphadenopathy
      Neck: Supple, Trachea midline
      Thyroid: No masses
------------------------------------------
INTEGUMENTARY
   ROS: Denies pruritus, Denies cuts, Xerosis (dry skin)
   Exam:
      Finding: Visible skin warm, dry, intact
------------------------------------------
ENDOCRINE
   ROS: Denies cold intolerance, Denies heat intolerance
   Exam:
      Finding: no Thyromegaly
------------------------------------------
------------------------------------------
```

12/20/2018                                               KareFirst

LABS
    Notes / Findings: Records reviewed for clinical progress notes, diagnostic tests/results,
medications, and treatments., See Coordination of Care description for lab details, Therapy Notes
reviewed
------------------------------------------
PLANS
    DX: J44.9  Chronic obstructive pulmonary disease, unspecified
    Problem: copd
    Plan: combivent, ipatropium, anoro elipta , o2 as needed
------------------------------------------
    DX: R52  Pain, unspecified
    Problem: pain
    Plan: chronic pain/ morphine refilled
------------------------------------------
    DX: M62.81  Muscle weakness (generalized)
    Problem: weakness
    Plan: longer transfers/ pt evaluated and started treatment, reviewed, continue
------------------------------------------
    DX:            REDACTED
    Problem: REDACTED
    Plan: REDACTED
------------------------------------------
NARRATIVE NOTES
REDACTED     seen and examined for mangement of chronic pain issues and COPD.  Recently evaluated
for difcculty breathing, with improvement of cough, but continued issues with copd.  Continue
plans, attempting to get porttable O2 for patient.  Morphine refilled for pain.  No
constipations.  Additionally, patient has had increasing difficulty with transfers.  PT evaluated
and he is currently recieving therapy which although beneficial, can cause acute exacerbations of
pain.  Continue with plans.
------------------------------------------
Electronically Signed By: Merchant Adams AGPCNP-BC

K

**Exhibit K**

Patient 5

(See Attached)

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB: REDACTED
  Date of Service: 11/02/2018
  Visit Type: Subsequent Visit - Chronic Disease Management
  Evaluated by: Merchant Adams AGPCNP-BC
  Chief Complaint: rash
-----------------------------------------
HISTORY OF PRESENT ILLNESS
  Location: under breasts
  Modifying Factors: dryness improves
  Quality: folds only
  Duration: ongoing
  Severity/Score: 3
  Timing: on/off
-----------------------------------------
CHRONIC CONDITIONS
REDACTED
  J44.9       Chronic obstructive pulmonary disease, unspecified
  I10         Essential (primary) hypertension
  E78.5       Hyperlipidemia, unspecified
  E03.9       Hypothyroidism, unspecified
  K21.9       Gastro-esophageal reflux disease without esophagitis
  M13.0       Polyarthritis, unspecified
```

# REDACTED

```
  M79.601     Pain in right arm
  N64.52      Nipple discharge
  R05         Cough
  J00         Acute nasopharyngitis [common cold]
  K59.00      Constipation, unspecified
  E87.1       Hypo-osmolality and hyponatremia
  M25.511     Pain in right shoulder
  S52.91XA    Unspecified fracture of right forearm, initial encounter for closed fracture
  B36.9       Superficial mycosis, unspecified
-----------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
  Prior Illness: right arm got hit by a bicycle years ago.
-----------------------------------------
  Significant Family Medical History: non-contrib
-----------------------------------------
  Marital Status: REDACTED
  Living Arrangements: Lives in Nursing home
  Alcohol/Tobacco/Illicit Drug Use: Never a smoker
  Other Relevant Social Factors: Refuses mammogram DEC 2017
NEUROLOGICAL
  ROS: alert
  Exam:
    Cranial Nerves: Blinks, Facial features even, Opens eyes spontaneously, Opens mouth when asked
-----------------------------------------
PSYCHIATRIC
```

# REDACTED

```
EYES
  ROS: Denies eye pain, Denies drainage
  Exam:
    Conjunctivae & Lids: Anicteric, No discharge, No tearing
    Pupils & Irises: Anicteric
-----------------------------------------
EARS, NOSE, MOUTH, THROAT
  ROS: Denies pharyngitis, Denies rhinitis
  Exam:
    External Ears & Nose: NOSE:, External nose intact, EARS:, Pinna intact
    lips, teeth & gums: Moist Mucous Membranes
-----------------------------------------
```

CARDIOVASCULAR
  ROS: Denies chest pain
  Exam:
    Palpation of Heart: PMI nondisplaced
    Auscultation of Heart: +S1S2, Regular rhythm, No gallops, No murmur, No rubs
    Pedal Pulse: Bilateral
    Extremities for Edema/Varicosities: No edema present
-------------------------------------------
RESPIRATORY
  ROS: Denies cough
  Exam:
    Respiratory Effort: Accessory muscle use (minor) tripods,
    Auscultation of Lungs: coarse but relatively clear
-------------------------------------------
GASTROINTESTINAL
  ROS: Denies ABD pain
  Exam:
    Abdomen: No guarding, No rebound tenderness
    Last BM: Last BM earlier
-------------------------------------------
GENITOURINARY
  ROS: Denies burning, Denies flank pain
  Exam:
    External REDACTED
    Bladder: Nondistended
-------------------------------------------
MUSCULOSKELETAL
  ROS: c/o right arm pain (on and off).
  Exam:
    Gait & Posture: Upright posture
    digits/nails: Cap refill < 2 seconds
    1) Head & Neck: Mobile
    2) Spine, Ribs & Pelvis: Mobile
    3) Right Upper Extremity: right arm hx of fx.
    4) Left Upper Extremity: Weak
    5) Right Lower Extremity: Weak
    6) Left Lower Extremity: Weak
-------------------------------------------
HEMATOLOGIC/LYMPHATIC
  ROS: Denies chills, Denies fever
  Exam:
    Neck: No lymphadenopathy
    Other: No bruising noted
    Neck: Nontender to palpation, Supple, Trachea midline
-------------------------------------------
INTEGUMENTARY
  ROS: Denies ecchymosis
  Exam:
    Finding: Visible skin warm, dry, intact/ rash under breasts bilaterally
-------------------------------------------
-------------------------------------------
LABS
  Notes / Findings: Records reviewed for clinical progress notes, diagnostic tests/results,
medications, and treatments., See Coordination of Care description for lab details,
-------------------------------------------
PLANS
  DX: J44.9  Chronic obstructive pulmonary disease, unspecified
  Problem: copd
  Plan: maintain hob upright / modalities
-------------------------------------------
  DX: I10  Essential (primary) hypertension
  Problem: htn
  Plan: amlodopine, metoprolol, lasix
-------------------------------------------
  DX: REDACTED
  Problem: REDACTED
  Plan: REDACTED
-------------------------------------------

12/20/2018                                          KareFirst

DX; B36.9  Superficial mycosis, unspecified
Problem: fungal rash
Plan: nystatin powder tid
-------------------------------------------
NARRATIVE NOTES
REDACTED     seen and examined for initil;y rash under breasts and stARTED on nystatoin.  Menaged
for chronic medical issues and medications were reconciled.  stay with plans currently, REDACTED
REDACTED    Acardiac meds in goosd supply.
-------------------------------------------

Electronically Signed By: Merchant Adams AGPCNP-BC

L

**Exhibit L**

Patient 6

(See Attached)

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB:  REDACTED
  Date of Service: 11/16/2018
  Visit Type: Initial Visit
  Evaluated by: Merchant Adams AGPCNP-BC
  Chief Complaint: pain
-----------------------------------------
HISTORY OF PRESENT ILLNESS
  Location: neck
  Context: frequent falls
  Modifying Factors: modalities improve
  Duration: ongoing
  Associated Symptoms: weakness
  Severity/Score: 4
  Timing: on/off
-----------------------------------------
CHRONIC CONDITIONS
REDACTED
  I10     Essential (primary) hypertension
  N18.3   Chronic kidney disease, stage 3 (moderate)
  D63.1   Anemia in chronic kidney disease
  K57.90  Diverticulosis of intestine, part unspecified, without perforation or abscess without
bleeding
  M54.2   Cervicalgia
  I25.10  Atherosclerotic heart disease of native coronary artery without angina pectoris
  M62.81  Muscle weakness (generalized)
  R26.2   Difficulty in walking, not elsewhere classified
REDACTED
  E78.5   Hyperlipidemia, unspecified
-----------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
  Prior Illness: ckd, htn, diverticulitis
  Prior Operations: prostatectomy, rt side abdomen cysts removal
  Prior Hospitalizations: REDACTED
-----------------------------------------
  Significant Family Medical History: pancreatic ca mat and pat
-----------------------------------------
  Marital Status: REDACTED
  Code Status: DNR/DNI
  Alcohol/Tobacco/Illicit Drug Use: denies x 3
ADVANCED CARE DISCUSSION
  Discussion Time: 5
  People Present: patient sw
  Summary: per chart and staff patient is dnr
-----------------------------------------
VITALS
  T: 97.6   P: 58   R: 18   B/P: 159/80   POX: 95
  T: 97.6   P: 58   R: 18   B/P: 159/80   POX: 95
-----------------------------------------
NEUROLOGICAL
  ROS: Slurred speech, A+O x2
  Exam:
    Cranial Nerves: Facial features even, Opens eyes spontaneously
    Sensation: Equal bilaterally
-----------------------------------------
PSYCHIATRIC
```

# REDACTED

```
-----------------------------------------
EYES
  ROS: Denies eye pain, Denies drainage, Denies diplopia
  Exam:
    Conjunctivae & Lids: No discharge, No tearing
    Pupils & Irises: PERRLA
```

------------------------------------------
EARS, NOSE, MOUTH, THROAT
   ROS: Denies HOH, Denies rhinitis, Denies pharyngitis
   Exam:
      External Ears & Nose: NOSE:, no rhinorrhea, No rhinitis, EARS:, No drainage, deformities or
lesions noted bilaterally
      Hearing: Hearing intact to conversation
      lips, teeth & gums: Moist Mucous Membranes
------------------------------------------
CARDIOVASCULAR
   ROS: Denies palpitations, Denies dyspnea on exertion, Denies orthopnea, Denies dizziness
   Exam:
      Palpation of Heart: PMI nondisplaced
      Auscultation of Heart: Regular rhythm, +S1S2
      Carotid Arteries: No carotid bruits appreciated bilaterally
      Pedal Pulse: 2+, Bilateral
      Extremities for Edema/Varicosities: Trace, BLE Edema
------------------------------------------
RESPIRATORY
   ROS: Denies wheezing, Denies Dyspnea, Denies hemoptysis, Denies pain with breathing
   Exam:
      Respiratory Effort: Bilateral equal lung expansion, No accessory muscle use
      Auscultation of Lungs: Clear Breath Sounds, No rales, No rhonchi, No wheezing
------------------------------------------
GASTROINTESTINAL
   ROS: Denies vomiting, Denies nausea, Denies diarrhea, Denies constipation
   Exam:
      Abdomen: Soft, Nondistended, Nontender, Bowel sounds active
      Liver & Spleen: No gross organomegaly
      Last BM: Last BM earlier
------------------------------------------
GENITOURINARY
   ROS: Denies urgency, Denies nocturia, Denies hematuria, Denies foul odor, Denies burning
   Exam:
      Bladder: Nondistended
------------------------------------------
MUSCULOSKELETAL
   ROS: Fall, Denies muscle spasms, Denies weakness
   Exam:
      Gait & Posture: Poor trunk control unsteady, nearly fell when entered room
      1) Head & Neck: Mobile
      2) Spine, Ribs & Pelvis: Mobile
      3) Right Upper Extremity: Strength: 4/5
      4) Left Upper Extremity: Strength: 4/5
      5) Right Lower Extremity: Strength: 4/5
      6) Left Lower Extremity: Strength: 4/5
------------------------------------------
HEMATOLOGIC/LYMPHATIC
   ROS: Denies tender nodes, Denies fever, Denies chills, Denies abnormal bruising
   Exam:
      Neck: No lymphadenopathy
      Other: no Unusual bruising,  residualbruising from fall
      Neck: Trachea midline, Supple, Nontender to palpation
------------------------------------------
INTEGUMENTARY
   ROS: Xerosis (dry skin), Denies rash, Denies cuts
   Exam:
      Finding: Visible skin warm, dry, intact, Poor skin turgor
------------------------------------------
------------------------------------------
LABS
   Notes / Findings: Records reviewed for clinical progress notes, diagnostic tests/results,
medications, and treatments., See Coordination of Care description for lab details, See above Lab
Panel results
------------------------------------------
PLANS
   DX: M54.2  Cervicalgia
   Problem: cervicalgia

```
    Plan: nsaids/ modalities/ addrss in therapy
-----------------------------------------
    DX: I25.10  Atherosclerotic heart disease of native coronary artery without angina pectoris
    Problem: CAD
    Plan: on lisinopril/ statin/ omega 3 monitor for dizziness and syncope.
-----------------------------------------
    DX: M62.81  Muscle weakness (generalized)
    Problem: weakness
    Plan: pt/ot to evaluate and treat
-----------------------------------------
    DX: F03.90  Unspecified dementia without behavioral disturbance
    Problem: dementia
    Plan: poor judgement, redirect
-----------------------------------------
    NARRATIVE NOTES
```

REDACTED          who was hospitalized post fall where ᴿᴱᴰᴬᶜ fell facefirst and was admitted to REDACTED
    REDACTED        was discharged to home, but had multiple fall there and is now admitted to facility for
    rehabilitation and management of chronic disease.  Carry through all orders and will run labs on
    monday

```
-----------------------------------------
    Electronically Signed By: Merchant Adams AGPCNP-BC
```

M

**Exhibit M**

Patient 7

(See Attached)

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB: REDACTED
  Date of Service: 11/09/2018
  Visit Type: Subsequent Visit - Chronic Disease Management
  Evaluated by: Merchant Adams AGPCNP-BC
  Chief Complaint: sob
------------------------------------------
HISTORY OF PRESENT ILLNESS
  Location: respiratory
  Context: smokes
  Modifying Factors: nebs help
  Quality: with cough
  Duration: ongoing
  Associated Symptoms: fatigue and endurance
  Severity/Score: 3
  Timing: on/off
------------------------------------------
CHRONIC CONDITIONS
  Z89.519     Acquired absence of unspecified leg below knee
  E78.5       Hyperlipidemia, unspecified
```

REDACTED

```
  G62.9       Polyneuropathy, unspecified
  J45.909     Unspecified asthma, uncomplicated
  D64.9       Anemia, unspecified
  E55.9       Vitamin D deficiency, unspecified
```

REDACTED

```
  Z89.029     Acquired absence of unspecified finger(s)
  R91.8       Other nonspecific abnormal finding of lung field
------------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
  Prior Illness: B/L BKA, neuropathy, amputated B/L digits
------------------------------------------
  Significant Family Medical History: REDACTED
------------------------------------------
  Marital Status:REDACTED
  Code Status: Full code
  Living Arrangements: Living in Nursing home
  Alcohol/Tobacco/Illicit Drug Use: Smoker 0 1ppd x 43 years
REDACTED
NEUROLOGICAL
  ROS: A+O x3, Denies being dizzy, Denies headache, Denies numbness
  Exam:
    Cranial Nerves: Blinks, Opens eyes spontaneously, Opens mouth when asked, Facial features even
------------------------------------------
PSYCHIATRIC
```

# REDACTED

```
------------------------------------------
EYES
  ROS: Denies visual changes, Denies eye pain
  Exam:
    Conjunctivae & Lids: Moist conjunctiva, No discharge, No tearing
    Pupils & Irises: PERRLA, EOMI
------------------------------------------
EARS, NOSE, MOUTH, THROAT
  ROS: Denies HOH, Denies pharyngitis, Denies rhinitis, Denies tinnitus
  Exam:
    External Ears & Nose: NOSE:, External nose intact, EARS:, No drainage, deformities or lesions
noted bilaterally
    Otoscopic : Tympanic membrane pearly grey and intact
    Hearing: Hearing intact to conversation
    Nasal Mucosa, Septum & Turbinates: Clear exudate
    lips, teeth & gums: Poor dentition, Moist Mucous Membranes, Poor oral hygiene
    Oropharynx: Bilateral Tonsils
```

------------------------------------------
**CARDIOVASCULAR**
  ROS: Denies chest pain, Denies dyspnea on exertion, Denies palpitations
  Exam:
    Palpation of Heart: no thrills
    Auscultation of Heart: +S1S2, Regular rhythm
    Extremities for Edema/Varicosities: absence of legs below the knee
------------------------------------------
**RESPIRATORY**
  ROS: Denies cough, Denies hemoptysis, Denies pain with breathing, Denies Dyspnea
  Exam:
    Respiratory Effort: Bilateral equal lung expansion, Unlabored breathing
    Auscultation of Lungs: Declines smoking cessation
------------------------------------------
**GASTROINTESTINAL**
  ROS: Denies ABD pain, Denies change in  appetite, Denies nausea, Denies vomiting
  Exam:
    Abdomen: Soft, Nondistended, Nontender, Bowel sounds active
    Last BM: Continent of bowel
------------------------------------------
**GENITOURINARY**
  ROS: Denies any urinary issues
  Exam:
    Penis: deferred
    Bladder: Nondistended
------------------------------------------
**MUSCULOSKELETAL**
  ROS: Denies fall, Denies joint pain, Denies joint swelling, Weakness
  Exam:
    Gait & Posture: W/C bound
    digits/nails: Absence of bilateral digits
    1) Head & Neck: Mobile
    2) Spine, Ribs & Pelvis: Mobile
    3) Right Upper Extremity: Strength: 4/5 absence of digits,
    4) Left Upper Extremity: Strength: 4/5 absence of digits
    5) Right Lower Extremity: absence of leg below the knee
    6) Left Lower Extremity: absence of leg below the knee
------------------------------------------
**HEMATOLOGIC/LYMPHATIC**
  ROS: Denies abnormal bruising, Denies chills, Denies fever
  Exam:
    Neck: No lymphadenopathy
    Axillae: No lymphadenopathy
    Other: No bruising noted
------------------------------------------
**INTEGUMENTARY**
  ROS: Denies rash, Denies pruritus
  Exam:
    Finding: Visible skin warm, dry, intact, extensive scarring
------------------------------------------
**ENDOCRINE**
  ROS: Denies heat intolerance, Denies cold intolerance, Denies sweating, Denies thirst
  Exam:
    Finding: no, Thyromegaly
------------------------------------------
------------------------------------------
**LABS**
  Notes / Findings: Records reviewed for clinical progress notes, diagnostic tests/results,
medications, and treatments., See Coordination of Care description for lab details
------------------------------------------
**PLANS**
  DX: J45.909  Unspecified asthma, uncomplicated
  Problem: asthma
  Plan: on nebs as needed
------------------------------------------
  DX: REDACTED
  Problem: REDACTED
  Plan: REDACTED

```
------------------------------------------
DX: G62.9  Polyneuropathy, unspecified
Problem: neuropathy
Plan: gabapentin
------------------------------------------
DX: Z89.519  Acquired absence of unspecified leg below knee
Problem: absence of legs
Plan: wc/ therapeutic activiites for wc monilty encoiuraged,
------------------------------------------
```

NARRATIVE NOTES
REDACTED      seen and examined for management of ongoing issues.  Has frequent exacerbations
related to asthma.  Smoking and otherwise doing well.  enciuraged nebs.  meds reviewed, in good
supply.  Continue mamngement .  no acute eventsa or injuries.

```
------------------------------------------
```

Electronically Signed By: Merchant Adams AGPCNP-BC

N

**Exhibit N**

Patient 8

(See Attached)

12/20/2018                                    KareFirst

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB:          REDACTED
  Date of Service: 11/02/2018
  Visit Type: Subsequent Visit - Chronic Disease Management
  Evaluated by: Merchant Adams AGPCNP-BC
  Chief Complaint: htn
-----------------------------------------
HISTORY OF PRESENT ILLNESS
  Location: cv
  Context: adl decline
  Modifying Factors: meds
  Duration: ongoing
  Associated Symptoms: fatigue/ ha
  Severity/Score: 4
  Timing: comstant
-----------------------------------------
CHRONIC CONDITIONS
  R13.11     Dysphagia, oral phase
  I12.9      Hypertensive chronic kidney disease with stage 1 through stage 4 chronic kidney
disease, or unspecified chronic kidney disease
  E11.65     Type 2 diabetes mellitus with hyperglycemia
  I10        Essential (primary) hypertension
  I25.10     Atherosclerotic heart disease of native coronary artery without angina pectoris
  I28.0      Arteriovenous fistula of pulmonary vessels
  N18.9      Chronic kidney disease, unspecified
  G47.33     Obstructive sleep apnea (adult) (pediatric)
  N32.81     Overactive bladder
  J45.909    Unspecified asthma, uncomplicated
  E78.5      Hyperlipidemia, unspecified
  R73.9      Hyperglycemia, unspecified
  R33.9      Retention of urine, unspecified
  R19.09     Other intra-abdominal and pelvic swelling, mass and lump
  REDACTED
  D64.9      Anemia, unspecified
  REDACTED
  L03.115    Cellulitis of right lower limb
  M79.604    Pain in right leg
  R60.0      Localized edema
  L29.9      Pruritus, unspecified
  E66.09     Other obesity due to excess calories
  R05        Cough
  E87.6      Hypokalemia
  J02.9      Acute pharyngitis, unspecified
  R09.81     Nasal congestion
  K59.00     Constipation, unspecified
  R21        Rash and other nonspecific skin eruption
  Z99.2      Dependence on renal dialysis
  Z79.4      Long term (current) use of insulin
-----------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
  Prior Illness: See above
  Prior Operations: non-contrib
  Prior Hospitalizations: no recent hospitalizations
-----------------------------------------
  Significant Family Medical History: Denies family history
-----------------------------------------
  Code Status: Full code
  Living Arrangements: Living in Nursing home.
  Alcohol/Tobacco/Illicit Drug Use: Denies Smoking or ETOH
VITALS
  T: 97.9    P: 76    R: 18    B/P: 120/70
  T: 97.9    P: 76    R: 18    B/P: 120/70
-----------------------------------------
NEUROLOGICAL
  ROS: alert,headache, Denies being dizzy
  Exam:
    Cranial Nerves: Facial features even, Opens eyes spontaneously, Opens mouth when asked, CN II-
```

```
XII intact/ sinus tenderness
    Sensation: Equal bilaterally
-------------------------------------------
PSYCHIATRIC
```

# REDACTED

```
-------------------------------------------
EYES
   ROS: + Glasses, Denies blurred vision, Denies visual changes
   Exam:
      Conjunctivae & Lids: Moist conjunctiva, No tearing, No discharge
      Pupils & Irises: Anicteric
-------------------------------------------
EARS, NOSE, MOUTH, THROAT
   ROS: Able to swallow foods, Able to swallow liquids
   Exam:
      External Ears & Nose: NOSE:, External nose intact, EARS:, No drainage, deformities or lesions
noted bilaterally
      Otoscopic : Tympanic membrane inflammed,  Bulging eardrum
      Hearing: Hearing intact to conversation
      Nasal Mucosa, Septum & Turbinates: (-) mucus
      lips, teeth & gums: Moist Mucous Membranes
      Oropharynx: slightly erythematous, no exudate.
-------------------------------------------
CARDIOVASCULAR
   ROS: Denies chest pain, Denies dizziness, Denies palpitations,
   Exam:
      Palpation of Heart: no thrills, PMI nondisplaced
      Auscultation of Heart: +S1S2, Regular rhythm
      Extremities for Edema/Varicosities: BLE Edema, 1+, Non-pitting BLE on compression stockings
-------------------------------------------
RESPIRATORY
   ROS: Denies pain with breathing, Denies wheezing
   Exam:
      Respiratory Effort: Unlabored breathing
      Auscultation of Lungs: , Coarse Breath Sounds
-------------------------------------------
GASTROINTESTINAL
   ROS: ..Denies ABD pain, Denies change in  appetite, Denies diarrhea, Denies nausea, Denies
vomiting,
   Exam:
      Abdomen: Soft, Bowel sounds active, Nondistended, No rebound tenderness
      Liver & Spleen: No gross organomegaly
      Last BM: Continent of bowel
-------------------------------------------
GENITOURINARY
   ROS: Denies flank pain, Denies burning, Denies foul odor
   Exam:
      Bladder: Nondistended
-------------------------------------------
MUSCULOSKELETAL
   ROS: Myalgia, Denies joint swelling, Denies muscle spasms
   Exam:
      Gait & Posture: W/C bound
      digits/nails: Cap refill < 2 seconds
      1) Head & Neck: Mobile
      2) Spine, Ribs & Pelvis: Mobile
      3) Right Upper Extremity: Strength: 4/5
      4) Left Upper Extremity: Strength: 4/5
      5) Right Lower Extremity: Weak
      6) Left Lower Extremity: Weak
-------------------------------------------
HEMATOLOGIC/LYMPHATIC
   ROS: Denies abnormal bruising, Denies chills, Denies fever
   Exam:
```

```
    Neck: No lymphadenopathy
    Axillae: No lymphadenopathy
    Neck: Trachea midline, No edema
    Thyroid: No thyroid nodules palpable, No masses
-----------------------------------------
INTEGUMENTARY
  ROS: Denies cuts, Denies ecchymosis, Denies pruritus, Denies rash
  Exam:
    Finding: Visible skin warm, dry, intact. No noted rash/lesions/excoriation marks.
-----------------------------------------
ENDOCRINE
  ROS: Denies heat intolerance, Denies cold intolerance
  Exam:
    Finding: Accuchecks stable
-----------------------------------------
-----------------------------------------
PLANS
  DX: R73.9  Hyperglycemia, unspecified
  Problem: hyperglycemia
  Plan: on insulin ss
-----------------------------------------
  DX: Z79.4  Long term (current) use of insulin
  Problem: insuklin
  Plan: ss for control, continue
-----------------------------------------
  DX: I10  Essential (primary) hypertension
  Problem: htn
  Plan: lasix, continue
-----------------------------------------
  DX: J45.909  Unspecified asthma, uncomplicated
  Problem: astma
  Plan: nebs as needed
-----------------------------------------
-----------------------------------------
Electronically Signed By: Merchant Adams AGPCNP-BC
```

O

**Exhibit O**

Patient 9

(See Attached)

12/20/2018                                                        KareFirst

```
EVALUATION INFO
   Patient Name: REDACTED
   Patient DOB:
   Date of Service: 11/01/2018
   Visit Type: Subsequent Visit - Chronic Disease Management
   Evaluated by: Merchant Adams AGPCNP-BC
   Chief Complaint: REDACTED seen and examined for management of htn
------------------              ---------
HISTORY OF PRESENT ILLNESS
   Location: cv
   Context: adl decline, REDACTED
   Modifying Factors: carvedilol helos
   Duration: ongoing
   Associated Symptoms: dizziness at time. hypotension.
   Severity/Score: 4
   Timing: constant
------------------------------------------
CHRONIC CONDITIONS
   I10        Essential (primary) hypertension
   K56.7      Ileus, unspecified
   S22.32XA   Fracture of one rib, left side, initial encounter for closed fracture
   R26.89     Other abnormalities of gait and mobility
   R27.8      Other lack of coordination
   M62.58     Muscle wasting and atrophy, not elsewhere classified, other site
   R29.3      Abnormal posture
   J44.9      Chronic obstructive pulmonary disease, unspecified
   W19.XXXD   Unspecified fall, subsequent encounter
   I50.22     Chronic systolic (congestive) heart failure
   K21.9      Gastro-esophageal reflux disease without esophagitis
   E03.9      Hypothyroidism, unspecified
```

# REDACTED

```
   N18.4      Chronic kidney disease, stage 4 (severe)
   G47.00     Insomnia, unspecified
   K58.9      Irritable bowel syndrome without diarrhea
   D63.8      Anemia in other chronic diseases classified elsewhere
   I25.5      Ischemic cardiomyopathy
   N18.9      Chronic kidney disease, unspecified
   N17.9      Acute kidney failure, unspecified
   M25.512    Pain in left shoulder
   W19.XXXA   Unspecified fall, initial encounter
   N28.9      Disorder of kidney and ureter, unspecified
   N39.0      Urinary tract infection, site not specified
   S42.202A   Unspecified fracture of upper end of left humerus, initial encounter for closed
fracture
------------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
   Prior Illness: see above, REDACTE REDACTED   REDACTED, qt elongation , lbbb, REDACTED
   Prior Operations: left hip arthoplasy, icd (removed)
   Prior Hospitalizations: REDACTED
------------------------------------------
   Significant Family Medical History: mat: breast Ca
pat: colon ca
------------------------------------------
   Marital Status: REDACTED
   Code Status: Full code
   Alcohol/Tobacco/Illicit Drug Use: REDACTED
```

# REDACTED

```
VITALS
      T: 98    P: 80    R: 20    B/P: 120/70    POX: 99
      T: 98    P: 80    R: 20    B/P: 120/70    POX: 99
------------------------------------------
NEUROLOGICAL
   ROS: Denies vertigo, Denies seizure, Denies headache
   Exam:
      Cranial Nerves: CN II-XII intact, Facial features even
      Sensation: Equal bilaterally
------------------------------------------
```

12/20/2018                                                          KareFirst

PSYCHIATRIC

# REDACTED

```
-----------------------------------------
```
CARDIOVASCULAR
    ROS: Denies PND, Denies palpitations, Denies dyspnea on exertion, Denies dizziness
    Exam:
       Palpation of Heart: PMI nondisplaced
       Auscultation of Heart: +S1S2, No gallops, No murmur, No rubs
       Carotid Arteries: No carotid bruits appreciated bilaterally
       Pedal Pulse: 1+, Bilateral
       Extremities for Edema/Varicosities: No edema present
```
-----------------------------------------
```
RESPIRATORY
    ROS: Denies cough, Denies hemoptysis, Denies pain with breathing, Denies wheezing, Denies
Dyspnea
    Exam:
       Respiratory Effort: Bilateral equal lung expansion, Unlabored breathing, No accessory muscle
use
```
-----------------------------------------
```
GASTROINTESTINAL
    ROS: Denies nausea, Denies diarrhea, Denies constipation, Denies vomiting
    Exam:
       Abdomen: Flat, Nontender, Nondistended, No guarding, No rebound tenderness, Bowel sounds
active
       Liver & Spleen: No gross organomegaly
       Last BM: Continent of bowel, Last BM earlier
```
-----------------------------------------
```
GENITOURINARY
    ROS: Denies nocturia, Denies hematuria, Denies foul odor, Denies burning
    Exam:
       Bladder: Nondistended
```
-----------------------------------------
```
MUSCULOSKELETAL
    ROS: Fall, Denies joint swelling, Denies muscle spasms, Denies weakness
    Exam:
       Gait & Posture: unsteady gait
       1) Head & Neck: Mobile
       2) Spine, Ribs & Pelvis: Mobile
       3) Right Upper Extremity: Strength: 4/5
       4) Left Upper Extremity: fx/ nwb
       5) Right Lower Extremity: Strength: 4/5
       6) Left Lower Extremity: Strength: 4/5
```
-----------------------------------------
```
HEMATOLOGIC/LYMPHATIC
    ROS: Denies tender nodes, Denies fever, Denies chills
    Exam:
       Neck: No lymphadenopathy
       Other: No bruising noted,
       Neck: Trachea midline, Supple, Nontender to palpation
```
-----------------------------------------
```
INTEGUMENTARY
    ROS: Xerosis (dry skin), Denies rash, Denies cuts
    Exam:
       Finding: Visible skin warm, dry, intact
```
-----------------------------------------
```
```
-----------------------------------------
```
LABS
    Notes / Findings: Therapy Notes reviewed, See Coordination of Care description for lab details,
Records reviewed for clinical progress notes, diagnostic tests/results, medications, and
treatments.
```
-----------------------------------------
```
PLANS
    DX: I10  Essential (primary) hypertension
    Problem: htn

```
Plan: on bb,
-----------------------------------------
DX: D63.8  Anemia in other chronic diseases classified elsewhere
Problem: anemia
Plan: supps, monitor hgb
-----------------------------------------
DX: M25.512  Pain in left shoulder
Problem: left shoulder pain
Plan: tylenol/ modlasities (max out 3 g daily tylenol)
-----------------------------------------
DX: N18.9  Chronic kidney disease, unspecified
Problem: ckd
Plan: weekly epo 20k q 2 weeks until hgb between 9 and 10 then q 2 weekuntil 10 then q month
-----------------------------------------
```

NARRATIVE NOTES

REDACTED          seen and examined for htn med review.    Carvedilol w/ [arameters.  Continue htn
meds.  Epo q week right nowfollowed by nephro, continue.   Pain is controlled with nsaids continue
-----------------------------------------

Electronically Signed By: Merchant Adams AGPCNP-BC

P

**Exhibit P**

Patient 10

(See Attached)

12/20/2018                                                        KareFirst

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB:
  Date of Service: 12/04/2018
  Visit Type: Subsequent Visit - Chronic Disease Management
  Evaluated by: Merchant Adams AGPCNP-BC
  Chief Complaint: weakness
-----------------------------------------
HISTORY OF PRESENT ILLNESS
  Location: general
  Context: decline in adl participation/ mobility/ and active enagment
  Modifying Factors: REDACTED
  Duration: ongoing
  Associated Symptoms: fatigue,
  Severity/Score: 5
  Timing: worsening
-----------------------------------------
CHRONIC CONDITIONS
```

# REDACTED

```
  I10        Essential (primary) hypertension
  E11.9      Type 2 diabetes mellitus without complications
  D64.9      Anemia, unspecified
  R94.31     Abnormal electrocardiogram [ECG] [EKG]
  R29.3      Abnormal posture
  I25.10     Atherosclerotic heart disease of native coronary artery without angina pectoris
  M62.81     Muscle weakness (generalized)
  M41.9      Scoliosis, unspecified
  R53.83     Other fatigue
  K56.699    Other intestinal obstruction unspecified as to partial versus complete obstruction
  K57.92     Diverticulitis of intestine, part unspecified, without perforation or abscess
without bleeding
  R11.10     Vomiting, unspecified
  K56.7      Ileus, unspecified
  K81.0      Acute cholecystitis
  R41.82     Altered mental status, unspecified
  REDACTED
  W19.XXXA   Unspecified fall, initial encounter
  R30.0      Dysuria
-----------------------------------------
PAST MEDICAL/FAMILY/SOCIAL HISTORY
  Prior Illness: HTN, REDACTED, prostate cancer, tardive dykinesia
  Prior Operations: REDACTED
-----------------------------------------
  Family Involvement: REDACTED
  Significant Family Medical History: non-contrib
-----------------------------------------
  Marital Status: REDACTED
  Code Status: Full code
  Current / Past Employment: REDACTED
VITALS
    T: 98   P: 64   R: 18   B/P: 140/70    POX: 97
    T: 98   P: 64   R: 18   B/P: 140/70    POX: 97
-----------------------------------------
NEUROLOGICAL
  ROS: alert, Denies seizure
  Exam:
    Cranial Nerves: Blinks, Facial features even, Opens eyes spontaneously, Opens mouth when
asked, CN II-XII intact/ ros with staff and chart assist
    Sensation: Equal bilaterally
-----------------------------------------
PSYCHIATRIC
```

# REDACTED

12/20/2018                                                    KareFirst

REDACTED

```
------------------------------------------
EYES
  ROS: Denies eye pain, Denies drainage
  Exam:
    Pupils & Irises: Anicteric, PERRLA
------------------------------------------
EARS, NOSE, MOUTH, THROAT
  ROS: Denies rhinitis, Denies nasal congestion
  Exam:
    Hearing: Hearing intact to conversation
    lips, teeth & gums: Moist Mucous Membranes
------------------------------------------
CARDIOVASCULAR
  Exam:
    Palpation of Heart: PMI nondisplaced
    Auscultation of Heart: No rubs, No gallops, +S1S2
    Extremities for Edema/Varicosities: No edema present
------------------------------------------
RESPIRATORY
  ROS: Denies cough, Denies Dyspnea
  Exam:
    Respiratory Effort: Unlabored breathing, No accessory muscle use
------------------------------------------
GASTROINTESTINAL
  ROS: Denies ABD pain, Denies nausea, Denies vomiting
  Exam:
    Abdomen: No guarding, No rebound tenderness,
    Liver & Spleen: No gross organomegaly
    Last BM: today
------------------------------------------
GENITOURINARY
  ROS: Denies burning
  Exam:
    Bladder: Nondistended
------------------------------------------
MUSCULOSKELETAL
  ROS: Denies fall
  Exam:
    Gait & Posture: unsteady gait
    digits/nails: Cap refill < 2 seconds
    1) Head & Neck: Mobile
    2) Spine, Ribs & Pelvis: Mobile
    3) Right Upper Extremity: Mobile
    4) Left Upper Extremity: Mobile
    5) Right Lower Extremity: Weak
    6) Left Lower Extremity: Weak
------------------------------------------
HEMATOLOGIC/LYMPHATIC
  ROS: Denies chills, Denies fever
  Exam:
    Neck: No lymphadenopathy
    Axillae: No lymphadenopathy
------------------------------------------
INTEGUMENTARY
  ROS: Denies cuts, Denies rash
  Exam:
    Finding: Visible skin warm, dry, intact/ biliary drain
------------------------------------------
------------------------------------------
LABS
  Notes / Findings: Cardiology notes reviewed, Therapy Notes reviewed, Records reviewed for
clinical progress notes, diagnostic tests/results, medications, and treatments.
------------------------------------------
PLANS
  DX: M62.81  Muscle weakness (generalized)
  Problem: weakness
  Plan: ongoing issues per restorative/ pt/ot to evaluaye and treat
```

```
----------------------------------------
DX: R53.83  Other fatigue
Problem: fatigue
Plan: REDACTED                    pt/ ot to evaluate and treat
----------------------------------------
DX: REDACTED
Problem: REDACTED
Plan: REDACTED
----------------------------------------
DX: REDACTED
Problem: REDACTED
Plan:REDACTED
----------------------------------------
NARRATIVE NOTES
  evaluated for resumption of pt/ot per report by restorative with functional decline most strking
that patient was ambulating and has become increasingly more dependnent on wc over last few weeks.
REDACTED                                                                          ok as
of late.  Will carry through all other plans/ meds in good supply/ pt/ot to evaliate and treat.
----------------------------------------
Electronically Signed By: Merchant Adams AGPCNP-BC
```

Q

**Exhibit Q**

Patient II

(See Attached)

EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB: REDACTED
  Date of Service: 12/10/2018
  Visit Type: Non-face-to-face Prolonged Service - Greater than 30 Minutes
  Evaluated by: Merchant Adams AGPCNP-BC
CHRONIC CONDITIONS
  I10          Essential (primary) hypertension
  K56.7        Ileus, unspecified
  S22.32XA     Fracture of one rib, left side, initial encounter for closed fracture
  R26.89       Other abnormalities of gait and mobility
  R27.8        Other lack of coordination
  M62.58       Muscle wasting and atrophy, not elsewhere classified, other site
  R29.3        Abnormal posture
  J44.9        Chronic obstructive pulmonary disease, unspecified
  W19.XXXD     Unspecified fall, subsequent encounter
  I50.22       Chronic systolic (congestive) heart failure
  K21.9        Gastro-esophageal reflux disease without esophagitis
  E03.9        Hypothyroidism, unspecified

# REDACTED

  N18.4        Chronic kidney disease, stage 4 (severe)
  G47.00       Insomnia, unspecified
  K58.9        Irritable bowel syndrome without diarrhea
  D63.8        Anemia in other chronic diseases classified elsewhere
  I25.5        Ischemic cardiomyopathy
  N18.9        Chronic kidney disease, unspecified
  N17.9        Acute kidney failure, unspecified
  M25.512      Pain in left shoulder
  W19.XXXA     Unspecified fall, initial encounter
  N28.9        Disorder of kidney and ureter, unspecified
  N39.0        Urinary tract infection, site not specified
  S42.202A     Unspecified fracture of upper end of left humerus, initial encounter for closed
  fracture
  N28.1        Cyst of kidney, acquired
  R10.9        Unspecified abdominal pain
------------------------------------------
------------------------------------------

PROLONGED NON FACE-TO-FACE SERVICE DESCRIPTION
  Reviewed all records for recent hospitalization including ancillary documentation of services
and exams received in hospital as well as all available specialist/ consults/ and therapy notes.
Current supplemental documentation was reviewed as available as well as current documentation on
resident that is ongoing in this facility.
------------------------------------------

Electronically Signed By: Merchant Adams AGPCNP-BC

R

**Exhibit R**

Patient 12

(See Attached)

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB:
  Date of Service: 12/10/2018
  Visit Type: Non-face-to-face Prolonged Service - Greater than 30 Minutes
  Evaluated by: Merchant Adams AGPCNP-BC
CHRONIC CONDITIONS
  R27.8        Other lack of coordination
  S32.89XA     Fracture of other parts of pelvis, initial encounter for closed fracture
  N18.3        Chronic kidney disease, stage 3 (moderate)
  R29.3        Abnormal posture
  R26.81       Unsteadiness on feet
  R13.12       Dysphagia, oropharyngeal phase
  M62.81       Muscle weakness (generalized)
  I50.9        Heart failure, unspecified
  I10          Essential (primary) hypertension
  E03.9        Hypothyroidism, unspecified
  R60.0        Localized edema
```
## REDACTED
```
  J18.9        Pneumonia, unspecified organism
  S72.001A     Fracture of unspecified part of neck of right femur, initial encounter for closed
fracture
  G89.11       Acute pain due to trauma
-------------------------------------------
-------------------------------------------
PROLONGED NON FACE-TO-FACE SERVICE DESCRIPTION
  Reviewed all records for recent hospitalization including ancillary documentation of services
and exams received in hospital as well as all available specialist/ consults/ and therapy notes.
Current supplemental documentation was reviewed as available as well as current documentation on
resident that is ongoing in this facility.
-------------------------------------------
Electronically Signed By: Merchant Adams AGPCNP-BC
```

S

**Exhibit S**

Patient 13

(See Attached)

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB:
  Date of Service: 12/10/2018
  Visit Type: Non-face-to-face Prolonged Service - Greater than 30 Minutes
  Evaluated by: Merchant Adams AGPCNP-BC
CHRONIC CONDITIONS
  E11.8      Type 2 diabetes mellitus with unspecified complications
  M17.11     Unilateral primary osteoarthritis, right knee
  E66.01     Morbid (severe) obesity due to excess calories
  E03.9      Hypothyroidism, unspecified
  E78.5      Hyperlipidemia, unspecified
  M51.86     Other intervertebral disc disorders, lumbar region
  N64.59     Other signs and symptoms in breast
  G89.11     Acute pain due to trauma
  M84.361A   Stress fracture, right tibia, initial encounter for fracture
  Z79.4      Long term (current) use of insulin
------------------------------------------
------------------------------------------
PROLONGED NON FACE-TO-FACE SERVICE DESCRIPTION
  Reviewed all records for recent hospitalization including ancillary documentation of services
and exams received in hospital as well as all available specialist/ consults/ and therapy notes.
Current supplemental documentation was reviewed as available as well as current documentation on
resident that is ongoing in this facility.
------------------------------------------

Electronically Signed By: Merchant Adams AGPCNP-BC
```

:

T

**Exhibit T**

Patient 14

(See Attached)

```
EVALUATION INFO
  Patient Name: REDACTED
  Patient DOB:
  Date of Service: 12/10/2018
  Visit Type: Non-face-to-face Prolonged Service - Greater than 30 Minutes
  Evaluated by: Merchant Adams AGPCNP-BC
CHRONIC CONDITIONS
  B95.62    Methicillin resistant Staphylococcus aureus infection as the cause of diseases
  classified elsewhere
REDACTED
  J96.21    Acute and chronic respiratory failure with hypoxia
  E11.8     Type 2 diabetes mellitus with unspecified complications
  N39.0     Urinary tract infection, site not specified
  M62.81    Muscle weakness (generalized)
  I50.9     Heart failure, unspecified
REDACTED
  M25.552   Pain in left hip
  Z79.4     Long term (current) use of insulin
  A41.9     Sepsis, unspecified organism
  R13.12    Dysphagia, oropharyngeal phase
-------------------------------------------
-------------------------------------------
PROLONGED NON FACE-TO-FACE SERVICE DESCRIPTION
  Reviewed all records for recent hospitalization including ancillary documentation of services
and exams received in hospital as well as all available specialist/ consults/ and therapy notes.
Current supplemental documentation was reviewed as available as well as current documentation on
resident that is ongoing in this facility.
-------------------------------------------
Electronically Signed By: Merchant Adams AGPCNP-BC
```